Case 8:25-cv-00113-DLB    Document 36    Filed 04/21/25    Page 1 of 29

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MARYLAND BUILDING INDUSTRY ASSOCIATION, INC.<br>11825 West Market Place<br>Fulton, MD 20759<br><br>THE BUILDING OWNERS AND MANAGERS ASSOCIATION OF GREATER BALTIMORE, INC.<br>2331 Rock Spring Road<br>Forest Hill, MD 21050<br><br>NAIOP MARYLAND, INC.<br>6030 Marshalee Drive, Suite 208<br>Elkridge, MD 21075<br><br>NAIOP DC \| MD, INC.<br>P.O. Box 2064<br>Kensington, MD 20891<br><br>MARYLAND MULTI-HOUSING ASSOCIATION, INC.<br>11155 Dolfield Blvd, Suite 200<br>Owings Mills, MD 21117<br><br>WASHINGTON GAS LIGHT COMPANY<br>1000 Maine Ave, SW<br>Washington, DC 20024<br><br>LEISURE WORLD COMMUNITY CORPORATION<br>3701 Rossmoor Boulevard<br>Silver Spring, MD 20906<br><br>THE ELIZABETH CONDOMINIUM ASSOCIATION, INC.<br>4601 N Park Ave<br>Chevy Chase, MD 20815<br><br>PROMENADE TOWERS MUTUAL HOUSING CORPORATION<br>5225 Pooks Hill Rd<br>Bethesda, MD 20814 | CASE NO. 8:25-CV-00113-DLB<br><br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

1

THE WILLOUGHBY OF CHEVY CHASE
CONDOMINIUM COUNCIL OF UNIT
OWNERS, INC.
4515 Willard Ave
Chevy Chase, MD 20815

APARTMENT AND OFFICE BUILDING
ASSOCIATION OF METROPOLITAN
WASHINGTON
1025 Connecticut Ave NW, Ste 1005
Washington, DC 20036

COLUMBIA GAS OF MARYLAND, INC.
P.O. Box 2318
Columbus, OH 43216

*Plaintiffs,*

v.

SERENA COLEMAN McILWAIN, in her
Official Capacity as the Secretary of the
Maryland Department of the Environment
1800 Washington Blvd,
Baltimore, MD 21230

*Defendant.*

## INTRODUCTION[1]

1. Plaintiffs Maryland Building Industry Association, Inc., The Building Owners and Managers Association of Greater Baltimore, Inc., NAIOP Maryland, Inc., NAIOP DC | MD, Inc., Maryland Multi-Housing Association, Inc., Washington Gas Light Company, Leisure World Community Corporation, The Elizabeth Condominium Association, Inc., Promenade Towers Mutual Housing Corporation, The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Apartment and Office Building Association of Metropolitan Washington, and Columbia Gas of Maryland, Inc. seek declaratory and injunctive relief under federal law against

---

[1] Pursuant to Local Rule 103.6(c), attached as Exhibit 1 is a copy of this First Amended Complaint that reflects the changes from the Original Complaint.

enforcement of Code of Maryland Regulations ("COMAR") 26.28 Building Energy Performance Standards ("Maryland BEPS"). The Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201-6422, regulates the energy use and efficiency of many gas appliances and expressly and broadly preempts state and local laws on that subject. The Maryland BEPS fall within the heartland of EPCA's express preemption provision because they regulate and restrict the energy use and efficiency of these covered appliances by restricting and penalizing the carbon dioxide emissions from covered buildings. As such, the Maryland BEPS are preempted by EPCA and unenforceable as a matter of law.

2.    Born out of the oil crisis of the 1970s and the accompanying concerns with energy independence, EPCA implements a national energy policy that, among other things, regulates the energy use and energy efficiency of appliances. *See, e.g.*, 42 U.S.C. § 6297(c). The thrust of EPCA is that nationally uniform energy use and efficiency standards are the best way to promote conservation goals while ensuring energy security and domestic supply and preserving consumer choice. *See, e.g.*, *id.*; S. Rep. No. 100-6, at 4 (1987); H.R. Rep. No. 100-11, at 24 (1987).

3.    To accomplish that needed national uniformity, EPCA expressly preempts state and local regulations concerning the energy use and energy efficiency of products for which EPCA sets energy conservation standards—with only the narrowest of exceptions to that preemption for state and local regulations that meet certain stringent statutory conditions. 42 U.S.C. §§ 6297(c)(3), (f)(3).

4.    The Ninth Circuit's recent invalidation of the City of Berkeley's prohibition on gas piping in new buildings illustrates how EPCA preemption operates to prohibit attempts to regulate the energy use or efficiency of gas appliances. *Cal. Rest. Ass'n v. City of Berkeley*, 65 F.4th 1045 (9th

3

Cir. 2023), *amended and superseded by Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024). Perhaps most notable is that the unanimous Ninth Circuit panel emphasized that "EPCA would no doubt preempt an ordinance that directly prohibits the use of covered natural gas appliances in new buildings." *Cal. Rest. Ass'n*, 89 F.4th at 1107. And "States and localities can't skirt the text of broad preemption provisions by doing *indirectly* what Congress says they can't do *directly.*" *Id.* Because the Maryland BEPS are an attempt to "skirt the text" of EPCA preemption provisions, there is "no doubt" that EPCA preempts it. *See id.* Indeed, some state and local governments have since taken note of EPCA and reconsidered their efforts to enact similar regulations. *See, e.g.,* Kale Williams, *Eugene reverses natural gas ban after ruling by federal appeals court*, KGW8 (July 12, 2023), https://www.kgw.com/article/news/politics/natural-gas-ban-eugene-oregon-repealed/283-5195461a-22cd-4176-9db7-8047fb56d887.       Because       the Maryland Department of the Environment ("Department") did not do so on its own, the Court must order the Defendant to do the same.

