IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Northern Division)

| | | |
|---|---|---|
| **MARYLAND BUILDING INDUSTRY** | * | |
| **ASSOCIATION, INC., ET AL.** | * | |
| | * | |
| **Plaintiffs,** | * | |
| | * | |
| **V.** | * | |
| | * | **CIVIL NO. 8:25-cv-00113-DLB** |
| **SERENA COLEMAN McILWAIN,** | * | |
| **IN HER OFFICIAL CAPACITY** | * | |
| **AS SECRETARY OF THE** | * | |
| **MARYLAND DEPARTMENT OF** | * | |
| **THE ENVIRONMENT,** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED**
**COMPLAINT**

Defendant Serena Coleman McIlwain in her Official Capacity as Secretary of the Maryland Department of the Environment ("Department"), by its undersigned counsel, pursuant to Federal Rule of Civil Procedure 12(b)(6), respectfully submits this memorandum of law in support of its Motion to Dismiss Plaintiffs' First Amended Complaint.

Respectfully submitted:

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Doris N. Lange*

Doris N. Lange
Assistant Attorney General
Federal Bar No.: 19679
Maryland Department of the
Environment
1800 Washington Boulevard, Suite 6048
Baltimore, MD 21230
Phone: 410-537-3038
Fax: 410-538-3943
doris.lange@maryland.gov

Michael F. Strande
Assistant Attorney General
Federal Bar No.: 30039
Maryland Department of the
Environment
1800 Washington Boulevard, Suite 6048
Baltimore, MD 21230
Phone: 410-537-3421
Fax: 410-538-3943
michael.strande@maryland.gov

*Attorneys for Defendant*

**TABLE OF CONTENTS**

I.  INTRODUCTION ...................................................................................................... 1

II.  STANDARD OF REVIEW ......................................................................................... 6

III.  ARGUMENT .......................................................................................................... 7

    A.  Textual Analysis of EPCA's Language Does Not Support Preemption ................. 7

      i.  "Energy use" and "energy efficiency" are technical terms of limited scope ........ 9

      ii.  "Concerning" should not be extended to unreasonable result ........................... 13

    B.  History and Legislative Intent Support Preemptive Effect Limited to   Energy
       Conservation Standards ..................................................................................... 17

    C.  Plaintiff's Reliance on *Berkeley* is Misplaced ...................................................... 21

      i.  *Berkeley* was Decided in Error ......................................................................... 22

      ii.  *Berkeley* does not apply to the Regulation ....................................................... 25

        a.  The Regulation is not a building code for new construction ......................... 26

        b.  The Regulation is not a prohibition on the use of gas-powered appliances ... 27

IV.  CONCLUSION ....................................................................................................... 29

**TABLE OF AUTHORITIES**

<u>CASES</u>

*Air Conditioning and Refrigeration Institute v. Energy Resource Conservation and Development Commission*, 410 F.3d 492 (2005) .............................................16-17

*Am. Bankers Ass'n. v. Gould*, 412 F.3d 1081 (9th Cir. 2005) ........................................... 14

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)................................................................................ 6

*Ass'n of Contracting Plumbers of the City of New York, Inc., et al., v. City of New York*, No. 23-cv-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025)..................................................................10, 16, 19, 22-25

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2013) ............................................................. 6

*California Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316 (1997) ............................................................................................................... 14

*California Rest. Ass'n v. City of Berkeley,* 89 F.4th 1094 (9th Cir. 2024) ...................................................................................21-26, 27, 29

*CMDS Residential, LLC v. Mayor and City of Baltimore*, 714 F.Supp.3d 583 (D. Md. 2024) ...................................................................................................... 7

*Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504 (1992)......................................................... 7

*Commonwealth Of Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115 (2016) ........................................................................................................ 8, 14, 21

*Corning Glass Works v. Brennan,* 417 U.S. 188 (1974) .................................................... 23

*Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251 (2013) ............................................ 14

*Dubin v. United States*, 599 U.S. 110 (2023) ................................................................... 13

*Gundy v. United States*, 588 U.S. 128 (2019) ..................................................... 9, 10, 15, 17

*Lara-Aguilar v. Sessions*, 889 F.3d 134 (4th Cir. 2018) ............................................ 20, 25

*Lamar, Archer, & Confrin, LLP v. Appling*, 584 U.S. 709 (2018).................................... 13

*Massachusetts v. EPA*, 549 U.S. 497 (2007).................................................................19-20

*Medtronic, Inc. v. Lohr*, 518 U.S. 470 (1996) ................................................................... 20

*Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724 (1985)............................................ 20

*Murphy v. Smith*, 583 U.S. 220 (2018)..................................................................... 7

*Nat. Res. Def. Council, Inc. v. Herrington* 768 F.2d 1355 (D.C. Cir. 2014) .................... 18

*Papasan v. Allain*, 478 U.S. 265 (1986)................................................................... 7

*Penn. Dep't of Corrections v. Yeskey*, 524 U.S. 206 (1998) ............................................ 11

*Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176 (4th Cir. 2009) ........................................ 3

*United States, ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419
      (2023) ............................................................................................................ 22

*United States v. George*, 946 F.3d 643 (4th Cir. 2020)...................................................... 14

*United States v. Perkins*, 67 F.4th 583 (4th Cir. 2023) ...................................................... 20

*Van Buren v. United States*, 593 U.S. 374 (2021) .......................................................... 9

*Wyeth v. Levine*, 555 U.S. 555 (2009) ........................................................................ 21

*Yates v. United States*, 574 U.S. 528 (2015) ........................................................... 12

### STATUTES

#### UNITED STATES CODE

42 U.S.C. §§6201 through 6422................................................................ 5

42 U.S.C. §6201 ................................................................................ 15

42 U.S.C. §6201(4).............................................................................. 15

42 U.S.C. §6201(5).............................................................................. 15

42 U.S.C. §§6291 through 6309................................................................ 15

42 U.S.C. §6291 (3).............................................................................. 9

42 U.S.C. §6291 (3)-(4).......................................................................... 9

42 U.S.C. §6291 (5).............................................................................. 11

42 U.S.C. §6291 (6).............................................................................. 11

42 U.S.C. §6292 .................................................................................. 8

42 U.S.C. §6293 ................................................................ 9-11, 16, 23-24

42 U.S.C. §6294 ................................................................................ 10, 24

42 U.S.C. §6297(c)............................................................................ 8, 11, 14

iv

42 U.S.C. §6311(1)-(2)........................................................................... 8

42 U.S.C §6313 ..................................................................................... 9

42 U.S.C. §6316(b)(2)(A) ..................................................................... 8

42 U.S.C. §7401 .................................................................................. 20

42 U.S.C. §7416 .................................................................................. 20

FEDERAL RULE OF CIVIL PROCEDURE

12(b)(6)........................................................................................... 3, 6

MD. CODE ANN., ENVIR. (2024 SUPP.)

