**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| Maryland Building Industry Association, Inc. *et al.*, <br><br>    *Plaintiffs*, <br><br>    *v.* <br><br> Serena Coleman McIlwain, in her official capacity as Secretary of the Maryland Department of the Environment, <br><br>    *Defendant*. | Case No. 8:25-cv-00113-DLB |

**BRIEF OF *AMICUS CURIAE* PUBLIC HEALTH LAW CENTER, INC. IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

Jon A. Mueller
Environmental Law Clinic
University of Maryland, Carey School of Law
500 W. Baltimore St.
Baltimore, MD 21201
JMueller@law.umaryland.edu
410-706-0590

Daniel Carpenter-Gold
Jamie Long
Public Health Law Center
Mitchell Hamline School of Law
875 Summit Ave.
St. Paul, MN 55105
Daniel.CarpenterGold@mitchellhamline.edu
651-290-7506

*Counsel for the Public Health Law Center*

**Table of Contents**

Interest and Identity of Amicus .................................................................................................. 1

Summary of the Argument .......................................................................................................... 1

Argument ...................................................................................................................................... 2

    I.    The Building Energy Performance Standards are Not Appliance Energy Conservation Standards ..................................................................................................................................... 2

        A.    The BEPS Regulate Greenhouse-Gas Emissions while Providing Building Owners with a High Level of Flexibility in Compliance .................................................................. 2

        B.    The BEPS do Not Regulate, Prohibit, or Penalize any Appliance .................................. 3

        C.    The BEPS do Not Concern the Energy Efficiency of any Appliance ............................. 6

        D.    The Legislative History does Not Support Plaintiffs' Reading of EPCA Preemption ... 7

    II.    Extending EPCA Preemption to Cover the Building Energy Performance Standards could Eliminate Core State Authorities ..................................................................................................... 9

        A.    The Berkeley Reasoning Threatens Important Health and Safety Standards ................. 9

        B.    Plaintiffs' Logic Goes Beyond Berkeley and could Eliminate Major Functions of State Regulatory Authority ................................................................................................................ 11

Conclusion .................................................................................................................................. 15

**Interest and Identity of Amicus**

The Public Health Law Center (Center) is a public interest legal resource center dedicated to improving health through the power of law and policy. The Center helps local, state, national, Tribal, and global leaders promote health by strengthening public policies. These policies include regulations, such as those challenged in this case, that reduce the indoor and outdoor pollution caused by fossil-fuel combustion and mitigate climate change, which is among the greatest public-health threats today.

**Summary of the Argument**

Maryland's Building Energy Performance Standards (BEPS), Md. Code Regs. §§ 26.28.01.01-.04.03 (2025), do not "concern[]" the energy efficiency or energy use of appliances for the purposes of the Energy Policy and Conservation Act (EPCA), 42 U.S.C. §§ 6297(b), (c), 6316. The BEPS set net greenhouse-gas emissions targets for buildings which decline over time, eventually reaching zero. The program, designed for "maximum flexibility," Md. Code Ann., Env't § 2-1602(c)(2)(iv) (West 2025), offers a variety of options to meet these targets; it also specifies exemptions for certain buildings that cannot meet those targets. If building owners prefer, they may also simply pay an alternative compliance fee designed to offset the cost of their excess emissions rather than meeting the targets directly. Thus, the BEPS have only a distant connection to the energy efficiency or energy use of any particular appliance, and certainly none that would bring them within the scope of EPCA's preemption provisions.

Plaintiffs attempt to expand EPCA preemption to eliminate all state and local regulations that "restrict[] and penaliz[e]" either the use of EPCA-covered appliances, emissions, or the use of particular types of energy. First Am. Compl., ECF No. 36, ¶¶ 1, 67. This is not the correct test for EPCA preemption, as both the plain statutory language and the legislative history

1

demonstrate. *See generally* Mem. L. Supp. Def.'s Mot. Dismiss Ps.' First Am. Compl. (Def. Mem.), ECF No. 49-1. Moreover, this interpretation would threaten Maryland's ability to regulate in several core areas of state authority, such as health and safety standards, utility regulation, and water conservation. Congress could not possibly have intended this result and therefore it cannot be the correct reading of the law. The Center therefore urges the Court to grant Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint, ECF No. 49.