5.   The Maryland BEPS inflict serious and irreparable harm on Plaintiffs by restricting and penalizing EPCA-covered gas appliances in new and existing buildings through a series of declining carbon dioxide emissions limits for covered buildings and associated penalties for non-compliance. That policy is at odds with the needs of Maryland residents, workers, and businesses for affordable, resilient, and reliable energy. Restricting and penalizing the use of gas-powered cooking ranges, water heaters, furnaces, and other appliances or equipment is fundamentally inconsistent with the public interest, restricts consumer choice, exacerbates the State's housing crisis, and aims to shift the State's energy demand to an electric system that is facing both historic and increasing electricity demand and dwindling dispatchable electricity supply.

6.  Plaintiffs stand to lose much if Defendant is not enjoined from enforcing the Maryland BEPS. Plaintiffs and their members have interests in a broad range of residential and commercial buildings covered by the Maryland BEPS and in the natural gas and the gas delivery infrastructure that is used to provide gas service to those buildings. The Maryland BEPS will cause Plaintiffs financial harm, diminish their businesses, and substantially increase the cost for homes, lodging, and energy in Maryland—all despite EPCA's express preemption of the regulations.

7.  Even though the Maryland BEPS do not demand net zero carbon dioxide emissions until 2040, their restrictions on gas appliances have a chilling effect now and are already undermining Plaintiffs' livelihoods, harming profits, disrupting long-term business strategy and asset planning, jeopardizing jobs, and hampering the ongoing development of new and desperately needed multifamily homes. Indeed, the Department itself recognizes the immediate impact of the Maryland BEPS: "Between 2025 and 2040, building owners whose buildings do not already meet the BEPS standards will be required to implement energy efficiency measures and/or electrification measures or pay alternative compliance fees in order to comply." Maryland Department of the Environment, Technical Support Document for COMAR 26.28 – Building Energy Performance Standards, Nov. 2023 at 6, https://mde.maryland.gov/programs/regulations/air/Documents/BEPS/BEPS%20TSD%20PACKAGE%20FINAL%20%2812-5-2023%29.pdf. Additionally, starting on June 1, 2025, and annually thereafter, the Maryland BEPS will require building owners to submit certain "benchmarking information," a process that is both time-consuming and costly. COMAR 26.28.02.02. Similarly, the Maryland BEPS also require gas utilities to provide data on building energy consumption to building owners upon request starting on January 1, 2025. COMAR 26.28.02.04.

8. In sum, the Maryland BEPS are plainly preempted by EPCA, are already inflicting harm on Plaintiffs and their members, and will cause even more harm unless enjoined. Plaintiffs accordingly bring this action seeking a declaration that the Maryland BEPS are preempted by EPCA and an injunction against their enforcement.

## JURISDICTION AND VENUE

9. Jurisdiction is proper because, under 42 U.S.C. § 6306(c), federal district courts have jurisdiction over suits brought by any adversely affected person concerning state compliance with EPCA. Additionally, under 28 U.S.C. § 1331, the Court has federal question jurisdiction to determine the claims involving EPCA.

10. This Court has personal jurisdiction over the Defendant, as she is domiciled in Maryland and the claim asserted arises out of her actions in Maryland as the Secretary of the Maryland Department of Environment in Maryland.

11. This Court has authority to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202 and Rules 57 and 65 of the Federal Rules of Civil Procedure.

12. Venue in this Court is proper under 28 U.S.C. § 1391(b) because, among other things, (i) the actions violating federal law stated in this Complaint impose injuries in the state of Maryland, where Plaintiffs or their members reside and/or do business, and (ii) the law at issue will be enforced here.

## PARTIES

13. Plaintiff Maryland Building Industry Association, Inc. ("MBIA") formed in 2014 as the result of a merger between two local associations with over 175 years of combined experience: the Home Builders Association of Maryland that covered the Baltimore area and the Maryland

National-Capital Building Industry Association that covered the District of Columbia and Southern Maryland. MBIA is a local chapter of the National Association of Home Builders of the United States. MBIA is a not-for-profit trade organization representing the interests of over 1,100 member firms and more than 100,000 employees, including home builders, remodelers, developers, and affiliate professional and service providers in the Maryland Counties of Anne Arundel, Baltimore, Calvert, Carroll, Cecil, Charles, Harford, Howard, Montgomery, Prince George's, and St. Mary's, as well as Baltimore City, the Eastern Shore, and the District of Columbia. MBIA has one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. For example, the Maryland BEPS frustrate MBIA's members' ability to meet customer preferences—especially at a price-point that their customers can afford—since many homeowners prefers using natural gas appliances for heating, hot water, and cooking. The increased costs of compliance with the Maryland BEPS likely will also decrease new construction, as customers will be priced out of the market. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like MBIA's members to pay higher rates for gas service than they would otherwise pay.