§2-301 through §2-304 ...................................................................... 3

§2-1201(3) .......................................................................................... 2

§2-1201(6) ........................................................................................ 16

§2-1204.2............................................................................................ 2

§2-1601(e)(1)...................................................................................... 2

§2-1602(a) .......................................................................................... 2

MD. CODE ANN., PUBLIC SAFETY

§§12-501 through 12-510.................................................................. 26

§ 12-503(d) ....................................................................................... 27

MD. CODE ANN., STATE GOVERNMENT

§10-101 through §10-139 .................................................................. 3

FEDERAL REGISTER

47 Fed. Reg. 14,424 (April 2, 1982) ............................................. 17, 23

74 Fed. Reg. 66,496 (Dec. 15, 2009) ................................................. 1

75 Fed. Reg. 59,470 (Sept. 27, 2010)............................................... 12

REGULATIONS

CODE OF FEDERAL REGULATIONS

10 C.F.R. § 429.13 ............................................................................ 10

10 C.F.R. § 431.64 ............................................................................ 10

16 C.F.R. §§ 305.1 through 305.31 ............................................................. 24

16 C.F.R. § 305.2(p) and (q) ..................................................................... 24

CODE OF MARYLAND REGULATIONS ("COMAR")

09.12.51 ..................................................................................................... 26

26.28 ............................................................................................................. 3

26.28.01.02(B)(15) ....................................................................................... 4

26.28.01.02(B)(21) ..................................................................................... 12

26.28.01.02.(B)(31) ................................................................................... 27

26.28.02.02(B)(5) ......................................................................................... 4

26.28.03.02 ................................................................................................... 4

26.28.04.01 ............................................................................................. 5, 28

26.28.04.02 ................................................................................................... 5

MISCELLANEOUS

Berkeley Mun. Code § 12.80.040(A) ....................................................... 21

Climate Solutions Now Act of 2022 .................................................... 2, 26

U.S. Code Cong. & Admin. News 1975 ................................................... 18

## I.    INTRODUCTION

Plaintiffs challenge the Maryland Building Energy Performance Standards, adopted by the Maryland Department of the Environment ("Department") pursuant to legislative mandate to reduce greenhouse gas emissions from certain large commercial and multi-family residential buildings in support of the State's climate pollution reduction goals. Plaintiffs contend those regulations are preempted by a federal law designed to address energy conservation standards in the design, marketing, and manufacture of certain consumer products and industrial equipment.  Because the State's regulations fall outside the scope of that federal law, the First Amended Complaint[1] ("Amended Complaint") should be dismissed for failure to state a claim.

Greenhouse gases, both naturally present and created from human activity, trap the earth's heat that would otherwise escape the atmosphere, thus contributing to climate change. *See Endangerment and Cause or Contribute Findings for Greenhouse Gases Under Section 202(a) of the Clean Air Act*, 74 Fed. Reg. 66,496, 66,499 (Dec. 15, 2009). The primary greenhouse gases of concern that are emitted from human activities are carbon dioxide, methane, nitrous oxide, hydrofluorocarbons, perfluorocarbons, and sulfur hexafluoride. *Id*. at 66,499.  The acceleration of climate change due to the warming caused by these gases is an existential problem, causing heat waves and extreme weather events

---

[1] Plaintiffs' filed their initial Complaint (ECF No. 1) on January 13, 2025 and then filed a First Amended Complaint (ECF No. 36) on April 21, 2025.  As the Plaintiffs' legal claims have not been materially altered, the arguments set forth in this Memorandum of Law are substantially similar to those set forth in the Department's initial Memorandum in Support of Motion to Dismiss (ECF No. 23-1).

that increase rates of heat-related mortality and morbidity; worsening air quality that increases respiratory illness and premature death; increasing the spread of vector-borne diseases; and increasing the production and distribution of aeroallergens that worsen allergy symptoms and related illnesses. *Id.* at 66,299, 66,525, and 66,527. Children, the elderly, and those of low income are most vulnerable to suffering these physical and life-threatening impacts. *Id.* at 66,298. With over 3,100 miles of tidally influenced shoreline, Maryland is especially vulnerable to the sea level rise and flooding caused by climate change. Md. Code Ann. Envir. § 2-1201(3) (Lexis Nexis Supp. 2024).

Recognizing the direct impact that climate change will have on Maryland's citizens, infrastructure, and economy, the Maryland General Assembly passed the Climate Solutions Now Act of 2022 ("Act"), a comprehensive plan to address climate change and reduce the environmental and public health threat of global warming to the State. S. 528, 2022 Leg., 444th Sess. (Md. 2022). The Act requires that Maryland achieve net-zero statewide greenhouse gas emissions by 2045, Envir. § 2-1204.2, by establishing various requirements across different sectors of the State.

One piece of the Act focuses on commercial and multi-family buildings that are 35,000 square feet or larger ("covered buildings"). Envir. § 2-1601(e)(1). The Act mandates the Department to develop and adopt building energy performance standards for covered buildings to achieve a 20% reduction in net direct greenhouse gas emissions from covered buildings on or before January 1, 2030, and net-zero direct greenhouse gas emissions on or before January 1, 2040. Envir. § 2-1602(a).

In response to this legislative mandate, the Department initiated its rulemaking process by publishing its proposed regulation to implement the building energy performance standards. The Department completed the public comment and participation process required by Subtitle I of the Maryland Administrative Procedures Act, State Government Article § 10-101 through § 10-139, and Title 2, Subtitle 3 of the Environment Article, § 2-301 through § 2-304. During the public comment period for its initial proposal, Plaintiff Washington Gas Light Company commented that the proposed regulations should allow for greenhouse gas emissions reductions to be achieved using advanced solutions including carbon capture technology and use of alternative fuels like renewable natural gas or hydrogen. Maryland Department of the Environment, Technical Support Document for COMAR 26.28—Building Energy Performance Standards, Nov. 2023 at 414, 415, and 417, *available at* https://mde.maryland.gov/programs/regulations/air/Documents/BEPS/BEPS%20TSD%20PACKAGE%20FINAL%20%2812-5-2023%29.pdf. In its response to comments, the Department acknowledged that carbon capture and alternative fuels can be used to meet the requirement.[2] Maryland Department of the Environment, Response to Comments On the Proposed Regulations Under COMAR 26.28, pertaining to Building Energy Performance Standards (BEPS), at 41-42, *available*

---

[2] Though not appended to Plaintiffs' Amended Complaint, this Court may take judicial notice of the Department's Response to Comments document without converting this motion to a motion for summary judgment because that document is a public record, published in accordance with the Department's rulemaking process. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (observing that a court may properly take judicial notice of matters of public record when considering a motion to dismiss under Rule 12(b)(6)).