<b>Argument</b>

**I.    The Building Energy Performance Standards are Not Appliance Energy Conservation Standards**

> ***A.  The BEPS Regulate Greenhouse-Gas Emissions while Providing Building Owners with a High Level of Flexibility in Compliance***

The BEPS regulate the greenhouse-gas emissions of certain large buildings in the State of Maryland. They set targets for those buildings' net greenhouse-gas emissions, which vary based on building type and year but which all decline to zero in the year 2040. Building owners have a variety of options to comply with the BEPS, including reducing their energy needs by making their buildings more efficient, using lower-emission energy sources, applying for exemptions, or, if the owner prefers, paying an alternative compliance fee.

Specifically, the BEPS apply to certain buildings and groups of buildings that have at least 35,000 square feet of gross floor area and are used for one or more designated purposes such as multifamily housing, offices, or retail stores (property types). *See* Code Md. Regs. §§ 26.28.01.02(B)(15), 26.28.03.02(A), tbl. 1. Each non-exempt property type has three targets for net emissions, all specified in terms of carbon dioxide equivalent ($CO_2e$) per square foot of floor area. The first targets apply from 2030 through 2034; the second, which are set at roughly one-half of the first, apply from 2035 through 2039; and the third, which are zero for all non-

2

exempt property types, apply from 2040 onward. *Id.* § 26.28.03.02(A), tbl. 1, (D). The owner of any covered, non-exempt building must monitor and report information necessary to determine the building's net greenhouse-gas emissions in $CO_2e$ each year. *Id.* § 26.28.02.02(B)(4).

Building owners have multiple options for complying with the BEPS. First, they can take steps to ensure that their buildings' net $CO_2e$ emissions per square foot do not exceed the target for the relevant year and property type. Second, they can apply for one or more temporary exemptions. *Id.* § 26.28.04.02. Finally, a building owner may pay an alternative compliance fee for any emissions that exceed the relevant target. *Id.* § 26.28.04.01(A). That fee, which starts at $230 (in 2020 dollars) per excess metric ton of $CO_2e$ in 2030 and increases by $4 per year, *id.*, is equal to the "social cost of carbon"—the monetary value of the harm estimated to result from the release of each new metric ton of carbon—calculated by the U.S. Environmental Protection Agency. *See* Md. Code Ann., Env't § 2-1602(c)(3); Md. Dep't Env't, *Response to Comments: On the Proposed Regulations under COMAR 26.28, pertaining to Building Energy Performance Standards (BEPS)* 18-19 (2024) (MDE Response to Comments).[1]

The exemption and alternative compliance fee options remain available even after the emissions targets reach zero. *Id.* §§ 26.28.03.02(A), tbl. 1, 26.28.04.01(A), 26.28.04.02. Because of this, even building owners that do nothing at all to help their buildings meet their targets will have the option to comply by simply paying a fee equal to the social cost of their buildings' excess carbon emissions.

### B.  The BEPS do Not Regulate, Prohibit, or Penalize any Appliance

None of these provisions regulate any appliance. Quite the opposite: because the BEPS

---

[1] *Available at* https://mde.maryland.gov/programs/regulations/air/Documents/Hearings/BEPS%20RTC%20December%202024%20Final%20Draft.pdf.

are designed to "[p]rovide maximum flexibility to the owners of covered buildings" while still meeting the state's regulatory goals, Md. Code Ann., Env't § 2-1602(c)(2)(iv), they allow for a variety of compliance pathways that do not require any change in appliances. *See* Def. Mem., ECF No. 49-1, at 27-29. For example, buildings can meet their emissions targets through weatherization measures like insulation and ventilation improvements—which will also improve health outcomes for the people that live there. *See generally, e.g.*, Green & Healthy Homes Initiative, *Weatherization and Its Impact on Occupant Health Outcomes* (2017).[2] Approaches to account for other emissions reductions, including the use of biomethane or carbon capture, are under development. MDE Response to Comments 41.