14. Plaintiff The Building Owners and Managers Association of Greater Baltimore, Inc. ("BOMA Baltimore") represents the owners and managers of all commercial property types, including 143 million square feet of office space that supports over 15,500 jobs, and contributes $2.1 billion to the Maryland economy. A professional trade association with over 300 members, BOMA Baltimore's mission is to actively represent the best interests of the commercial real estate owner, the real estate professional, and its associate members through effective leadership in

7

advocacy, collection, and dissemination of industry information, education, community involvement, membership participation, and professional development. BOMA Baltimore has one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. BOMA Baltimore's members will incur costs in replacing existing gas appliances in order to comply with the Maryland BEPS or will be forced to incur the yearly penalty for noncompliance with the kilogram of carbon dioxide equivalent ("Kg CO2e") per square foot requirement in the Maryland BEPS. Additionally, BOMA Baltimore's members will have to meet time-consuming and expensive reporting and benchmarking requirements beginning this year. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like BOMA Baltimore's members to pay higher rates for gas service than they would otherwise pay.

15. Plaintiff NAIOP MD, Inc. is a commercial real estate association serving as the industry's legislative advocate, providing superior networking, education, and professional opportunities and delivering high-quality services and valuable member benefits. With more than 400 members, NAIOP MD is comprised of companies involved in development, investment, construction, brokerage, asset management, finance, architecture, engineering, and legal services associated with office, industrial, retail, and mixed-use real estate. NAIOP MD members own, operate, and intend to construct new buildings that are subject to the Maryland BEPS.

16. Plaintiff NAIOP DC | MD, Inc. is an organization for those involved in all areas of commercial real estate in Washington, DC, and in Montgomery, Prince George's, and Frederick Counties in Maryland. Founded in 1990, NAIOP DC | MD's membership represents the region's leading firms involved in all aspects of the commercial real estate industry. NAIOP DC | MD offers

educational programming, networking opportunities, and legislative insight and advocacy. NAIOP DC | MD members own, operate, and intend to construct new buildings that are subject to the Maryland BEPS.

17. NAIOP MD and NAIOP DC | MD each have one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. For example, due to the Maryland BEPS, members will face increased capital costs for equipment replacements and for increases in electric service capacity and increased utility costs from higher electricity use and from higher peak demand charges due to an inability to use hybrid heating systems. Members and their tenants that do not qualify for the limited exemption for the use of backup power generators that run on combustible fuels will be faced with increased costs of installing new standby and backup power equipment, as well as risks and costs associated with shorter duration and less reliable backup power systems. Members also will experience loss of income due to vacancy and disruptions to tenant occupancy during construction and renovations made necessary by the Maryland BEPS. The Maryland BEPS will inflict further harm on members in the form of reduced property valuations due to higher operating expenses and lower net operating incomes and reduced marketability to industrial and other tenants that need or prefer gas energy systems. The Maryland BEPS also place members at a competitive disadvantage to similarly situated buildings in neighboring states and Maryland buildings that are smaller than 35,000 square feet and are thus not subject to the Maryland BEPS. With or without making operational and physical changes to covered buildings, failure to meet the applicable Kg $CO_2e$ per square foot requirement will force members to incur the yearly penalty for noncompliance with the Maryland BEPS. Additionally, members will have to meet time-

consuming and expensive reporting and benchmarking requirements beginning this year. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like NAIOP MD's and NAIOP DC | MD's members to pay higher rates for gas service than they would otherwise pay.

18. Plaintiff Maryland Multi-Housing Association, Inc. ("MMHA") was formed in 1996 and serves the multi-housing industry and Maryland communities by providing education, information, and legislative and advocacy services. Among MMHA's membership are one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. MMHA's members will incur costs in replacing existing gas appliances in order to comply with the Maryland BEPS or will be forced to incur the yearly penalty for noncompliance with the Kg CO2e per square foot requirement in the Maryland BEPS. Members also will experience loss of income due to vacancy and disruptions to tenant occupancy during construction and renovations made necessary by the Maryland BEPS. Additionally, MMHA's members will have to meet time-consuming and expensive reporting and benchmarking requirements beginning this year. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like MMHA's members to pay higher rates for gas service than they would otherwise pay.

19. Plaintiff Washington Gas Light Company ("WGL") is a regulated public utility that provides natural gas service to more than 1.2 million customers in Maryland, the District of Columbia, and Virginia. WGL has been providing energy to residential, commercial, and industrial customers for 175 years. The Maryland BEPS will cause the loss of would-be customers and threatens to erode its customer base through the permanent loss of new customers and existing

customers over time. As a result, WGL's customer base will grow less than it otherwise would, resulting in higher rates for WGL's remaining gas customers, who will be left to cover the costs of WGL's new investments in maintaining its gas system. The result will be financial harm to and lower profits for WGL. Additionally, under the Maryland BEPS, WGL will have to meet time-consuming and expensive reporting requirements at the request of covered building owners beginning this year.