*at* https://mde.maryland.gov/programs/regulations/air/Documents/Hearings/BEPS%20RT C%20December%202024%20Final%20Draft.pdf. Because those options are not adequately accounted for in the U.S. Environmental Protection Agency's ENERGY STAR Portfolio Manager, used for regulatory reporting, the Department explained that it would convene a working group to identify how to account for differing sources and sinks of onsite emissions like carbon capture in the performance standards before they go into effect in 2030. *Id.*

On December 13, 2024, the Department adopted the Maryland Building Energy Performance Standards, Code of Maryland Regulations ("COMAR") 26.28 ("the Regulation") implementing its statutory directive. The Regulation sets forth the requirement that covered buildings reduce net direct greenhouse gas emissions (or net direct emissions) from covered buildings to net-zero by 2040. Md. Code Regs. 26.28.03.02 (2024). The Regulation also sets interim net direct emissions standards in 2030 and 2035 to provide incremental environmental benefits and ensure the authorizing statute's 2030 and 2040 requirements are timely met. *Id.* Buildings designated as historic properties, elementary and secondary school buildings, manufacturing buildings, agricultural buildings, and buildings owned by the federal government are excluded from coverage under the Regulation, and greenhouse gas emissions and energy use attributable to fuel combustion for food service facilities that engage in commercial cooking and water heating, electric vehicle charging, and some generators are not included when calculating a covered building's net direct emissions. *See* Md. Code Regs. 26.28.01.02(B)(15); Md. Code Regs. 26.28.02.02(B)(5). Covered buildings may also receive exemptions from the

4

Regulation's requirements in certain situations such as financial distress or low occupancy. Md. Code Regs. 26.28.04.02.

For covered buildings which must achieve the net direct emissions standards, owners can take various actions, implementing any suite of individualized options that suit a particular building's needs.  For example, an owner could implement energy efficiency measures and retrofit windows, doors, walls, and/or roofs to better insulate the building. This can reduce the heating needs and thereby either reduce the greenhouse gases that are produced or prevent the emission of greenhouse gases into the atmosphere.  Additionally, covered buildings could replace greenhouse gas-producing equipment with all-electric, geothermal, solar, or wood-heated equipment, or retrofit equipment to utilize renewable natural gas or other biofuels.  An owner could also install carbon capture technologies to reduce or prevent greenhouse gases from being emitted into the atmosphere.  In lieu of meeting the net direct emission standards, owners can also pay an alternative compliance fee for emissions exceeding the emissions standards set in the Regulation.  Md. Code Regs. 26.28.04.01.    Notwithstanding the various flexibilities afforded therein, Plaintiffs mischaracterize the Regulation as an effective prohibition on the use of gas-powered appliances.  ECF No. 36, ¶ 72.

Plaintiffs have filed their Amended Complaint asking this Court to enjoin the Department from enforcing the Regulation and declare it void and unenforceable based on one claim: federal preemption by the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201 through 6422.  ECF No. 36, ¶ 81.  Because the Regulation falls outside the

5

scope of EPCA's express preemption clause, the Amended Complaint should be dismissed for failure to state a claim.

## II.    STANDARD OF REVIEW

A complaint must be dismissed if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2013). Under the plausibility standard, a complaint must contain "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* at 555. Thus, in considering the Motion to Dismiss, this Court can "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Well-plead factual allegations contained in a complaint are assumed to be true "even if [they are] doubtful in fact," but legal conclusions are not entitled to judicial deference. *Twombly*, 550 U.S. at 555-56 (citation omitted).

To survive a Rule 12(b)(6) motion, the legal framework of a complaint must be supported by factual allegations that "raise a right to relief above the speculative level." *Id.* at 555. The Supreme Court has explained that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly* at 555). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly* at 556). Thus, this Court must "draw on its judicial experience and common sense" to determine whether the pleader has stated a plausible claim for relief. *Id.* at 679.

**III.    ARGUMENT**

Plaintiffs request that this Court enjoin the Department from enforcing or attempting to enforce the Regulation based on the sole theory that the Regulation is preempted by EPCA, a federal law setting energy conservation standards for consumer products and industrial equipment.  This Court need not accept that legal conclusion or the leap of logic it is based on.  *See Papasan v. Allain*, 478 U.S. 265, 286 (1986) (stating that courts "are not bound to accept as true a legal conclusion couched as a factual allegation").  Plaintiffs fail to state a plausible claim for relief because the Regulation is not preempted by EPCA. Plaintiffs' legal conclusion is not supported by the text, structure, or context of EPCA, nor by the non-binding Ninth Circuit opinion the Amended Complaint is premised on.  For the following reasons, the Court should dismiss the Amended Complaint.

**A.    Textual Analysis of EPCA's Language Does Not Support Preemption**

When interpreting an express preemption clause, "the Court's task is one of statutory interpretation—only to 'identify the domain expressly pre-empted' by the provision, beginning 'with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose.'" *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 532 (1992) (quoting *FMC Corp. v. Holliday*, 498 U.S. 52, 57 (1990)).  The first step of statutory interpretation is to begin with the specific text in dispute.  *Murphy v. Smith*, 583 U.S. 220, 223 (2018).  The Court must start with the normal, plain meaning of the language of the statute as a whole, giving effect to every "word, clause, sentence [and] phrase."  *CMDS Residential, LLC v. Mayor and City of Baltimore*, 714 F.Supp.3d 583, 624 (D. Md. 2024) (*reconsideration denied*, No. CV

7

CCB-21-1774, 2024 WL 1156309 (D. Md. Mar. 18, 2024)).  Moreso, the Supreme Court has held that assessing the text of an express preemption provision should be the first and last step to interpreting its meaning because the plain wording of the clause necessarily contains the best evidence of Congress' preemptive intent.  *Commonwealth Of Puerto Rico v. Franklin California Tax-free Tr.*, 579 U.S. 115, 116 (2016) (citing *Chamber of Commerce of United States of America v. Whiting,* 563 U.S. 582, 594, (2011)).