If these measures are insufficient to meet a building's net emissions targets, the building owner can either apply for temporary exemptions or pay the alternative compliance fee instead, as described above. Contrary to Plaintiffs' assertions, *e.g.*, First Am. Compl., ECF No. 36, ¶ 14, this compliance option is not a "penalty." "A 'penalty' is a punishment…for a crime or offen[s]e against [a state's] laws"; a mandatory payment is a "penalty" "only if it is sought for the purpose of punishment, and to deter others from offending in like manner." *Kokesh v. S.E.C.*, 581 U.S. 455, 461-62 (2017) (quotation marks and citations omitted, second alteration original). Maryland has penalties for violations of its air-quality regulations, including the BEPS: the state can seek fines up to $25,000 per violation (or per day of a continuing violation) through a civil action or up to $2,500 per violation (or day) through an administrative hearing, depending on indicia of guilt such as "[t]he willfulness of the violation" and any "recurrent pattern…of violation." Md. Code Ann., Env't §§ 2-610(a), 2-610.1(a), (c)(1)-(2). But these are distinct from the alternative

---

[2] *Available at* https://www.greenandhealthyhomes.org/wp-content/uploads/Weatherization-and-its-Impact-on-Occupant-Health_Final_5_23_2017_online.pdf.

compliance fee. The amount of the alternative compliance fee is constant, not dependent on a court's discretion or level of guilt; the fee is incorporated into the same regulatory process the other compliance mechanisms, not the result of a separate administrative hearing or court case; and, ultimately, the fee is a means to comply with the law, not a punishment for violating it. *See, e.g.*, *Gonzalez v. Sessions*, 894 F.3d 131, 138-39 (4th Cir. 2018) ("long-standing and well-established understanding[]" of "penalty" requires "account[ing] for the culpability flowing from the actor's underlying conduct" and typically giving "the adjudicator…discretion to determine both whether to impose the assessment and the amount of any assessment").

Because the BEPS do not regulate any appliances, they are not preempted by EPCA. This is true even under the reasoning of *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024), referenced in Paragraph 4 of the Amended Complaint.[3] Despite the Amended Complaint's sweeping references to it, this case has a "very narrow" holding: that EPCA preempts some "building codes" that prohibit gas infrastructure. 89 F.4th at 1106 ("We only hold that EPCA prevents Berkeley from prohibiting new-building owners from 'extending' fuel gas piping within their buildings 'from the point of delivery at the gas meter' by way of a building code." (citation omitted)). Certainly, Plaintiffs' assertion that the BEPS are preempted because they "restrict[] and penaliz[e]" the use of fuels or appliances has no purchase in *Berkeley*: neither "restrict" nor "penalize" appear anywhere in the opinion.

At most, *Berkeley* could be read to imply that EPCA preempts some regulations that prevent the use of EPCA-covered appliances. This is not what the BEPS do. As explained above, the BEPS have alternative compliance mechanisms that allow building owners to continue to use

---

[3] The Center agrees with Defendant that the interpretation of EPCA preemption in *Berkeley* is incorrect and should not be adopted by this Court. *See generally* Def. Mem., ECF No. 49-1, at 22-25.

any kind of appliance in their buildings for as long as they like. Even when the net-zero-$CO_2e$ targets take effect in 2040, and for buildings with no other options to reduce net emissions or receive exemptions, the BEPS would effectively be a carbon tax—a fee on each metric ton of $CO_2e$ emitted. "[N]othing in EPCA's text or structure suggests any concern with state and local taxes that might reduce consumption of natural gas. Thus, at least as far as EPCA is concerned, states and local governments are likely free to impose carbon taxes." *Id.* at 1117 (Baker, J., concurring). The *Berkeley* interpretation of EPCA does not preempt regulations like the BEPS.

### C. The BEPS do Not Concern the Energy Efficiency of any Appliance

The Amended Complaint asserts that the BEPS' declining target for net $CO_2e$ emissions also "concern[s]" the "energy efficiency" of EPCA-covered appliances because it "penalize[s] less efficient gas appliances" and "effectively require[s] more efficient appliances." First Am. Compl., ECF No. 36, ¶ 67. This is incorrect on both counts. As noted above, the BEPS do not create penalties for the use of any appliance; the alternative compliance fee is just that: an alternative means to comply with the BEPS. Furthermore, Plaintiffs assume a constant relationship between $CO_2e$ emissions and energy efficiency, which is incorrect. There are many instances in which using lower-emissions appliances will increase, rather than decrease, energy usage. For example, one gas clothes dryer—used in a compact washer/gas dryer combination from GE—can dry 60% more clothing per unit energy than some electric dryers.[4] But only the gas dryer will create emissions that count toward a buildings' net emissions target. Thus, given a

---

[4] Specifically, the GE gas dryer has a "combined energy factor"—a measure of pounds of laundry dried per unit energy—of 3.3, while an equivalent Whirlpool electric dryer has a combined energy factor of 2.08. Data obtained from U.S. Dept. of Energy, *CCMS - Public Database* (accessed May 12, 2025), *available at* https://www.regulations.doe.gov/certification-data/ (select product group "Clothes Dryers - Appendix D1" and enter model number "M44G_4_M" for the gas dryer and "C18HAQ13AM0" for the electric dryer).

choice between the two, the BEPS would incentivize using the *less*-efficient electric dryer.