20. Plaintiff Leisure World Community Corporation is a not-for-profit, non-stock membership corporation that governs the Leisure World of Maryland trust properties and owns Leisure World of Maryland Corporation, which is the property manager for the Leisure World community, a gated community that is home to more than 8,000 residents aged 55 and older located in Silver Spring, Maryland. The Leisure World Community Corporation is owned by the owners of the 29 Mutuals (27 condominiums, 1 cooperative, and 1 homeowner association). The Leisure World Community Corporation has the authority to represent the overall interest of the 29 Mutuals on government matters. These Mutuals own 18 multifamily buildings that use gas appliances and are subject to the Maryland BEPS. Resident owners of these buildings will have to fund expensive retrofits impacting the energy use of these appliances in order to comply with the Maryland BEPS or will be forced to incur the yearly penalty for noncompliance with the Kg $CO_2e$ per square foot requirement in the Maryland BEPS. These financial harms are compounded because Leisure World is a senior community with many residents on limited or fixed incomes, such that some owners likely will be unable to afford the increased assessments necessary to pay for the compliance work and/or fees for noncompliance. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like Leisure World's residents to pay higher rates

11

for gas service than they would otherwise pay.

21. Plaintiff The Elizabeth Condominium Association, Inc. ("The Elizabeth") manages The Elizabeth, a high-rise condominium located in Chevy Chase, Maryland. This building relies on gas for its boilers, which are very efficient in providing large quantities of hot water for domestic use, and its air handler systems for heat and cooling. The Elizabeth will have to spend millions of dollars to try to bring its building into compliance with the Maryland BEPS. The Elizabeth also will have to meet time-consuming reporting and benchmarking requirements beginning this year. Additionally, the Maryland BEPS will limit the pool of gas customers, forcing existing gas customers like The Elizabeth to pay higher rates for gas service than they would otherwise pay.

22. Plaintiff Promenade Towers Mutual Housing Corporation ("The Promenade"), built in 1973, is a residential cooperative housing corporation formed pursuant to the Maryland Cooperative Housing Corporation Act on March 20, 1980. The Promenade owns and operates (via an independent management company) the real property and improvements thereon located at 5225 Pooks Hill Rd., Bethesda, Maryland, 20814. The improvements contain 1,071 residential apartment units and certain commercial spaces. The Promenade relies upon natural gas for residential and commercial uses to fuel: its boilers for potable hot water, its hot water for heating its apartment units, its stoves, its ovens, and other amenities. In order to attempt compliance with the Maryland BEPS, The Promenade would have to undertake major and costly projects. For example, it would have to replace three gas boilers it uses for heating and hot water, at a cost of millions of dollars. Even if The Promenade implements these upgrades, it still may fail to meet the Maryland BEPS' standards, which could subject The Promenade to significant monetary penalties for noncompliance. Additionally, the units do not have sufficient power capacity to support the

12

installation of electric stoves and other appliances, and increasing the amperage to accommodate such appliances would involve significant costs amounting to millions of dollars. The Promenade's residents—many of whom are of modest means—would have to bear these costs and may be financially unable to do so. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers at the The Promenade to pay higher rates for gas service than they would otherwise pay.

23. Plaintiff The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc. is the Maryland corporation that operates the Willoughby Condominium for the benefit of approximately 700 members who own units and parking spaces in the Willoughby Condominium. The Willoughby Condominium was constructed in the mid-1960s and, as was standard at that time, uses natural gas for heating, domestic hot water, and cooking. The Maryland BEPS will require the Council to spend millions of dollars on electrification measures. Even then, it may not be able achieve compliance. If the Willoughby Condominium does not comply with the Maryland BEPS' requirements, it will have to pay substantial fees for noncompliance. These financial harms likely will compound further because some owners will be unable to afford the increased assessments necessary to pay for the compliance work and/or fees for noncompliance. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like Willoughby Condominium owners to pay higher rates for gas service than they would otherwise pay.

24. Plaintiff Apartment and Office Building Association of Metropolitan Washington ("AOBA") is a membership organization representing commercial office building and multifamily residential real estate in the Washington, D.C. Metropolitan Area, including in parts of Maryland. AOBA has 151 commercial and multifamily members that comprise 19,540,735 square feet of

office buildings and 168,131 multifamily apartment units in the state of Maryland. AOBA serves its members by advocating for the industry, providing information, and fostering professional development. Among AOBA's membership are one or more members that do business in Maryland and are suffering or will imminently suffer harm to their profits and business operations as a result of the Maryland BEPS. AOBA's members will be forced to choose between either incurring substantial costs to replace existing gas appliances (and make the associated necessary electrical upgrades) in order to comply with the Maryland BEPS or incurring the yearly penalty for noncompliance with the Kg $CO_2e$ per square foot requirement in the Maryland BEPS. Members also may experience loss of income due to vacancy and disruptions to tenant occupancy during construction and renovations made necessary by the Maryland BEPS. For those buildings that cannot comply with the Maryland BEPS in an economically viable manner, the best of a bad series of options may be to replace them entirely with new structures, at great cost. Additionally, AOBA's members will have to meet time-consuming and expensive reporting and benchmarking requirements beginning this year. The Maryland BEPS also will limit the pool of gas customers, forcing existing gas customers like AOBA's members to pay higher rates for gas service than they would otherwise pay.