EPCA's express preemption provision for consumer products provides in pertinent part, that "…no State regulation concerning the energy efficiency [or] energy use…, of such covered product shall be effective with respect to such product."  42 U.S.C. § 6297(c). The preemption clause applicable to consumer products is nearly identical to that for industrial equipment, and as such, the ensuing analysis applies equally to each product category.[3]  Covered products and industrial equipment are articles that are designed to consume energy and water and are enumerated in United States Code, Title 42, §§ 6292

---

[3] There is no meaningful distinction between EPCA's preemption clauses for energy conservation standards of consumer and industrial appliances.  EPCA's consumer product section defines "covered product" as "a consumer product of a type specified in section 6292 of this title," which includes products such as refrigerators, room air conditioners, and water heaters.  "Covered equipment" under EPCA's industrial equipment standard is equipment that is not designated as a covered product under section 6292, including electric motors and pumps, commercial package air conditioning and heating equipment, and other equipment "which in operation consumes, or is designed to consume, energy." 42 U.S.C. § 6311(1)-(2).  Each section has its own preemption clause: 1) 42 U.S.C. § 6297(c), preempting State or local energy conservation standards "concerning the energy efficiency, energy use, or water use" of consumer products; and 2) 42 U.S.C. § 6316(b)(2)(A), preempting State or local regulation "concerning the energy efficiency or energy use of a product for which a standard is prescribed or established pursuant to such section." Given their similarities, the same preemption analysis applies, regardless of whether the standards at issue concern consumer or industrial covered products.

8

and 6313, respectively.  To determine whether the Regulation is preempted by EPCA, the Court must decide whether regulations limiting greenhouse gas emissions from buildings concern the energy efficiency or energy use of those products.

### i. "Energy use" and "energy efficiency" are technical terms of limited scope

The first step to interpreting the statute is to understand what "energy efficiency" and "energy use" mean in the context of EPCA.  Each term "should be read in their context and with a view to their place in the overall statutory scheme."  *Gundy v. United States*, 588 U.S. 128, 141 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)).  Additionally, when putting technical statutory terms into context, their technical meaning must be employed.  *See Van Buren v. United States*, 593 U.S. 374, 389, n.7 (2021) (citing Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 232 (2012), at 73)) (explaining that the Court's narrow interpretation of the term "access" in the Computer Fraud and Abuse Act of 1986 "tracks the specialized meaning of 'access' in the computer context").

"Energy" is key to understanding the technical terms, whether defined or not, in EPCA's preemption provision.  Energy is defined as "electricity or fossil fuels."  42 U.S.C. § 6291(3).  "Energy use" is then defined as "the quantity of [electricity or fossil fuels] directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title."  42 U.S.C. § 6291(3)-(4).  Two terms from the definition of "energy use" also need to be defined for a full understanding of its meaning: "point of use" and "test procedures."  By the text of these definitions, the quantity

9

of energy consumed by a consumer product is constrained by its "point of use" as determined by certain "test procedures."  Therefore, "point of use" cannot be read in a vacuum—it is essential to read "point of use" only in the context of the test procedures. *Gundy,* 588 U.S. at 141.

Pursuant to § 6293, test procedures are designed to measure energy efficiency and energy use, or the estimated annual operating cost of appliances during a "representative average use cycle or period of use."  The U.S. Department of Energy ("DOE") is tasked with creating test procedures that detail how manufacturers must test their products and equipment to measure whether they meet energy use or energy efficiency standards.  *See, e.g.* 10 C.F.R. § 429.13; 10 C.F.R. § 431.64.  Then, based on the appliance's energy use and energy efficiency performance during the test procedure, the manufacturer must calculate an estimated annual operating cost and affix a sticker to the appliance indicating those costs to assist consumers in making purchasing decisions.  42 U.S.C. § 6294.

Because "energy use" is the quantity of energy at the point of use *determined* by the test procedures, it is clear that "energy use" is a predetermined standard of how much energy is used by the product as developed, designed, and manufactured, regardless of how often or in what manner an end user might employ that product.  *See Ass'n of Contracting Plumbers of the City of New York, Inc., et al., v. City of New York*, No. 23-cv-11292, 2025 WL 843619, at *5 (S.D.N.Y. Mar. 18, 2025) (concluding that "'energy use' refers to a predetermined fixed value that measures the characteristics of a covered product as manufactured.").  Under § 6293, a covered product would have the same "energy use" whether it was sitting unplugged in a garage or used in a kitchen every day.  Similarly,

10

EPCA defines "energy efficiency" as the "ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under § 6293 of this title."  42 U.S.C. § 6291(5).  Again, "energy efficiency" is constrained by the test procedures found in § 6293.

As such, the terms "energy efficiency" and "energy use" are both technical terms that set manufacturing standards related to different aspects of an appliance's consumption of energy: "energy use" standards regulate the total amount of electricity or fossil fuels an appliance uses during the test procedures; and "energy efficiency" standards regulate the ratio of energy use compared to its function during the test procedures.  Importantly, both standards are set through the test procedures and are used to describe the capabilities of the design and function of the appliances.  Together, energy use and energy efficiency can be used to calculate the total estimated energy consumption of an appliance.

As the title of the preemption provision signals, EPCA only preempts energy conservation standards.  42 U.S.C. § 6297(c) (Titled "General rule of preemption *for energy conservation standards* when Federal standard becomes effective for product." (emphasis added)).  EPCA defines "energy conservation standard" as a "performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy use … for a covered product, determined in accordance with test procedures …" or "a design requirement for products…" 42 U.S.C. § 6291(6).  In other words, an "energy conservation standard" promotes the reduction of energy consumption by setting a minimum efficiency level or a maximum quantity of energy use for a covered product during the test procedures.  Therefore, the best reading of the preemption provision is that

11

EPCA is the exclusive authority for setting energy conservation standards for covered products and preempts states from enacting regulations concerning energy conservation standards for those same products. *Penn. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) (noting the title of a statutory section may be used for interpretive purposes where it sheds light on an ambiguous word or phrase (internal quotations omitted)); *Yates v. United States*, 574 U.S. 528, 552 (2015) (Alito, J., concurring) ("Titles can be useful devices to resolve doubt about the meaning of a statute[,] . . . especially [where they] reinforce[ ] what the text's nouns and verbs independently suggest."). This reading is consistent with the view of DOE, the agency implementing the statute. *See Energy Conservation Program: Energy Conservation Standards for Residential Refrigerators, Refrigerator-Freezers, and Freezers,* 75 Fed. Reg. 59,470, 59,530 (Sept. 27, 2010) (explaining "DOE interprets 'regulation concerning energy use' [in EPCA's preemption provision] to be equivalent to 'energy conservation standard'").

The Regulation does something very different from regulating the "energy use" or "energy efficiency" of a covered product, as those terms are defined. It sets performance standards for large buildings based on the total amount of greenhouse gases a building emits, separate and distinct from energy conservation standards for consumer products. The building performance standards in the Regulation are pollutant emissions limits based on the "numeric values of net direct greenhouse gas emissions that each covered building shall ultimately achieve on an annual basis." Md. Code Regs. 26.28.01.02(B)(21). These are objective standards, with compliance determined by each building's annual greenhouse gas emissions.