The BEPS also do not "effectively require" higher-efficiency gas appliances. As an initial matter, Plaintiffs have not adequately substantiated this claim. As the District of Colorado noted in dismissing a very similar case, without a specific explanation, "the allegation that [a regulation] 'effectively' requires Plaintiffs' members to replace and install [EPCA-covered products] that exceed DOE efficiency standards…amounts to a conclusory allegation of Plaintiffs' preemption claim and speculation as [to] what is required to comply with [the regulation]." *Colo. Apartment Ass'n v. Ryan*, No. 24-cv-1093, 2025 WL 947531, at *6 (D. Colo. Mar. 28, 2025). In any case, as noted above, a building owner could improve the efficiency of their building through other measures, such as insulation and ventilation improvements, without changing the energy efficiency of any given appliance. Indeed, a building owner could comply with the BEPS without making any changes to their buildings at all, through the alternative compliance fee or an exemption. Thus, the BEPS cannot be said to "effectively require" any change to a building's appliances.

D. *The Legislative History does Not Support Plaintiffs' Reading of EPCA Preemption*

The legislative record supports the reading that EPCA preemption does not apply to standards like the BEPS. First, the record shows an intent to preempt only regulations that directly address appliances, which the BEPS do not. The National Appliance Energy Conservation Act of 1987 (NAECA), the source for the preemption language at issue here, was specifically written to counteract the trend of "separate State *appliance* standards." S. Rep. No. 100-6, at 4 (1987) (emphasis added). The preemption provision itself is described as affecting "State *appliance* efficiency regulations or requirements." *Id.* at 9 (emphasis added). Similarly, the regulatory impact evaluation for NAECA describes it as preempting "State *appliance*

7

efficiency regulations." *Id.* at 13 (emphasis added). Conversely, there is no indication that Congress intended to preempt regulations that do not regulate specific appliances. Even the exemption for building codes, 42 U.S.C. § 6297(f), was included to protect codes that "regulate the energy efficiency of *central heating and cooling equipment and water heaters*"; that is, NAECA's building-codes provision anticipates protecting building codes with provisions that regulate specific appliances, not regulations like the BEPS that apply only to buildings as a whole. *Id.* at 10 (emphasis added).

It is likewise clear that Congress only intended NAECA to preempt regulations that prescribed specific design or performance requirements to appliances. A House committee report describes the "efficiency standards" that NAECA preempts as "design requirements or minimum efficiency requirements for appliances"; in other words, "actual baseline, minimum requirements for [a] covered product." H.R. Rep. No. 100-11, at 18, 24 (1987). This description matches the intent behind NAECA preemption, namely to avoid "a patchwork of numerous conflicting State requirements." *Id.* at 24.

But these concerns do not apply to the BEPS, which does not apply any design or efficiency requirements to appliances and therefore does not create any risk of conflicting standards. For example, if one state were to require 85% efficiency for gas furnaces and another state to require 86% efficiency, a furnace manufacturer would either need to conform to the more stringent state's requirements or split their product lines into two very similar sub-categories for the two states, with all the attendant logistical difficulties. But manufacturers face no such restriction under the BEPS: they can sell the exact same appliances in Maryland as they could sell to any other state. And if another state passes a similar set of standards with, say, different $CO_2e$ targets, manufacturers will still be free to sell the same product lines in both states.

II.  **Extending EPCA Preemption to Cover the Building Energy Performance Standards could Eliminate Core State Authorities**

As Defendant notes, Plaintiffs have not fully explained the logical connection between EPCA preemption and the BEPS. Def. Mem., ECF No. 49-1, at 13. Filling in the blanks, however, leads to the conclusion that Plaintiffs' interpretation of EPCA would invalidate large areas of state authority. Adopting the reasoning of the *Berkeley* opinion would, on its own, threaten core health and safety standards. But Plaintiffs' arguments go even further: First, they assert that EPCA preempts regulations whenever they "restrict[] and penaliz[e]" any use of energy by covered appliances, even indirectly. *See, e.g.*, First Am. Compl., ECF No. 36, ¶¶ 1, 29, 67. Second, Plaintiffs claim that the BEPS' $CO_2e$ targets "concern[] energy efficiency" for the purposes of EPCA preemption because they "penalize less efficient gas appliances and effectively require more efficient appliances." First Am. Compl., ECF No. 36, ¶ 67.