25. Plaintiff Columbia Gas of Maryland, Inc. is a regulated public utility that provides natural gas service to more than 34,000 customers in western Maryland. The Maryland BEPS will cause the permanent loss of current customers and potential new customers and threatens to erode the company's customer base. As a result, Columbia Gas of Maryland, Inc.'s customer base will be smaller than it otherwise would be, but the overall costs of service will largely remain the same, resulting in higher rates for Columbia Gas of Maryland, Inc.'s remaining gas customers, who will

be left to cover the costs of Columbia Gas of Maryland, Inc.'s investments to maintain and operate its gas system. The result will be financial harm to all of Columbia Gas of Maryland's remaining customers and to the company itself. The regulations also impede customers' ability to adopt new, more environmentally-friendly gas technologies which would reduce their costs, improve the reliability of their utility service, and lower emissions at the same time. Additionally, under the Maryland BEPS, Columbia Gas of Maryland, Inc. will have to meet time-consuming and expensive energy use data reporting requirements at the request of covered building owners beginning this year as mandated by the regulations.

26. Defendant Serena Coleman McIlwain is the Secretary of the Maryland Department of the Environment ("Department"). In her capacity as the Secretary of the Maryland Department of the Environment, Defendant promulgated and is charged with enforcing the Maryland BEPS. Md. Code, Env't §§ 1-301(a); 1-404(b)(1); 2-609.

27. An actual and substantial controversy has arisen and now exists between Plaintiffs and Defendant concerning the validity of the Maryland BEPS. Plaintiffs contend that the Maryland BEPS are preempted by EPCA. Plaintiffs believe, and on that basis allege, that Defendant disagrees with Plaintiffs' contentions and will assert that the Maryland BEPS are lawful and enforceable. Enforcement of the Maryland BEPS will injure Plaintiffs and/or their members. Those injuries will be redressed by a favorable ruling from this Court.

28. The claims asserted herein are ripe for review because Plaintiffs are facing imminent and certain injury from the Maryland BEPS. Plaintiffs challenge the facial validity of the Maryland BEPS, thereby raising a legal question. When a question is "predominantly legal," there is generally no need to await further factual development. *Pacific Gas & Elec. Co. v. State Energy*

*Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983). There is no set of circumstances under which the Maryland BEPS would be valid under federal law.

## ALLEGATIONS

**The Maryland BEPS Regulate EPCA-Covered Appliances**

29. The Maryland BEPS regulate the energy use and energy efficiency of EPCA-covered appliances by imposing penalties and restrictions on the emissions from gas appliances.

30. The Maryland BEPS require all "covered building[s]" to achieve certain interim and final "net direct emissions standards" measured on a Kg $CO_2e$ per square foot basis. COMAR 26.28.03.02.

31. "Covered building" is defined as "a building that is a commercial or multifamily residential building in the State of Maryland . . . and has a gross floor area of 35,000 square feet or more, excluding the parking garage area and is (i) a single building; (ii) one or more buildings held in the condominium form of ownership with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, and governed by a single board of managers; or (iii) two or more buildings with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, that are served in whole or in part by the same electric or gas meter or are served by the same heating or cooling system or systems, which is not a district energy system." COMAR 26.28.01.02(15).

32. "Net direct emissions" are "(i) the sum of all direct greenhouse gas emissions from a covered building; or (ii) for a covered building connected to a district energy system, direct greenhouse gas emissions plus the greenhouse gas emissions attributable to thermal energy inputs from the district energy system used by the covered buildings." COMAR 26.28.01.02(31).

33. "Direct greenhouse gas emissions" or "direct emissions" are "greenhouse gas emissions produced on-site by covered buildings, as calculated by the benchmarking tool unless otherwise specified by the Department." COMAR 26.28.01.02(17). The "benchmarking tool" is the U.S. Environmental Protection Agency's ENERGY STAR Portfolio Manager. COMAR 26.28.01.02(10).

34. The ENERGY STAR Portfolio Manager calculates "building's emissions (including carbon dioxide, methane, and nitrous oxide) from on-site fuel combustion and purchased electricity and district heating and cooling. Portfolio Manager also enables tracking of avoided emissions from any green power purchases." U.S. Environmental Protection Agency, *How Portfolio Manager Calculates Emissions*, https://www.energystar.gov/buildings/benchmark/understand-metrics/how.

35. The Maryland BEPS performance standards differ by building type (*e.g.*, multifamily housing, office, strip mall, etc.), and come in three forms: Interim Standard for years 2030-2034, Interim Standard for years 2035-2039, and Final Standard for year 2040 and beyond. COMAR 26.28.03.02. Measured as Kg $CO_2e$/sq. ft., the Interim Standard for years 2030-2034 is the highest, followed by the Interim Standard for years 2035-2039. The Final Standard for all non-exempt building types is 0 Kg $CO_2e$/sq. ft. *Id.*

36. Owners of covered buildings can opt to pay a fee in lieu of meeting the standard, starting at $230 per metric ton of excess $CO_2e$ in 2030, and increasing each year thereafter. COMAR 26.28.04.01.