Plaintiffs claim that "[t]he [Regulation] regulate[s] the energy use and energy efficiency of EPCA-covered appliances by imposing penalties and restrictions on the emissions from gas appliances." ECF No. 36, ¶ 29. This claim is nothing more than a formulaic recitation of the elements of the cause of action. Plaintiffs fail to allege any specific facts demonstrating that the Regulation regulates "energy use" or "energy efficiency" of covered products as those terms are specifically employed in EPCA. The only facts alleged in the Amended Complaint indicate that the Regulation requires *buildings* to achieve "net direct emissions standards" measured on a kilogram of carbon dioxide equivalent per square foot, which is *per se*, not a regulation establishing energy conservation standards for a covered product and contrary to Plaintiff's conclusory allegations. ECF No. 36, ¶ 30.

### ii.    "Concerning" should not be extended to unreasonable result

Since the Regulation does not set energy conservation standards for covered products, the Court must then consider whether the Regulation *concerns* the energy use or energy efficiency of covered products. The Supreme Court has provided that "[c]oncerning means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer, & Confrin, LLP v. Appling*, 584 U.S. 709, 717-718 (2018) (internal citation omitted). It is well-settled that when used in preemption clauses, "relate to" cannot be interpreted in an unlimited sense because, "universally, relations stop nowhere." *Dubin v. United States*, 599 U.S. 110, 119 (2023) (citing *New York State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655 (1995) ("[I]f 'relate to' were taken to extend to the furthest stretch of its indeterminacy, then for all practical purposes pre-

emption would never run its course."). Though "concerning" may be interpreted as broadening the scope of preemption, EPCA's preemption clause only preempts state and local laws concerning energy use or energy efficiency "with respect to" covered products. 42 U.S.C. 6297(c). The Supreme Court has held that the use of "with respect to" in an express preemption clause "massively limits" the preemptive scope of the law. *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 261 (2013). Although *Franklin* suggests that the interpretation of an express preemption clause should begin and end with the plain language of the statute, when a statute uses ambiguous or unclear terms, as noted above, statutory context and congressional intent can be used to elucidate the intended scope of preemption. *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020).

Because the plain language of EPCA's preemption clause does not prescribe a degree of relation between federal energy conservation standards and state regulations that will trigger preemption, there must be some level of analysis of the structure, context, and history of the statute to identify the scope of where "concerning" ends. *California Div. of Lab. Standards Enf't v. Dillingham Const., N.A., Inc.*, 519 U.S. 316, 325 (1997) ("[T]o determine whether a state law has the forbidden connection," a court must "look both to the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law" on the subject matter of the federal statute.). Contextual clues must be evaluated here, as the term "concerning" expands EPCA's preemption provision to some undefined degree, but it certainly "does not mean the sky is the limit." *Dan's City Used Cars, Inc.*, 569 U.S. at 260.

14

In deciding where the universe of what "concerns" energy conservation standards must end, this Court should not look to "isolated words," but to "text in context, along with purpose and history." *Gundy*, 588 U.S. at 140.  Rather, when analyzing the scope of the EPCA express preemption provision, it must interpret EPCA as a "symmetrical and coherent regulatory scheme" and "fit, if possible, all parts into a harmonious whole." *Am. Bankers Ass'n. v. Gould*, 412 F.3d 1081, 1086 (9th Cir. 2005).

EPCA's Congressional statement of purpose, which is instructive as to the intended scope of preemption, provides in pertinent part that the statute is intended "to conserve energy supplies through energy conservation programs, and … the regulation of certain energy uses," and provide for "improved energy efficiency" of motor vehicles, major appliances and certain consumer products.[4]  42 U.S.C. § 6201(4) and (5).  Simply, the principal purpose of EPCA is to reduce energy waste and improve resource management in response to a drain on the national energy supply.

It is equally helpful to conduct a holistic examination of the subchapter that contains the preemption clause, Subchapter III, Part A, entitled "Energy Conservation Program for Consumer Products Other Than Automobiles," 42 U.S.C. §§ 6291 through 6309, which establishes energy conservation standards for covered products, including test procedures, labeling, advertising, and manufacturing requirements.  Read as a whole, this part is intended to regulate the design capabilities, production, and marketing of the products

---

[4] The statute is also intended to fulfill the United States's obligations under the international energy program, establish a Strategic Petroleum Reserve, provide for energy data verification, and improve water efficiency of plumbing products and appliances. 42 U.S.C. § 6201.

themselves to provide for minimum energy efficiencies and consumer notification.  *See Ass'n of Contracting Plumbers*, 2025 WL 843619, at \*6 ("EPCA sets energy conservation standards for covered products and requires that they be tested for compliance with such standards and labeled accordingly.").   This part does not regulate overall building efficiency, or energy use at the building level, and does not even mention any type of emission standards for products, let alone buildings themselves.

The purpose of the Regulation at issue is to reduce greenhouse gas emissions.  Envir. § 2-1201(6).  Plaintiffs' tortured attempt to characterize the regulation of a building's greenhouse gas emissions as an "Energy Conservation Program for Consumer Products" within the intended scope of EPCA is anything but harmonious.  Plaintiffs only feign harmony between the two vastly different regulations, ignoring or distorting key provisions of EPCA in an attempt to unreasonably expand its preemptive effect to their desired result. The Amended Complaint relies on remote connections between the Regulation's declining kilogram carbon dioxide equivalent per square foot of building requirement; the fact that natural-gas powered appliances emit carbon dioxide; and the contention that the Regulation somehow restricts the quantity of energy directly consumed by consumer products at their point of use by "effectively requir[ing] more efficient appliances."  ECF No. 36, ¶ 66 and 67.  In pressing these tenuous connections, Plaintiffs inappropriately omit the portion of the definitions of energy use and energy efficiency limiting their scope to measures "determined in accordance with test procedures under § 6293."  The Regulation does not regulate or restrict the energy consumed or energy efficiency of consumer products as they are designed, manufactured, and tested in accordance with EPCA conservation standards,

16

and therefore, is beyond EPCA's preemptive reach.  *See Energy of Conservation Program for Consumer Products; Proposed Rulemaking and Public Hearings Regarding Energy Efficiency Standards for Refrigerators and Refrigerator-Freezers, Freezers, Clothes Dryers, Water Heaters, Room Air Conditioners, Kitchen Ranges and Ovens, Central Air Conditioners, and Furnaces*, 47 Fed. Reg. 14,424, 14,456 (April 2, 1982) (DOE proposing to review waivers of preemption only for "State regulations that are appliance efficiency standards" because "[a] rule whose purpose is other than energy efficiency such as a law on fire safety, would not appear to be preempted by the Federal rule, even if it has a secondary and incidental effect of improving the efficiency of a covered product."). Plaintiffs' forced relation between the federal statute and the Regulation is too indirect, remote, and tenuous to support preemption.  *Air Conditioning and Refrigeration Institute v. Energy Resource Conservation and Development Commission*, 410 F.3d 492, 502 (2005) (noting that, properly interpreting the phrase "with respect to," poses the question of whether the relation is too indirect, remote, and tenuous for the requisite connection).