As described above, Plaintiffs' theory is incorrect. The BEPS do not restrict, penalize, or require the use of any EPCA-covered appliances. It is entirely possible for a building to comply with the BEPS without changing, or even while worsening, the efficiency of the building's appliances. Plaintiffs' interpretation also has dangerous consequences for laws "peculiarly within the province of state and local legislative authorities," implying that the reading itself is incorrect. *See, e.g.*, *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 264 (2013).

A. *The* Berkeley *Reasoning Threatens Important Health and Safety Standards*

*Berkeley*'s animating idea—that EPCA preempts state standards that would prevent the use of EPCA-covered appliances—threatens to eliminate states' ability to enforce basic health and safety standards. As the federal government stated in a rare *amicus curiae* brief urging the Ninth Circuit to rehear the case, the opinion "threaten[s] a broad swath of State and local health and safety protections by making EPCA preemption turn on unpredictable judicial intuitions."

9

*Cal. Restaurant Ass'n v. Berkeley*, Br. for the U.S. as Amicus Curiae Supp. Pet. for Reh'g 17, Case No. 21-16278, Dkt. No. 94 (9th Cir. filed June 12, 2023).

More recently, the Southern District of New York has highlighted some of the regulations in this "broad swath" of threatened preemption. *Ass'n of Contracting Plumbers v. City of New York*, No. 23-cv-11292 (RA), 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025). The *Contracting Plumbers* opinion points out that "[r]egulations prohibiting the use of certain types of fuels and appliances in residential, commercial, and industrial settings are integral to municipal construction and fire codes." *Id.* at *6. As an example, the opinion notes that New York City's "prohibit[ion on] the installation of commercial cooking appliances in domestic dwelling units" would apparently be preempted under the *Berkeley* theory, "an absurd result that the Court must avoid." *Id.* (citing *Troll Co. v. Uneeda Doll Co.*, 483 F.3d 150, 160 (2d Cir. 2007)); *see also, e.g.*, *Lynch v. Jackson*, 853 F.3d 116, 122 (4th Cir. 2017) ("Readings of a statute that produce absurd results are to be avoided." (quotation marks and citation omitted)).

Maryland's building code includes essentially the same prohibition on commercial appliances in residential units as New York City's. 2018 Int'l Mech. Code § 917.2 ("Cooking appliances installed within dwelling units…shall be listed and labeled as household-type appliances for domestic use.").[5] Similarly, Maryland prohibits the use of portable generators indoors, 2018 Nat'l Fire Prot. Ass'n Standard (NFPA) 1 § 11.7.2.1, and prevents potentially dangerous appliances from being used in certain types of buildings, *e.g.*, *id.* § 11.5.1.10.2 (waste-

---

[5] Maryland's building and safety codes adopt by reference several model codes, including the International Code Commission's 2018 International Mechanical Code and the National Fire Protection Association's 2018 Standards 1 and 101. Code Md. Regs. §§ 09.15.05.01(A)(1), 29.06.01.06(B). Section 9.2.2 of the National Fire Protection Association's Standard 101, in turn, incorporates the organization's Standard 54. The 2018 International Mechanical Code is available at https://codes.iccsafe.org/content/IMC2018 and the National Fire Protection Association's 2018 Standards 1, 54, and 101 are available at https://link.nfpa.org/free-access/publications/1/2018, https://link.nfpa.org/free-access/publications/54/2018, and https://link.nfpa.org/free-access/publications/101/2018.

oil burners prohibited in residential buildings); 2018 NFPA 54 § 10.22.3 (room heaters prohibited in healthcare and assisted-living buildings).

These sorts of basic safety regulations all prohibit the use of appliances in some circumstances, meaning that adopting the *Berkeley* interpretation of EPCA preemption would put them at risk. By the same token, they "restrict[]" the use of appliances and "penaliz[e]" use contrary to the codes. *See, e.g.*, Code Md. Regs. § 29.06.01.04(E) (providing for penalties for violation of fire-code standards). If Plaintiffs were correct, therefore, these commonsense safety regulations would be preempted by EPCA. But this is clearly not the intent of Congress: not only is there no indication in the text or structure of EPCA that preemption would extend this far, a committee report for the amendments that inserted the current language specifically uses "fire, heating or safety standards" as examples of state regulations that the new language would *not* preempt. H.R. Rep. No. 100-11, at 24. The fact that they could be preempted under Plaintiffs' reading, therefore, indicates that Plaintiffs' interpretation is incorrect.