37. The Maryland BEPS contain certain exemptions, including for some building types and building owners that can demonstrate financial distress. COMAR 26.28.03.02, 26.28.04.02.

38. The Department published the Maryland BEPS in the *Maryland Register* on December 13, 2024. They took effect on December 23, 2024.

**EPCA Establishes National Binding Appliance Energy Regulations**

39. The Maryland BEPS impermissibly regulate the energy use and efficiency of gas appliances, which is an area that Congress directed the U.S. Department of Energy ("DOE") to regulate through the adoption of federal energy efficiency standards under EPCA. 42 U.S.C. §§ 6201-6422.

40. EPCA was first passed in 1975 to create a comprehensive energy policy to address the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources.

41. The original EPCA was designed to "(1) maximize domestic production of energy and provide for strategic storage reserves of crude oil, residual fuel oil and refined petroleum products; (2) . . . minimize the impact of disruptions in energy supplies by providing for emergency standing measures; (3) provide for domestic crude oil prices that will encourage domestic production in a manner consistent with economic recovery; and (4) reduce domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs." S. Rep. No. 94-516, at 116-17 (1975).

42. In its original form in 1975, EPCA's provisions regarding consumer appliances focused on requiring labeling of appliances, reasoning that consumers would choose more efficient appliances if they had access to accurate information about efficiency. Thus, the statute required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should utilize energy efficiency standards if the labeling program proved

ineffective. The legislative history makes clear Congress's intent at the time: "it is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation." H.R. Rep. No. 94-340, at 95 (1975).

43. Originally, EPCA permitted significant state involvement in appliance regulation. It allowed state regulations that differed from the federal regulations if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard.

44. Since 1975, Congress has amended EPCA several times, progressively moving away from a laissez faire approach to appliance efficiency that relied upon consumers to choose more efficient appliances, and towards binding federal energy efficiency standards. Each amendment to EPCA further emphasized the federal government's intent to regulate appliance energy use and efficiency, and further limited states' abilities to set their own standards.

45. In 1978, Congress passed a range of statutes known as the National Energy Act ("NEA"), which gave the federal government broader authority over energy policy to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy for sustained economic growth. *See* Julia Richardson and Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the federal DOE in 1977 to coordinate a federal response to the nation's energy problems.

46. One of these 1978 statutes passed as part of NEA was the National Energy Conservation and Policy Act ("NECPA"). NECPA amended the 1975 EPCA. Rather than relying exclusively on labeling, NECPA required DOE to prescribe minimum energy efficiency standards for certain products. NECPA also strengthened the preemption provisions in EPCA, allowing state regulations that were more stringent than federal regulations, but *only* if the Secretary found there was a significant state or local interest to justify the state's regulation and the regulation would not unduly burden interstate commerce.

47. Despite the NECPA's new requirements, DOE did not initially adopt federal minimum energy standards. Instead, it "initiated a general policy of granting petitions from States requesting waivers from preemption. As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." S. Rep. No. 100-6, at 4 (1987).

48. In 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA"). The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 1 (1987).

49. As the Senate recognized, varying state standards created "the problem of a growing patchwork of differing state regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." S. Rep. No. 100-6, at 4 (1987). Similarly, the reports about NAECA in the House of Representatives make clear that Congress wanted to "end an era of confusion and uncertainty" for the industry and "to protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 24, 30 (1987).

50. Thus, NAECA contained "two basic provisions": "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2 (1987). "In general, these national standards would preempt all State standards." *Id.*

51.  After NAECA, federal law provided two routes for a state or local jurisdiction to qualify for an exception to EPCA preemption. First, as mentioned above, DOE can grant a waiver of preemption; but while states could seek permission to establish their own standards, "achieving the waiver is difficult." S. Rep. No. 100-6, at 2 (1987). It would require showing an unusual and compelling local interest, and the waiver cannot be granted if the "State regulation is likely to result in the unavailability in the State of a product type or of products of a particular performance class, such as frost-free refrigerators." *Id.*

52. The second option to avoid preemption concerns consumer appliances, and it applies only to performance-based building codes for new construction. 42 U.S.C. § 6297(f). To qualify for this exception, the state code must meet a strict seven-part test, enumerated in 42 U.S.C. § 6297(f)(3). The House Report regarding NAECA explains that this exception is intended to "prevent[] state building codes from being used as a means of setting mandatory State appliance standards in excess of Federal Standards." H.R. Rep. 100-11, at 26. In addition, flexibility under this exception was "limited" to "ensure that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard . . . ." *Id.* Congress intended to allow only "performance-based codes" that "authorize builders to adjust or trade off the efficiencies of the various building components so long as an energy objective is met." S. Rep. No. 100-6, at 10–11. To avoid preemption, among other requirements, a state building code provision must "establish 'credits' for various conservation measures, to

provide, to the greatest degree possible, one-for-one equivalency between the energy efficiency of these differing measures and the credits provided for such energy efficiency." *Id.* at 11. The Senate chose this requirement "to assure that the credits for exceeding Federal standards are even-handed and are not unfairly weighted resulting in undue pressure on builders to install covered products exceeding Federal standards." *Id.*

53. In 1992, Congress amended EPCA once more through the Energy Policy Act of 1992. That amendment expanded the federal appliance program to include energy efficiency standards for industrial appliances as well as consumer appliances. Likewise, a pathway was added for a state building code regulation for new construction concerning industrial appliances to be exempt from preemption: the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." 42 U.S.C. § 6316(b)(2)(B)(i).