### B.    History and Legislative Intent Support Preemptive Effect Limited to Energy Conservation Standards

While it is clear from a strictly textualist interpretation that the Regulation is not preempted, the purpose of EPCA's preemption provision further supports that reading. *Gundy*, 588 U.S. at 140 (The Court may also look to the history and purpose of the statute to divine the meaning of language.).

EPCA was born out of the 1970s oil crisis that occurred after an energy embargo imposed upon the United States.  ECF No. 36, ¶ 2.  In response to this energy crisis,

17

Congress enacted EPCA in 1975 as part of a "comprehensive national energy policy." *Nat. Res. Def. Council, Inc. v. Herrington* 768 F.2d 1355, 1362 (D.C. Cir. 2014) (quoting S. Rep. No. 516, 95th Cong., 1st Sess. 116 (1975), U.S. Code Cong. & Admin. News 1975, p. 1762 (conference report)).  EPCA's stated purpose was essentially to increase national energy production, decrease foreign energy dependence, and reduce domestic energy consumption. *Id.*

The original EPCA statute did not include nationwide energy conservation standards, but in 1978 the National Energy Conservation Policy Act "created a nationwide conservation program for appliances and required DOE to prescribe minimum energy efficiency standards for thirteen covered products." *Herrington,* 768 F.2d at 1367 (citing *Energy Conservation Program for Consumer Products* 45 Fed. Reg. 43,976 (Jun. 30, 1980)).  DOE declined to follow that directive, determining instead that energy savings would be so low that it would not be economically efficient to do so. *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499 (internal citations omitted).

In the absence of national energy efficiency standards, DOE initiated a general policy of accepting State waivers of preemption to set their own energy efficiency standards. *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499 (quoting S. Rep. No. 100–6, at 4 (1987).  DOE's decision not to adopt federal energy efficiency standards was challenged in court, and in 1985, the U.S. Court of Appeals for the District of Columbia Circuit held that DOE's practice was unlawful and ordered DOE to adopt federal appliance efficiency standards. *Herrington*, 768 F.2d at 1363-64.  Thereafter, major manufacturer trade associations and the Natural Resources Defense Council negotiated a compromise

18

solution, resulting in Congress's adoption of the National Appliance Energy Conservation Act of 1987, setting national energy efficiency standards without any action on the part of DOE. *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 499-500 (citing National Appliance Energy Conservation Act of 1987, Pub.L. No. 100–12, 101 Stat. 103 (1987)). EPCA's preemption clause was included in that legislation to "counteract the systems of separate state appliance standards," which would "increasingly complicate their design, production and marketing plans." *Air Conditioning & Refrigeration Inst.*, 410 F.3d at 500 (quoting S. Rep. No. 100-6, 3 (1987)), *reprinted in* 1987 U.S.C.C.A.N. 52, 54-55.

Contrary to Plaintiffs' contention, EPCA's preemption clause does not create an affirmative right for consumers to use covered appliances at a particular location or in any manner they choose. *Ass'n of Contracting Plumbers*, 2025 WL 843619, at *5 (finding the term "point of use" does not "expand EPCA's scope to reach the actual use of covered products, nor does it grant consumers an absolute right to use such products."). Nor was EPCA intended to foreclose state regulation of environmental pollution, including Maryland's building emission standards. The regulation of air pollution is a complicated, intricate, and vast issue. It is unreasonable to assume that Congress intended the sole authority to regulate greenhouse gas emissions from buildings to be couched in a regulation of energy conservation standards for appliances. *See Massachusetts v. EPA*, 549 U.S. 497, 532 (2007) (noting EPA is charged with protecting the public's health and welfare, "a statutory obligation wholly independent of DOT's mandate to promote energy efficiency" under EPCA.). The legislative history does not reveal any congressional intent to step into, much less fully occupy, an area of regulation which was within the authority of the EPA

19

and its concurrent jurisdiction with States. *See* 42 U.S.C. § 7401 (finding "air pollution control at its source is the primary responsibility of States and local governments"); 42 U.S.C. § 7416 (preserving the "right of any State or political subdivision thereof to adopt or enforce (1) any standard of limitation respecting emissions of air pollutants or (2) any requirement respecting control or abatement of air pollution"); *United States v. Perkins*, 67 F.4th 583, 611 (4th Cir. 2023) (discussing the interpretive principle that Congress is presumed to have knowledge of existing law and absent a clear manifestation of contrary intent, a newly-enacted or revised statute is presumed to be harmonious with existing law and its judicial construction).

It stretches credulity to suggest Congress amended EPCA with the intent to preempt State regulation of greenhouse gas emissions at a time when the impact of greenhouse gas emissions was not as fully understood and roughly two decades before EPA began earnest efforts to regulate those pollutants under the Clean Air Act. *See Massachusetts v. EPA.*, 549 U.S. at 507-09 (2007); *see also Lara-Aguilar v. Sessions*, 889 F.3d 134, 144 (4th Cir. 2018) ("We are to avoid 'interpretations of a statute which would produce absurd results ... if alternative interpretations consistent with the legislative purpose are available.'") (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982)). Rather, the Regulation, which seeks to address global warming for the health and safety of the people of Maryland, lies squarely within the traditional police powers of the State. *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 475 (1996); *Metro. Life Ins. Co. v. Massachusetts*, 471 U.S. 724 at 756 (noting States traditionally have "great latitude under their police powers" to legislate for the protection of the lives, health, and comfort of all persons (internal citations

20

omitted)).    Those powers should be preserved lest all public safety-based regulations limiting pollution from electricity or fossil-fuel-powered equipment be preempted as regulating energy use.[5]

EPCA was originally passed without any energy conservation standards, then allowed states to develop their own, and eventually set national standards for the sake of consistency for the manufacturers of covered products—not to enlarge federal control over the use of such products such that State pollution regulations should be preempted.    Absent any evidence to the contrary, this Court should decline to expand the reach of EPCA's preemption provision as Plaintiffs ask.

### C.    Plaintiff's Reliance on *Berkeley* is Misplaced

The premise of the Plaintiffs' single claim relies entirely on *California Rest. Ass'n v. City of Berkeley,* 89 F.4th 1094 (9th Cir. 2024), a recent non-binding decision from the Ninth Circuit.    ECF No. 36, ¶ 4.    In that case, the court found that EPCA preempted the City of Berkeley's building code that prohibited natural gas connections in newly constructed buildings.    Berkeley Mun. Code § 12.80.040(A).    The Ninth Circuit determined that the building code "concerned energy use" because it effectively prohibited consumers from being able to use their natural gas-powered appliances.    However, the court noted the "limited" nature of its decision, concluding "only that EPCA applies to building codes and

---

[5]    To the extent that any presumption against preemption survives post-*Franklin*, that interpretive tool places a heavy "thumb on the scale" weighing against the application of preemption to the public safety regulation at issue here.    *California Rest. Ass'n v. City of Berkeley,* 89 F.4th 1094, 1101 (9th Cir. 2024); *see also Wyeth v. Levine*, 555 U.S. 555, 623-24 (2009).

that Berkeley's Ordinance falls with the Act's preemptive scope." *Berkeley*, 89 F.4th at 1101.