### B. *Plaintiffs' Logic Goes Beyond* Berkeley *and could Eliminate Major Functions of State Regulatory Authority*

As discussed above, Plaintiffs' claims would not survive even if the Court adopted the *Berkeley* panel's flawed interpretation of EPCA preemption. Plaintiffs therefore stretch EPCA preemption even further, alleging that EPCA preempts regulations that, however indirectly, "restrict[] and penaliz[e]" either the use of EPCA-covered appliances or the energy they consume. First Am. Compl., ECF No. 36, ¶¶ 1, 29, 67. Adopting this scope of EPCA preemption could wipe out key areas of state regulatory authority, from utility distribution to noise regulation. While the full extent of the impact is impossible to know, since the chain of causality Plaintiffs assert could extend indefinitely, the Center sketches a few examples here to explain the

11

unreasonableness of the interpretation.

First, preempting any regulation "restricting and penalizing" gas or electricity use would eliminate states' historical role in regulating the distribution and retail sale of utilities. Congress has left primary responsibility for regulating these elements of our utility infrastructure to the states. *See, e.g.*, *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 279, 304 (1997) (noting Congress's "unbroken recognition" of state authority over distribution and that "Congress did nothing to limit the States' traditional autonomy to authorize and regulate local gas franchises," despite changes to other areas of utility regulation). At the core of this responsibility is state and local authority to determine where utility service is to be offered and what the rates of such service will be, something which even the *Berkeley* panel declined to override. *See* 89 F.4th at 1103 ("[O]ur holding here has nothing to say about a State or local government regulation of a utility's distribution of natural gas to premises where covered products might be used.").

Many other authorities indirectly "restrict[] and penaliz[e]" the use of gas or electric utilities, as Plaintiffs use those terms. For example, Maryland imposes a per-therm and per-kilowatt-hour tax on gas and electric sales, which utilities can pass on to their customers. Md. Code Ann., Tax-Gen. §§ 8-402.1, 8-409(b). This tax directly increases the cost of using EPCA-covered gas or electric appliances; thus, if the BEPS, with an alternative compliance fee, are preempted because they "restrict[] and penaliz[e]" the use of appliances, then this form of utility regulation would certainly be preempted. That is clearly not the intent of Congress, however, and therefore Plaintiffs interpretation must be incorrect. *See, e.g.*, *Berkeley*, 89 F.4th at 1117 (Baker, J., concurring) ("Nor is there any indication from its text or structure that EPCA speaks to the distribution of natural gas.").

Similarly, Plaintiffs' reading threatens the state's system of water-use permitting. EPCA

12

preemption applies to "water use" via the same provision that applies to "energy use." *See* 42 U.S.C. § 6297(b), (c) (preempting regulations "concerning the energy efficiency, energy use, or water use" of covered appliances). Maryland requires many water users, including larger residential developments that are home to a variety of EPCA-covered appliances, to obtain use permits. Md. Code Regs. § 26.17.06.03. These permits include limits on average daily use at the development level, and the state can suspend or revoke a permit for violating those limits. *Id.* § 26.17.06.07(A)(3), (7). Thus, these regulations "restrict[] and penaliz[e]" water use to at least the same extent as the BEPS "restrict[] and penaliz[e]" energy use, and would likewise be preempted under Plaintiffs' reading of EPCA. But there is no indication that Congress intended EPCA to interfere with states' regulatory authority over water use, which "lies at the core of traditional state authority," *Sackett v. E.P.A.*, 598 U.S. 651, 679 (2023), and thus this interpretation of EPCA's preemptive scope must be incorrect.

Plaintiffs' argument that the BEPS $CO_2e$ targets "concern" energy efficiency creates the same sort of risk for state utility regulation as their theory about "restricting and penalizing" appliance use. A tax on each unit of gas or electricity used encourages energy efficiency, and a cap on aggregate water use encourages water efficiency, even more directly than the BEPS' $CO_2e$ targets encourage the efficient use of gas appliances. After all, BEPS allows building owners to switch fuel types, or simply pay an alternative compliance fee, rather than increase appliance efficiency—something neither Maryland's utilities tax nor its water permitting allows. Thus, if Plaintiffs are correct that the BEPS targets "concern" energy efficiency, these traditional elements of state power are also preempted by EPCA, an absurd result.