54. Thus, in its present form, EPCA covers both consumer and industrial appliances, and it sets federal standards for the energy use and efficiency of those products.

**EPCA Expressly Preempts Regulation of Consumer and Industrial Appliances**

55. EPCA expressly preempts state and local regulation of appliance energy use and efficiency, with only narrow exemptions. Congress therefore meant to preempt the entire field of energy use and energy efficiency of covered appliances, leaving DOE to set nationwide standards and establishing detailed conditions that state regulations must meet to avoid preemption.

56. EPCA's energy use and efficiency regulations apply to "covered products." EPCA defines "covered products" for consumers as the types of products listed in Section 6292. 42 U.S.C. § 6291(2). Section 6292 in turn lists 19 types of defined covered products, including "water

22

heaters," "furnaces," and "kitchen ranges and ovens." *Id.* § 6292(a). Section 6295 sets out the energy conservation standards for these covered products.

57. EPCA defines a "consumer product" as one "(A) which in operation consumes, or is designed to consume, energy . . . and (B) which, to any significant extent, is distributed in commerce for personal use or consumption by individuals[.]" *Id.* § 6291(1). The definition of a consumer product is "without regard to whether such article of such type is in fact distributed in commerce for personal use or consumption by an individual . . . ." *Id.* In other words, products which are regularly sold to individuals may be classified as consumer products, regardless of whether a particular *unit* of the product has been purchased by an individual or by a business, and regardless of whether the products are used in a commercial building or a residential building.

58. The express preemption provision in EPCA's consumer product regulations states that as of "the effective date of an energy conservation standard established in or prescribed . . . for any covered product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product unless the regulation" falls within certain enumerated exceptions. *Id.* § 6297(c).

59. "Energy use" is defined as "the quantity of energy directly consumed by a consumer product at point of use . . . ." *Id.* § 6291(4). "Energy efficiency" is defined as "the ratio of the useful output of services from a consumer product to the energy use of such product . . . ." *Id.* §§ 6291(5). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3).

60. Thus, EPCA's consumer standards preempt state regulations concerning the quantity of electricity or fossil fuels consumed by appliances (such as water heaters and furnaces and gas stoves) which are regularly sold to individuals or the efficiency of such appliances.

61. Similarly, EPCA also governs the energy efficiency and energy use of certain industrial appliances. *Id.* § 6311-6317.

62. Like EPCA's consumer standards, the industrial standards explicitly "supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established" in the federal statute. *Id.* § 6316(b)(2)(A).

63. "Energy use," for the purposes of the industrial standards, is defined as "the quantity of energy directly consumed by an article of industrial equipment at the point of use . . . ." *Id.* § 6311(4). "Energy efficiency," for the industrial standards, is defined as "the ratio of the useful output of services from an article of industrial equipment to the energy use by such article . . . ." *Id.* § 6311(3). The definition of "energy" refers back to the definition in the consumer standards in Section 6291: energy is "electricity, or fossil fuels." *Id.* §§ 6311(7), 6291(3).

64. EPCA also prescribes standards for various types of "industrial equipment," including "commercial package air conditioning and heating equipment," "warm air furnaces," and several types of water heaters. *Id.* § 6311(1). Those products are "industrial" rather than "consumer" if they are "distributed in commerce for industrial or commercial use" to "any significant extent." *Id.* § 6311(2)(A).

65. Thus, EPCA's standards for consumer products and industrial equipment preempt state and local regulations concerning energy use or energy efficiency of heating equipment, water heaters, furnaces, gas stoves, and other appliances which are regularly sold for residential, industrial, or commercial use—including those present in the "covered building[s]" under the Maryland BEPS.

**EPCA Preempts the Maryland BEPS**

66. EPCA preempts the Maryland BEPS because they concern the energy use and energy efficiency of EPCA-covered gas appliances.

67. Since all EPCA-covered gas appliances emit some level of carbon dioxide, the Maryland BEPS are regulating their energy use and energy efficiency by imposing declining net Kg CO2e per square foot requirements—which eventually will go all the way down to zero—and associated penalties if those requirements are not met. That regulatory mandate "concern[s] the . . . energy use" and "energy efficiency" of those gas appliances because it imposes restrictions on and penalizes "the quantity of energy directly consumed by a consumer product [or by an article of industrial equipment] at the point of use." 42 U.S.C. §§ 6291(4), 6297(c), 6311(4), 6316(b)(1)(2)(A). Specifically, the Maryland BEPS are restricting and penalizing the consumption of certain quantities—and eventually any quantity—of gas energy by covered gas appliances. The Maryland BEPS concern the "energy efficiency" of those appliances as well since the declining Kg CO2e requirements penalize less efficient gas appliances and effectively require more efficient appliances.