This Court should not adopt the Ninth Circuit's reading of the EPCA express preemption provision because the Ninth Circuit failed to appropriately apply canons of statutory interpretation. But even if it did, the Regulation is distinguishable from *Berkeley* placing it outside EPCA's preemptive scope.

### i. *Berkeley* was Decided in Error

To reach its conclusion, a three-judge panel of the Ninth Circuit underwent a textual analysis of the EPCA express preemption provision. In response to the panel's ruling, the City filed a petition for rehearing en banc, supported by several amicus briefs. While that petition was ultimately denied, it prompted a robust dissent from eight of the Circuit's justices identifying many of the panel's mistakes. *Id.* at 1119-26 (Friedland, J., dissenting from denial of rehearing en banc). In an apparent attempt to capitalize on *Berkeley's* erroneous finding, a flurry of preemption lawsuits were filed to challenge state and local building decarbonization regulations across the nation. The United States District Court for the District of New York recently rejected one such suit, finding EPCA did not preempt a New York City law prohibiting the use of fossil fuels in newly constructed residential buildings. *Ass'n of Contracting Plumbers*, 2025 WL 843619.

To reach its conclusion, the *Berkeley* panel interpreted "energy use" using an incomplete definition. *United States, ex rel. Polansky v. Executive Health Resources, Inc.*, 599 U.S. 419, 432 (2023) (every clause and word of a statute should have meaning). The Ninth Circuit's analysis of "energy use" completely omitted the entire clause—

22

"*determined in accordance with test procedures under section 6293 of this title*"—when evaluating the meaning of the term. *Cf. Berkeley*, 89 F.4th at 1101 *with* 42 U.S.C. §6291(4) (emphasis added). In fact, the *Berkeley* opinion does not even mention "test procedures" until the dissent. *See Berkeley*, 89 F.4th at 1121 (Friedland, J., dissenting). Based on this truncated definition lacking the constraints of the test procedure clause, the court improperly assigned "point of use" its ordinary meaning of "the place where something is used," instead of evaluating it within its appropriate technical meaning. *See supra*, Section III.A.i.; *Cf. id.* at 1101-02 *with* 1123-25 (Friedland, J., dissenting); *Corning Glass Works v. Brennan,* 417 U.S. 188, 201 (1974) ("[W]here Congress has used technical words or terms of art, it [is] proper to explain them by reference to the art or science to which they [are] appropriate." (internal quotation omitted)). Though not defined in EPCA, "point of use" also bears a technical meaning that cannot be ignored. When measuring energy use, one must decide whether to include only energy used on-site by a product, or additionally, to include energy used off-site to deliver fuel or electricity. *See Berkeley*, 89 F.4th at 1123 (Friedland, J., dissenting); *see also* 47 Fed. Reg. at 14,427. As such, the inclusion of "point of use" in the definition of energy use constitutes a technical instruction to only measure the energy directly used by the product without including energy used off-site to power the product (e.g., at the power plant) or energy lost in transmission from the power plant to the site of use, *not* that it should be measured in the end user's kitchen. *See Berkeley*, 89 F.4th at 1123-25 (Friedland, J., dissenting); *Ass'n of Contracting Plumbers,* 2025 WL 843619, at *5.

Thus, the court erred in its conclusion that "energy use" must be measured "not only from where the products roll off the factory floor, but also from where consumers *use* the products." *Id.* at 1103. That conclusion is in direct conflict with a plain reading of the statute. *See supra* Section III.A.i; *Berkeley*, 89 F.4th, at 1125 (Friedland, J., dissenting) (noting various technical sources demonstrating that "point of use" does not refer to the place where an appliance is used, but to a technical way of measuring energy consumption); *Ass'n of Contracting Plumbers, 2025 WL 843619* at *5 (declining to adopt *Berkeley*'s interpretation of "energy use" because it relies on a flawed reading of "point of use"). Energy use must be measured in accordance with test procedures promulgated by the DOE, which are measured only from where the "products roll off the factory floor." The interpretation that these energy use thresholds are pre-market requirements for products is consistent with § 6294 of the Act, which requires the Federal Trade Commission to create labeling requirements for EPCA's energy conservation standards. *See generally* 16 C.F.R. §§ 305.1 through 305.31. The *Berkeley* panel's interpretation is discredited by the fact that product-specific energy consumption (i.e. "energy use") and "energy efficiency" ratings (as determined in accordance with tests prescribed under § 6293) must be affixed to the products with a sticker before they are sold, a directive that would be impossible to comply with if "point of use" included the actual deployment of a product at a location of the consumer's choice. 16 C.F.R. § 305.2(p) and (q); *Ass'n of Contracting Plumbers*, 2025 WL 843619 at *5 (finding EPCA would be "impossible to implement" if "energy use" referred to the amount of energy a product actually consumes in the hands of a consumer.).

24

Divorcing "point of use" from its modifier clause led the *Berkeley* panel to its unsupported conclusion that "EPCA is concerned with the end-user's ability to *use* installed covered products at their intended final destinations" and that "a regulation on 'energy use' fairly encompasses an ordinance that effectively eliminates the 'use' of an energy source." *Berkeley*, 89 F.4th at 1102.  As a result of its interpretive errors, the panel found that a building code which prevents consumers from "using" covered products in their location of choice, such as home kitchens or businesses, would indirectly impact the appliance's "energy use" and therefore is preempted.  This incorrect interpretation causes the absurd result of creating an affirmative right for consumers to use appliances in any location they choose, which is clearly not contemplated by EPCA or consistent with the remainder of the statute and would displace legitimate public safety restrictions on product use.  *Lara-Aguilar*, 889 F.3d at 144 (noting interpretations producing absurd results should be avoided if alternative interpretations consistent with the legislative purpose are available.).  This Court should reject the panel opinion, which flies far afield from proper textual interpretation, and heed the warning contained in the dissent by declining to adopt *Berkeley's* flawed interpretation.  *Berkeley*, 89 F.4th at 1119 (Friedland, J., dissenting) ("[Urging] any future court that interprets [EPCA] not to repeat the panel opinion's mistakes."); *Ass'n of Contracting Plumbers, 2025 WL 843619* at *5 ("The Court therefore declines to adopt the interpretation of 'energy use' employed [by *Berkeley*].").