Many other areas of traditional state regulation would also be at risk of preemption under Plaintiffs' reasoning. For example, the Maryland electrical code limits the total amperage of

13

appliances on any given circuit; if a building owner wishes to install appliances that use more energy, they must put in additional electric wiring. 2020 NFPA 70 §§ 210.21-25.[6] Putting an upper limit on the amount of energy used on a given circuit restricts the appliances' energy use at least as directly as limiting the amount of emissions a building can emit, and offers the same sort of options: a building owner could change the design of the building by, in the case of circuit limits, adding in more circuits and eventually upgrading the electrical panel, or in the case of emissions limits, improving insulation and lowering the heating needs of the house. And only the BEPS offers the alternative of simply paying an alternative compliance fee, making it *less* restrictive of appliance usage than the state electrical code.

Even the state's noise regulations are at risk under this theory. Maryland limits the aggregate amount of permissible noise in most cases to between 55 and 75 A-weighted decibels (dbA), depending on the area and the time of day. Code Md. Regs. § 26.02.03.02(B). These noise standards function similarly to the BEPS' $CO_2e$ targets, in that both limit emissions from appliances without regulating those appliances. Louder EPCA-covered appliances, such as industrial air compressors, cannot operate at all without taking other compensating measures to reduce noise emissions.[7] Other EPCA-covered appliances, such as televisions, must be operated in a limited manner to avoid exceeding the noise emission caps.[8] And, as with maximum circuit

---

[6] Maryland has adopted the National Fire Protection Association's Standard 70, also known as the National Electrical Code, by reference. Md. Code Ann., Pub. Safety § 12-603(1). The standard is available at https://link.nfpa.org/free-access/publications/70/2020.

[7] DOE has designated industrial air compressors as EPCA-covered appliances pursuant to 42 U.S.C. § 6312(b). *See generally* 81 Fed. Reg. 79,991 (Nov. 15, 2016). Such air compressors can easily exceed certain state noise limits; for example, air compressors used for construction typically emit 80 dbA of noise at 50 feet of distance. *E.g.*, Fed. Transit Admin., *Transit Noise and Vibration Impact Assessment Manual*, tbl. 7-1 (2018), *available at* https://www.transit.dot.gov/sites/fta.dot.gov/files/docs/research-innovation/118131/transit-noise-and-vibration-impact-assessment-manual-fta-report-no-0123_0.pdf.

[8] Television sets are designated as covered products in 42 U.S.C. § 6292(a)(12).

14

load, there is no alternative compliance option for Maryland noise regulations that is equivalent to the BEPS' alternative compliance fee. Thus, Maryland's noise-control regulations "penalize and restrict" the use of EPCA-covered appliances even more directly than BEPS regulations.

There is no principled way to distinguish, for the purposes of EPCA preemption, between the BEPS and these other commonsense regulations. If Plaintiffs were correct that EPCA's preemption provision could apply to the BEPS, all these regulations—and, no doubt, myriad others—would be subject to challenge. Congress cannot possibly have intended this when it enacted the current EPCA preemption language, and therefore Plaintiffs' interpretation must be incorrect.

### Conclusion

EPCA does not preempt regulations like the BEPS and expanding EPCA preemption to include them would threaten a large swath of core state authority, something Congress clearly did not intend. The Center therefore urges the Court to dismiss this case.

Dated: May 12, 2025                                    Respectfully submitted,

    /s/                           /s/

Jon A. Mueller                                         Daniel Carpenter-Gold (admitted *pro hac vice*)
Environmental Law Clinic                               Jamie Long
University of Maryland, Carey School of Law            Public Health Law Center
500 W. Baltimore St.                                   Mitchell Hamline School of Law
Baltimore, MD 21201                                    875 Summit Ave.
JMueller@law.umaryland.edu                             St. Paul, MN 55105
410-706-0590                                           Daniel.CarpenterGold@mitchellhamline.edu
                                                       651-290-6329
(signed by Daniel Carpenter-Gold with permission
of Jon A. Mueller)                                     *Counsel for the Public Health Law Center*

15