68. The Maryland BEPS do not qualify for an exception from EPCA's preemption provision. For consumer appliances, a state or local regulation is exempted from preemption if it "is in a building code for new construction" and meets seven specific requirements. 42 U.S.C. §§ 6297(c)(3), (f)(3). The regulation is preempted unless it meets *all seven* of these requirements.

69. The seven requirements, taken together, are intended to allow only performance-based codes that give builders a choice about how to meet overall efficiency or conservation objectives, ensuring an even-handed policy that does not pressure builders to choose one type of appliance over another. *See* S. Rep. 100-6, at 10–11 (1987).

25

70. For new construction, the requirements are based on the typical structure of performance-based energy efficiency provisions in building codes, which establish overall energy efficiency or conservation measures for a building and specify different ways in which a builder or building owner can meet the required objectives.

71. The Maryland BEPS do not meet all seven requirements listed in Section 6297(f)(3) and are therefore preempted. For one, the Maryland BEPS are not "a building code for new construction." Indeed, the Maryland BEPS even apply to existing buildings.

72. Additionally, the second requirement, for example, is that "[t]he code does not require that the covered product have an energy efficiency exceeding the" federal EPCA standards in section 6295, absent a state waiver (which does not apply in this case). *Id.* § 6297(f)(3)(B). The Maryland BEPS do not meet this requirement because they prohibit (or effectively prohibit via costly penalties and/or compliance costs) in many instances the use of EPCA-covered gas appliances that meet federal energy efficiency standards.

73. As another example, the third requirement is that "[t]he credit to the energy consumption or conservation objective allowed by the code for installing covered products having energy efficiencies exceeding [the federal EPCA standards in section 6295] is on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C). But the Maryland BEPS do not give credit "on a one-for-one equivalent energy use . . . basis" for products that are more efficient than what the federal standards require.

74. The Maryland BEPS fail the sixth requirement, too—that "[t]he energy consumption or conservation objective is specified in terms of an estimated total consumption of energy . . .

utilizing an equivalent amount of energy," *id.*§ 6297(f)(3)(F)—because they specify their objective in terms of emissions rather than energy consumption.

75. Similar to the consumer product standards, EPCA contains only limited exemptions to the default rule of preemption of state regulations concerning the energy use or efficiency of industrial appliances. 42 U.S.C. § 6316(b)(2)(B). To avoid preemption, a regulation in a "State or local building code for new construction" must not "require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1" *Id.* § 6316(b)(2)(B)(i).

76. The Maryland BEPS do not meet this requirement because they are not a "building code for new construction." Indeed, the Maryland BEPS even apply to existing buildings and require (or at least effectively require) that EPCA-covered industrial appliances exceed the efficiency standards in ASHRAE/IES Standard 90.1.

77. On information and belief, Maryland has not applied for a waiver from EPCA preemption from the U.S. Secretary of Energy, as would be required under 42 U.S.C. § 6297(d). Further, even if it applied, Maryland could not lawfully obtain such a waiver. EPCA prohibits the Secretary from granting a waiver where, as is the case here, "the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics (including reliability), features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the" waiver. *Id.* § 6297(d)(4).

**CAUSES OF ACTION**

**<u>COUNT ONE</u>: FEDERAL PREEMPTION BY
THE ENERGY POLICY AND CONSERVATION ACT**

78. Plaintiffs re-allege the preceding paragraphs as though set forth fully herein.

27

79. The Maryland BEPS concern the energy efficiency and energy use of EPCA-covered consumer and industrial appliances.

80. The Maryland BEPS do not fall within any exception from EPCA preemption.

81. The Maryland BEPS are therefore preempted by the federal EPCA.

82. There is no set of circumstances under which the Maryland BEPS would be valid.

83. Plaintiffs accordingly request that the Court declare that the Maryland BEPS are preempted by EPCA and enjoin Defendant from enforcing the preempted Maryland BEPS.

## PRAYER FOR RELIEF

84. WHEREFORE, Plaintiffs pray for relief as follows:

85.  For a permanent injunction enjoining Defendant from enforcing or attempting to enforce the Maryland BEPS;

86.  For a declaratory judgment, pursuant to 28 U.S.C. § 2201(a) and § 1331, that the Maryland BEPS are preempted by federal law because they concern the energy use of appliances covered by the federal Energy Policy and Conservation Act and are therefore void and unenforceable.

87. For costs of this suit, including reasonable attorney's fees; and

88. For such other and further relief as the Court may deem just and proper.

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ *Scott Novak*
Scott Novak (Bar Number: 31357)
700 K St NW
Washington, DC
(P) 202-639-1316
(F) 202-585-1000
scott.novak@bakerbotts.com

J. Mark Little (*admitted pro hac vice*)
910 Louisiana St
Houston, TX
(P) 713-229-1234
(F) 713-229-1522
mark.little@bakerbotts.com

*Counsel for Maryland Building Industry Association, Inc., The Building Owners and Managers Association of Greater Baltimore, Inc., NAIOP Maryland, Inc., NAIOP DC | MD, Inc., Maryland Multi-Housing Association, Inc., Washington Gas Light Company, Leisure World Community Corporation, The Elizabeth Condominium Association, Inc., Promenade Towers Mutual Housing Corporation, The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Apartment and Office Building Association of Metropolitan Washington, and Columbia Gas of Maryland, Inc.*