### ii.    *Berkeley* **does not apply to the Regulation**

Assuming arguendo that *Berkeley* was correctly decided and that this Court adopts its interpretation of EPCA preemption, even then, the Regulation is so distinguishable from

the ordinance in *Berkeley* that it would be unreasonable to further stretch the scope of EPCA to preempt the Regulation. The Ninth Circuit made clear that EPCA's preemption provision, though broad, is not unlimited. *Id.* at 1103. This Court should not extend EPCA's preemptive scope here because the Regulation 1) is not a building code and 2) is not a ban on the use of natural gas-powered appliances.

### a. The Regulation is not a building code for new construction

*Berkeley* itself acknowledges that the decision is "very narrow." *Id.* at 1106 ("We only hold that EPCA prevents Berkeley from prohibiting new-building owners from 'extending' fuel gas piping within their buildings 'from the point of delivery at the gas meter' by way of a building code."). *Berkeley* couches much of its opinion on the fact that EPCA explicitly addresses building codes and provides that certain building codes can be exempted from preemption if they meet certain criteria. However, that decision is inapplicable on its face because the Regulation is not a building code for new construction, a fact conceded by Plaintiffs. ECF No. 36, ¶ 76. State building codes refer specifically to the set of rules and standards governing construction within a state, focused on building safety and design. Maryland's state building codes are promulgated by the Maryland Department of Labor and are codified in the Maryland Code, Public Safety Article, §§ 12-501 through 12-510, with implementing regulations located at COMAR 09.12.51. By contrast, the Regulation is promulgated under authority granted to the Department under the Environment article and applies equally to new construction and existing buildings alike. The Climate Solutions Now Act further demonstrated the distinction between state building codes and the Regulation by directing the Department to adopt building energy

performance standards, while also separately amending the Department of Labor's building code regulations. Md. Code Ann. Pub. Safety § 12-503(d) (2022) (Lexis Nexis Supp. 2022); S. 528, 2022 Leg., 444th Sess. (Md. 2022). The Amended Complaint leaps to the unsupported legal conclusion that *Berkeley* applies to the present case while failing to articulate facts showing that the Regulation is a building code. Despite the Amended Complaint's analysis of the applicability of the building code criteria enumerated in EPCA, that analysis is irrelevant, and appropriately dismissed.

### b. The Regulation is not a prohibition on the use of gas-powered appliances

Another major concern of the *Berkeley* court was that the City's ordinance wholly prevented the use of certain appliances because it "prohibits the installation of necessary natural gas infrastructure on premises where covered appliances are used." *Berkeley,* 89 F.4th at 1102. Here, however, the Regulation does not prohibit consumers from using natural gas-powered appliances or prohibit the installation of natural gas infrastructure, a fact Plaintiffs seemingly acknowledge. ECF No. 36, ¶ 5 ("The [Regulation] inflict[s] serious and irreparable harm on Plaintiffs by restricting and penalizing EPCA-covered gas appliances in new and existing buildings…"). Rather, the Regulation requires covered buildings to reach net-zero direct greenhouse gas emissions by 2040. Net direct gas emissions are defined as "the sum of all direct greenhouse gas emissions from a covered building." Md. Code Regs. 26.28.01.02.(B)(31). The distinction between zero emissions and net-zero emissions is crucial. Building owners who currently combust fuel on-site to

27

power their buildings may continue to do so and comply with the Regulation through any means deemed most advantageous to that owner.

The Regulation does not mandate use of any particular appliance or compel manufacturers to produce appliances according to a higher standard of energy use or efficiency than those already on the market. Nor does it provide prescriptive requirements for building owners to reach net-zero direct emissions. While building owners certainly can phase out natural gas-powered appliances and switch to electric options to reach net-zero emissions,[6] they have the flexibility to choose any combination of approaches to best suit their needs. Such options include installing LED lighting, purchasing ENERGY STAR certified electric equipment, making weatherization improvements to the building envelope including air sealing and insulation, retro-commissioning building systems, or installing control systems for plug loads, lighting, and HVAC equipment to reduce emissions from on-site electricity generation. Owners can also choose to reduce direct emissions by installing carbon capture technology or employing alternative fuels such as hydrogen, renewable natural gas or other biofuels. Alternatively, building owners can utilize the Regulation's alternative compliance pathway, which affords them the opportunity to pay a fee for their greenhouse gas emissions above the applicable net direct emission standard in lieu of meeting the standards. Md. Code Regs. 26.28.04.01. Although Plaintiffs mischaracterize the fee as a "penalty," all regulations carry compliance costs, and the

---

[6] Electric appliances are not necessarily more energy efficient than natural gas-powered appliances, further supporting the distinction that the Regulation is agnostic to energy conservation standards and instead regulates emissions.

alternative compliance fee is simply one pathway for building owners to meet the Regulation's requirements rather than (or prior to) investing in other alternatives, should they deem this alternative beneficial. Moreover, as Plaintiffs admit, the Regulation provides for exceptions for certain types of buildings and for building owners demonstrating financial hardship. ECF No. 36, ¶ 37. In their Amended Complaint, Plaintiffs unabashedly ask this Court to stretch the scope of EPCA beyond the Ninth Circuit's narrow ruling to supplant the State's legitimate pollution control authority. Even the *Berkeley* concurrence notes that EPCA preemption is unlikely to reach a host of state and local regulations that incidentally impact the quantity of natural gas directly consumed by a covered product. *Berkeley,* 89 F.4th at 1117 (Baker, J., concurring) (noting "state and local governments are likely free to impose carbon taxes designed to discourage [natural gas] consumption" or otherwise terminate existing gas utility service). The Regulation does not fall within *Berkeley's* analysis, and this Court should decline to extend EPCA's preemption clause under the facts of this case.

## IV.    CONCLUSION

Combating climate change and the disastrous effects that it will have on the citizens, infrastructure, and economy of Maryland is an imperative goal that will require cooperation and contributions from the public and private sectors alike. The Regulation is a legitimate exercise of the State's sovereign right to pursue that goal by reducing harmful greenhouse gas emissions. This Court should not expand EPCA's express preemption, allowing it to bleed into the State's traditional authority to control pollution. Preemption in this case is not supported by the text, structure, or context of EPCA, nor does the Ninth's Circuit

29

holding in *Berkeley* support such a reading.  For the foregoing reasons, this Court should grant the Department's motion to dismiss the Amended Complaint.

**<u>NOTICE OF ELECTRONIC FILING</u>**

I hereby certify that on May 5, 2025, a copy of the foregoing Memorandum in Support of Motion to Dismiss Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief was electronically filed and served on all counsel of record via the Court's CM/ECF system.

<u>*/s/ Doris N. Lange*</u>
Doris N. Lange

30
