**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARYLAND BUILDING INDUSTRY
ASSOCIATION, INC., et al.,

              *Plaintiffs*,

   v.

SERENA COLEMAN MCILWAIN, in her
Official Capacity as the Secretary of the
Maryland Department of the Environment,

              *Defendant*.

CASE NO. 8:25-CV-00113-DLB

**PLAINTIFFS' RESPONSE TO DEFENDANT'S MOTION
TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

TABLE OF CONTENTS

**Page**

Table of Contents ..................................................................................................................... i

Table of Authorities ................................................................................................................ ii

Introduction ............................................................................................................................. 1

Background .............................................................................................................................. 1

    I.     The Energy Policy and Conservation Act ................................................................. 1

    II.    The Maryland BEPS ................................................................................................. 5

    III.   Plaintiffs' Challenge ................................................................................................. 7

Legal Standards ....................................................................................................................... 8

Argument ................................................................................................................................. 9

    I.     EPCA's text, history, and purpose establish that it preempts the Maryland
        BEPS. ........................................................................................................................ 9

        A.   EPCA's plain text expressly preempts the Maryland BEPS because it
            is a regulation "concerning" the "energy use" and "energy efficiency"
            of EPCA-covered appliances. .......................................................................... 9

        B.   EPCA's history and purpose further confirm its preemption of the
            Maryland BEPS. ............................................................................................. 15

    II.    The various arguments to the contrary cannot save the Maryland BEPS from
        preemption. ............................................................................................................. 18

        A.   *Berkeley* was rightly decided and applies here. ........................................... 18

        B.   EPCA does not create a right to use gas appliances. ..................................... 27

        C.   The parade of horribles presented by the State and its *amici* is both
            overblown and not implicated here. ............................................................... 28

Conclusion ............................................................................................................................. 30

TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Air Evac EMS v. Cheatham*,
   910 F.3d 751 (4th Cir. 2018) ....................................................................................................9

*Altria Grp., Inc. v. Good*,
   555 U.S. 70 (2008)....................................................................................................................11

*American Trucking Associations, Inc. v. City of Los Angeles*,
   569 U.S. 641 (2013)............................................................................................................26, 27

*Asgrow Seed Co. v. Winterboer*,
   513 U.S. 179 (1995)..................................................................................................................20

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)....................................................................................................................8

*Association of Contracting Plumbers of the City of New York, Inc. v. City of New York*,
   No. 23-CV-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) .....................................19, 27

*Brotherhood of R.R. Trainmen v. Balt. & O. R. Co.*,
   331 U.S. 519 (1947)..................................................................................................................20

*Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*,
   519 U.S. 316 (1997)..................................................................................................................30

*Cal. Rest. Ass'n v. City of Berkeley*,
   547 F. Supp. 3d 878 (N.D. Cal. July 6, 2021) .........................................................................23

*California Restaurant Association v. City of Berkeley*,
   89 F.4th 1094 (9th Cir. 2024) ................................................. 1, 10-13, 15, 17, 19, 20,  24,  28

*Dan's City Used Cars, Inc. v. Pelkey*,
   569 U.S. 251 (2013)..................................................................................................................28

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
   541 U.S. 246 (2004)..................................................................................................................27

*Env't Def. v. Duke Energy Corp.*,
   549 U.S. 561 (2007)..................................................................................................................21

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000)............................................................................................................16, 22

*Firestone Tire & Rubber Co. v. Bruch*,
    489 U.S. 101 (1989)......................................................................................................29

*Flores-Figueroa v. United States*,
    556 U.S. 646 (2009)......................................................................................................16

*Georgia v. Pub. Res. Org.*,
    590 U.S. 255 (2020)......................................................................................................19

*Holland v. Burlington Indus., Inc.*,
    772 F.2d 1140 (4th Cir. 1985) .....................................................................................29

*Jackson v. Metropolitan Edison Co.*,
    419 U.S. 345 (1974)......................................................................................................26

*Lamar, Archer & Cofrin, LLP v. Appling*,
    584 U.S. 709 (2018)......................................................................................................11

*Medtronic, Inc. v. Lohr*,
    518 U.S. 470 (1996)......................................................................................................15

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)......................................................................................................11

*Nat. Res. Def. Council, Inc. v. Herrington*,
    768 F.2d 1355 (D.C. Cir. 1985).....................................................................................16

*Nat'l Fed. of Indep. Bus. v. Sebelius*,
    567 U.S. 519 (2012)......................................................................................................29

*Nat'l Meat Ass'n v. Harris*,
    565 U.S. 452 (2012)................................................................................................26, 27

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
    591 F.3d 250 (4th Cir. 2009) .........................................................................................8

*Pa. Dep't of Corrections v. Yeskey*,
    524 U.S. 206 (1998)......................................................................................................20

*Poudel v. Mid Atl. Pros., Inc.*,
    115 F.4th 287 (4th Cir. 2024) .........................................................................................8

*Puerto Rico v. Franklin Cal. Tax-free Tr.*,
    579 U.S. 115 (2016)........................................................................................................9

*Pulsifer v. United States*,
    601 U.S. 124 (2024)......................................................................................................12

iii

*Rowe v. New Hampshire Motor Transp. Ass'n*,
  552 U.S. 364 (2008)................................................................................27, 29

*Scott v. Baltimore County*,
  101 F.4th 336 (4th Cir. 2024) .........................................................................19

*Scrimgeour v. Internal Rev.*,
  149 F.3d 318 (4th Cir. 1998) ..........................................................................21

*United States v. Montejo*,
  442 F.3d 213 (4th Cir. 2006) ..........................................................................16

*Util. Air. Grp. v. EPA*,
  573 U.S. 302 (2014)..................................................................................21, 22

**CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATIONS**

U.S. Const. VI, cl. 2 ...............................................................................................28

42 U.S.C. § 6291.........................................................................................9, 10, 13, 20

42 U.S.C. § 6292.....................................................................................................21

42 U.S.C. § 6295............................................................................................4, 17, 21

42 U.S.C. § 6297.......................................................1, 4, 9, 10, 12, 13, 17, 18, 20, 23, 27

42 U.S.C. § 6311............................................................................................9, 10, 13, 20,

42 U.S.C. § 6313......................................................................................................5

42 U.S.C. § 6316.........................................................................1, 5, 9, 10, 13, 18, 23

Md. Code Envir. § 2-1602 ......................................................................................14

Pub. L. No. 94-163, 89 Stat. 871 (1975)...............................................................2, 16

Pub. L. No. 95-619, 92 Stat. 3206 (1978)..............................................................3, 16

Pub. L. No. 100-12, 101 Stat. 103 (1987)..............................................................3, 4

10 C.F.R. § 430.32 ...................................................................................................5

16 C.F.R. § 305.1 ...................................................................................................21

**OTHER AUTHORITIES**

11 Weekly Comp. Pres. Doc. 40, 41 (Jan. 20, 1975)................................................16

Black's Law Dictionary 1158 (5th ed. 1979)...................................................................................11

Cambridge English Dictionary Online...........................................................................................10

H.R. Rep. No. 94-340 (1975).........................................................................................................2

H.R. Rep. No. 100-11 (1987).............................................................................................4, 5, 17

Oxford English Dictionary Online (2022) ....................................................................................10

Julia Richardson & Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat. Res. &
    Env't 62 (1995)......................................................................................................................3

S. Rep. No. 94-516 (1975).......................................................................................................1, 16

S. Rep. No. 100-6 (1987) ............................................................................3, 4, 7, 16, 17, 18

*Standards and Test Procedures*, DOE, https://www.energy.gov/eere/buildings/standards-and-
    test-procedures .......................................................................................................................5

U.S. Environmental Protection Agency, How *Portfolio Manager Calculates Emissions*,
    ENERGY STAR. ....................................................................................................................7

**INTRODUCTION**

The core of this case is simple and straightforward.  The federal Energy Policy and Conservation Act ("EPCA") expressly preempts State laws "concerning the energy efficiency [or] energy use" of gas appliances.  42 U.S.C. §§ 6297(c), 6316(b)(2)(A).  The Maryland Building Energy Performance Standards ("Maryland BEPS") are precisely that.  They impose declining net kilogram of carbon dioxide equivalent per square foot ("Kg CO2e/sq. ft.") emissions limits—eventually going all the way down to zero—on a large swath of buildings in the State.  Because all gas appliances emit some level of carbon dioxide and other gases that qualify as CO2e under the Maryland BEPS, the Maryland BEPS regulate those appliances' energy use and energy efficiency by restricting—and ultimately prohibiting entirely (unless the building owner goes to extreme lengths to avoid to their emissions or pays a non-compliance fee)—those necessary byproducts of their use of gas energy.  The Maryland BEPS thus plainly qualify as a State law "concerning the energy efficiency [or] energy use" of gas appliances.  EPCA's text, context, history, and purpose are all in accord on this point and confirm that EPCA preempts laws like the Maryland BEPS.  The Ninth Circuit followed similar reasoning when it struck down the City of Berkeley's gas ban in *California Restaurant Association v. City of Berkeley*, 89 F.4th 1094 (9th Cir. 2024).  This Court should follow suit, hold that EPCA preempts the Maryland BEPS, and deny the State's motion to dismiss on that basis.

**BACKGROUND**

## I.    The Energy Policy and Conservation Act

EPCA was first passed in 1975 to create a comprehensive energy policy to address the serious economic and national security problems associated with our nation's continued reliance on foreign energy resources.  *See* S. Rep. No. 94-516, at 116-17 (1975).  Since then, Congress has amended EPCA several times to emphasize the federal government's intent to regulate appliance

1

energy use and efficiency and limit states' ability to act in those areas.

The original 1975 EPCA provisions regarding consumer appliances focused on appliance labeling, with the expectation that consumers would choose more efficient appliances if they had access to accurate information about efficiency.  Pub. L. No. 94-163, 89 Stat. 871 (1975).  The statute accordingly required manufacturers to label their appliances and provided that the Secretary of the Federal Energy Administration should issue energy-efficiency standards if the labeling program proved ineffective.    Pub. L. No. 94-163, §§ 324-325, 89 Stat. at 920-24. Contemporaneous legislative materials make that vision clear: "[I]t is the Committee's hope that voluntary efforts by manufacturers and better consumer information will make energy efficiency standards unnecessary; however, should the labeling program not suffice, energy efficiency standards should be utilized to achieve the goals of the legislation."  H.R. Rep. No. 94-340, at 95 (1975).

In addition to this consumer-empowering approach, the original EPCA also permitted significant state involvement in appliance regulation.  Specifically, it allowed state regulations that differed from federal regulations, but only if the state regulations were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard.  Pub. L. No. 94-163, § 327, 89 Stat. at 926-27.  Thus, as originally enacted in 1975, EPCA's provisions regarding energy efficiency took a laissez faire approach to appliance use and efficiency and permitted state regulation, assuming there was a showing of local need.

Since 1975, however, Congress has amended EPCA several times, progressively moving away from this laissez faire approach and toward binding federal appliance standards.  Each one of these amendments further strengthened the federal government's role in regulating appliance energy use and efficiency and restricted states' abilities to set their own standards.

First, in 1978, Congress passed a range of statutes that gave the federal government broader authority over energy policy to ensure national security, decrease energy consumption, reduce dependency on energy imports, generate a strategic petroleum reserve, and broadly develop reliable sources of energy to sustain economic growth. *See* Julia Richardson & Robert Nordhaus, *The National Energy Act of 1978*, 10 Nat. Res. & Env't 62, 62-63 (1995). President Carter also created the federal Department of Energy ("DOE") in 1977 to coordinate a federal response to the nation's energy problems.

One of those 1978 statutes was the National Energy Conservation Policy Act ("NECPA"), Pub. L. No. 95-619, 92 Stat. 3206 (1978), which amended the 1975 EPCA. Rather than rely exclusively on labeling, as EPCA had done, NECPA required DOE to prescribe minimum energy-efficiency standards for certain products. Pub. L. No. 95-619, sec. 422, § 325, 92 Stat. at 3259-62. NECPA also strengthened EPCA's preemption provisions, allowing state regulations that were more stringent than federal regulations, but only if the Secretary found that there was a significant state or local interest to justify the regulation and that the regulation would not unduly burden interstate commerce. Pub. L. No. 95-619, sec. 424, § 327(b), 92 Stat. at 3263-64.

Despite NECPA's new requirements, DOE did not act to adopt federal minimum energy standards. Instead, it "initiated a general policy of granting petitions from States requesting waivers from preemption." S. Rep. No. 100-6, at 4 (1987). "As a result, a system of separate State appliance standards ha[d] begun to emerge and the trend [was] growing." *Id.*

So, in 1987, Congress responded by passing the National Appliance Energy Conservation Act ("NAECA"), Pub. L. No. 100-12, 101 Stat. 103 (1987). The purpose of the NAECA amendment was "to reduce the regulatory and economic burdens on the appliance-manufacturing industry through the establishment of national energy conservation standards for major residential

3

appliances." S. Rep. No. 100-6, at 2. As the Senate at the time recognized, DOE's abdication of its standard-setting responsibility and its freewheeling policy of granting preemption waivers had created "the problem of a growing patchwork of differing State regulations which would increasingly complicate [appliance manufacturers'] design, production and marketing plans." *Id.* at 4. Similarly, reports about NAECA in the House make clear that Congress sought to "end the era of confusion and uncertainty" for the appliance industry and "protect the appliance industry from having to comply with a patchwork of numerous conflicting State requirements." H.R. Rep. No. 100-11, at 23, 30 (1987).

NAECA thus contained "two basic provisions": "[t]he establishment of Federal standards and the preemption of State standards." S. Rep. No. 100-6, at 2. "In general, these national standards would preempt all State standards." *Id.* To that end, EPCA's current preemption provision regarding consumer appliances reads:

> [E]ffective on the effective date of an energy conservation standard established or prescribed under [42 U.S.C. § 6295] for any covered product, **no State regulation concerning the energy efficiency, energy use,** or water use **of such covered product shall be effective with respect to such product**.

42 U.S.C. § 6297(c) (emphases added).

After NAECA, federal law provided two routes for a state or local jurisdiction to avoid preemption. First, DOE can grant a waiver of preemption in certain limited circumstances. *Id.* § 6297(d). Second, performance-based building codes for new construction can qualify for an exception from preemption if they meet a strict seven-part test. *Id.* § 6297(f). As the House Report regarding NAECA explains, this exception is intended to "prevent[] state building codes from being used as a means of setting mandatory State appliance standards in excess of Federal Standards." H.R. Rep. No. 100-11, at 26. Flexibility under this exception was "limited" to "ensure

that performance-based codes cannot expressly or effectively require the installation of covered products whose efficiencies exceed . . . the applicable Federal standard . . . ." *Id.*

Congress amended EPCA once more through the Energy Policy Act of 1992. Pub. L. No. 102-486, 106 Stat. 2776 (1992). That amendment expanded the federal appliance program to include energy-efficiency standards for industrial appliances as well as consumer appliances. EPCA's current preemption provision regarding industrial appliances reads:

> A standard prescribed or established under section 6313(a) of this title shall, beginning on the effective date of such standard, **supersede any State or local regulation concerning the energy efficiency or energy use of a product** for which a standard is prescribed or established pursuant to such section.

42 U.S.C. § 6316(b)(2)(A) (emphasis added). Likewise, a pathway was added for a state building code regulation for new construction concerning industrial appliances to be exempt from preemption: the regulation must "not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1." *Id.* § 6316(b)(2)(B)(i).

Thus, in its present form, EPCA covers both consumer and industrial appliances, sets federal standards for the energy use and efficiency of those products, and preempts State regulations concerning those matters.

Invoking its authority under EPCA, DOE has set energy conservation standards for over 70 consumer and industrial appliances. *Standards and Test Procedures*, DOE, https://www.energy.gov/eere/buildings/standards-and-test-procedures. To name a few, gas stoves, ovens, furnaces, water heaters, dryers, and commercial boilers are all subject to federal energy conservation standards DOE has promulgated under EPCA. *Id.*; 10 C.F.R. § 430.32.

## II.   The Maryland BEPS

In December 2024, the Maryland Department of the Environment adopted subtitle 28 of

title 26 of the Code of Maryland Regulations ("COMAR").  Starting in 2030, these Maryland BEPS impose declining net Kg CO2e/sq. ft. emissions limits—eventually going all the way down to zero by 2040—on a large swath of buildings in the State.  Buildings must comply by ceasing their on-site gas combustion and other emissions-generating conduct, avoiding their CO2e emissions through extreme and costly means (such as by installing "carbon capture technologies," *see* Mot., ECF 49-1 at 5), or paying a substantial fee for emissions in excess of the limits.

Examining the Maryland BEPS in more detail, they apply to all "[c]overed building[s]," which include any

> building that is a commercial or multifamily residential building in the State of Maryland . . . and has a gross floor area of 35,000 square feet or more, excluding the parking garage area and is (i) [a] single building; (ii) [o]ne or more buildings held in the condominium form of ownership with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, and governed by a single board of managers; or (iii) [t]wo or more buildings with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, that are served in whole or in part by the same electric or gas meter or are served by the same heating or cooling system or systems, which is not a district energy system.

COMAR 26.28.01.02B(15).  The Maryland BEPS also contain limited exemptions for some "covered buildings," including for certain building types and for building owners that can demonstrate particular financial distress.  COMAR 26.28.04.02.

The Maryland BEPS impose interim and final "net direct emissions standards" measured on a Kg CO2e/sq. ft. on the buildings they cover.  COMAR 26.28.03.02A.  "Net Direct Emissions" are "(i) [t]he sum of all direct greenhouse gas emissions from a covered building; or (ii) [f]or a covered building connected to a district energy system, direct greenhouse gas emissions plus the greenhouse gas emissions attributable to thermal energy inputs from the district energy system used by the covered building . . . ."  COMAR 26.28.01.02B(31).  "Direct greenhouse gas emissions" are "greenhouse gas emissions produced on-site by covered buildings, as calculated by the benchmarking tool unless otherwise specified by the Department."  COMAR 26.28.01.02(17).

That "benchmarking tool" is the U.S. Environmental Protection Agency's ENERGY STAR Portfolio Manager. COMAR 26.28.01.02(10). It calculates "building's emissions (including carbon dioxide, methane, and nitrous oxide) from on-site fuel combustion and purchased electricity and district heating and cooling. Portfolio Manager also enables tracking of avoided emissions from any green power purchases." U.S. Environmental Protection Agency, How *Portfolio Manager Calculates Emissions*, ENERGY STAR, https://www.energystar.gov/buildings/benchmark/understand-metrics/how.

The Maryland BEPS' performance standards differ by building type (*e.g.*, multifamily housing, office, strip mall, etc.), and come in three forms: the Interim Standard for years 2030-2034, the Interim Standard for years 2035-2039, and the Final Standard for year 2040 and beyond. COMAR 26.28.03.02A.  Measured as Kg CO2e/sq. ft., the Interim Standard for years 2030-2034 is the highest, followed by the Interim Standard for years 2035-2039.  The Final Standard for all non-exempt building types is 0 Kg CO2e/sq. ft. *Id.*  Owners of covered buildings can opt to pay a fee in lieu of meeting the standard, starting at $230 per metric ton of excess CO2e in 2030, and increasing each year thereafter.  COMAR 26.28.04.01A.

### III.    Plaintiffs' Challenge

Plaintiffs—a diverse coalition of condominium associations, cooperative housing associations, construction and real estate trade associations, and utilities, *see* Am. Compl., ECF 36, ¶¶ 13-25—challenge the Maryland BEPS as preempted under EPCA and seek declaratory and injunctive relief.  Plaintiffs stand to lose much if the State is not enjoined from enforcing the Maryland BEPS.

For example, members of some Plaintiffs—including BOMA Baltimore, NAIOP MD, Inc., NAIOP DC | MD, Inc., Maryland Multi-Housing Association, Inc., and the Apartment and Office Building Association of Metropolitan Washington—will be forced to fund expensive electric

7

retrofits of their buildings or face the yearly penalty for non-compliance. *Id.* ¶¶ 14-18, 24.  The Maryland BEPS harm gas utilities as well, as they will erode the customer base of Plaintiffs Washington Gas Light Company and Columbia Gas of Maryland, Inc. *Id.* ¶¶ 19, 25.  Additionally, because the Maryland BEPS will dampen the growth of gas customers statewide, they will result in higher gas prices for those customers that remain since that smaller pool of customers will have to bear the costs of maintenance of the gas system. *Id.* § 19.  Those higher gas prices will harm many of the Plaintiffs. *Id.* ¶¶ 13-14, 17-18, 20-24.  Plaintiffs' harms will be further exacerbated by the fact that energy demand will ineluctably shift to the State's electric system, which is facing both historic and increasing electricity demand and dwindling dispatchable electricity supply. *Id.* ¶ 5.

To prevent and mitigate these harms, Plaintiffs brought this suit for declaratory and injunctive relief.

## LEGAL STANDARDS

Under Rule 12(b)(6), a "complaint . . . must contain sufficient facts to state a claim that is plausible on its face." *Poudel v. Mid Atl. Pros., Inc.*, 115 F.4th 287, 290 (4th Cir. 2024) (alteration in original) (internal quotation marks and citation omitted).  "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  When evaluating whether a claim has facial plausibility, the Court must accept all well-pleaded facts as true and construe them in the light most favorable to Plaintiffs.  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

**ARGUMENT**

**I.    EPCA's text, history, and purpose establish that it preempts the Maryland BEPS.**

EPCA preempts the Maryland BEPS.  Its plain text establishes that, and an examination of its history and purpose only further confirms that conclusion.

**A.    EPCA's plain text expressly preempts the Maryland BEPS because it is a regulation "concerning" the "energy use" and "energy efficiency" of EPCA-covered appliances.**

1.    Plaintiffs and the State agree that because EPCA contains an express preemption provision, this Court's preemption analysis should begin and end with the statute's plain text.  *See* Mot., ECF 49-1, at 8 ("[T]he Supreme Court has held that assessing the text of an express preemption provision should be the first and last step to interpreting its meaning because the plain wording of the clause necessarily contains the best evidence of Congress's preemptive intent.").  Thus, the presumption against preemption, which the State vaguely gestures to elsewhere in its motion, *see id.* at 21 n.5, has no place here.  Supreme Court and Fourth Circuit precedent confirm that point.  *See Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 116 (2016) ("[B]ecause the statute contains an express pre-emption clause, we do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." (internal quotation marks omitted)); *Air Evac EMS v. Cheatham*, 910 F.3d 751, 762 n.1 (4th Cir. 2018) ("We think the best course is simply to follow as faithfully as we can the wording of the express preemption provision, without applying a presumption one way or the other.").

Examining EPCA's plain text, it becomes clear that the Maryland BEPS must fall to EPCA preemption because they are regulations "concerning the" "energy use" or "energy efficiency" of EPCA-covered appliances.  42 U.S.C. §§ 6297(c), 6316(b)(2)(A).  The statute defines those terms broadly.  EPCA defines "energy" as "electricity[] or fossil fuels," such as natural gas.  42 U.S.C.

9

§§ 6291(3), 6311(7). It then defines "energy use" as "the quantity of energy directly consumed by a consumer product at point of use" for consumer products and as "the quantity of energy directly consumed by an article of industrial equipment at the point of use" for industrial products and specifies certain procedures for measuring that value. *Id.* §§ 6291(4), 6311(4). So EPCA preemption is aimed at regulations concerning the "quantity"—*i.e.*, how much, if any—of "energy"—including "fossil fuels" such as natural gas—that can be used by an EPCA-covered product at its "point of use"—*i.e.*, "the place where or time when a product or service is used," Cambridge English Dictionary Online[1]; *see also Berkeley*, 89 F.4th at 1101 ("'[P]oint of use' means the 'place where something is used.'" (quoting Oxford English Dictionary Online (2022)).

As for "energy efficiency," EPCA defines that term as "the ratio of the useful output of services from a consumer product [or an article of industrial equipment] to the energy use of such product [or article]" and specifies procedures for measuring that value. 42 U.S.C. §§ 6291(5), 6311(3). So the higher the appliance's "energy efficiency," the less energy (*e.g.*, electricity or fossil fuels) it requires for the same amount of output. EPCA preempts any regulations concerning efficiency standards for covered appliances.

Congress's use of the term "concerning" further broadens the scope of EPCA's preemption provision, as the State acknowledges. *See* Mot., ECF 49-1, at 14 (admitting that "'concerning' may be interpreted as broadening the scope of preemption"). Congress could have employed narrower language—for example, preempting only regulations "of" the energy efficiency or energy use of EPCA-covered appliances. But Congress chose instead to preempt all regulations "*concerning* the energy efficiency [or] energy use" of EPCA-covered appliances. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A) (emphasis added). "'Concerning' means 'relating to,' and is the

---

[1] https://dictionary.cambridge.org/us/dictionary/english/point-of-use.

equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018). Such language "has a broadening effect, ensuring that the scope of a provision covers not only its subject but also matters relating to that subject," and courts therefore read it "expansively." *Id.* at 717-18. Indeed, the Supreme Court has held as much: "We ha[ve] previously held that the meaning of the key phrase in the ADA's preemption provision, '*relating to* rates, routes, or services,' is a broad one." *Altria Grp., Inc. v. Good*, 555 U.S. 70, 85 (2008) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383-84 (1992)). Specifically, "relating to" is the equivalent of "concerning," *Appling*, 584 U.S. at 717, and it means "to stand in some relation; to have bearing or concern; to pertain; refer; to bring into association with or connection with." *Morales*, 504 U.S. at 383 (quoting Black's Law Dictionary 1158 (5th ed. 1979)). "[T]he words thus express a broad pre-emptive purpose." *Id.*

Most importantly here, the word "concerning" indicates an intent to preempt not only regulations that look like DOE's standards, but also regulations that merely "concern[]" covered appliances' energy efficiency or energy use. *Cf. Morales*, 504 U.S. at 383-90 (holding that the Airline Deregulation Act, which prohibits States from enforcing any law "relating to rates, routes, or services" of any air carrier, preempts not only State laws "actually prescribing rates, routes, or services," but also fare-advertising guidelines that "would have a significant impact upon . . . the fares [airlines] charge"). The Ninth Circuit's observations on this point are especially instructive here:

> By using the term "concerning," Congress meant to expand preemption beyond direct or facial regulations of covered appliances. And a building code that bans the installation of piping that transports natural gas from a utility's meter on the premises to products that operate on such gas "concerns" the energy use of those products as much as a direct ban on the products themselves.

*Berkeley*, 89 F.4th at 1103.

11

This "concerning" language is one of several textual indications of EPCA's broad preemptive scope. The preemption provision also contains explicit exceptions and waiver procedures which make plain that it reaches beyond regulation of how covered appliances are designed and manufactured. As for the exceptions, the statute contains an entire subsection detailing the "[e]xception for certain building code requirements" from the preemption provision for consumer appliances. 42 U.S.C. § 6297(f). It specifies the circumstances in which "a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of [a] covered product" can avoid preemption. *Id*. § 6297(f)(3).

The requirements to trigger the exception include, for example, that "[t]he code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective" and that "[t]he energy consumption or conservation objective is specified in terms of an estimated total consumption of energy . . . utilizing an equivalent amount of energy." *Id.* § 6297(f)(3)(A), (F). To avoid reading this exception as a nullity, EPCA's general preemption provision must extend, at a minimum, to building codes that set "energy consumption or conservation" requirements. *See Pulsifer v. United States*, 601 U.S. 124, 143 (2024) ("When a statutory construction thus 'render[s] an entire subparagraph meaningless,' this Court has noted, the canon against surplusage applies with special force."). As the Ninth Circuit put it, "subsection (f) demonstrates that EPCA's preemptive scope extends beyond direct or facial regulations of covered products to at least include building codes 'concerning the energy . . . use' [or energy efficiency] of such products." *Berkeley*, 89 F.4th at 1101.[2]

---

[2] EPCA's preemption provision for industrial appliances similarly provides that a "State or local building code for new construction" can avoid preemption if "the standard in the building code

Also instructive are EPCA's provisions specifying the circumstances in which DOE can and cannot waive preemption.  DOE cannot waive preemption if the "State regulation will significantly burden manufacturing, marketing, distribution, sale, or servicing of the covered product on a national basis."  42 U.S.C. § 6297(d)(3); *see also id.* § 6316(b)(2)(D) (providing that § 6297(d) governs waivers for regulations concerning industrial appliances as well).  This is yet another indication that EPCA's preemption provision covers far more than direct regulations of an appliance's specifications, as the Ninth Circuit has explained:

> So the federal government must consider the complete lifecycle of an appliance— from manufacturing to servicing—in reviewing a waiver petition.  Such a provision would make little sense if the scope of EPCA's preemption ends with the design or manufacture of the product.  A burden on "servicing," for example, may implicate regulation of the installation and use of the product—like [a] building code.  And no doubt [a building code gas] ban, if adopted by States and localities throughout the country, would "significantly burden" the "sale" of covered products "on a national basis."

*Berkeley*, 89 F.4th at 1104.  Putting together all of this statutory text and context, in the words of the Ninth Circuit, "EPCA preempts regulations . . . [concerning] 'the quantity of [natural gas] directly consumed by' certain consumer [and industrial] appliances at the place where those products are used."  *Id.* at 1101.  And it also preempts regulations concerning their "energy efficiency"—*i.e.*, "the ratio of useful output of services" from a product to its "energy use."  42 U.S.C. §§ 6291(5), 6311(3).

2.      EPCA preempts the Maryland BEPS at issue here.  Because all EPCA-covered gas appliances emit some level of carbon dioxide and other gases that qualify as CO2e under the Maryland BEPS, the Maryland BEPS regulate those appliances' energy use and energy efficiency

---

does not require that the energy efficiency of such product exceed the applicable minimum energy efficiency requirement in amended ASHRAE/IES Standard 90.1."  42 U.S.C. § 6316(b)(2)(B). The implication is similar—that if the exception does not apply, then EPCA's preemption provision extends to such building codes.

by restricting—and ultimately prohibiting entirely—those necessary byproducts of their use of gas energy. The effect of the Maryland BEPS declining net Kg CO2e/sq. ft. requirements is best illustrated by considering what will happen once they reach zero, as it will in 2040. Md. Code Envir. § 2-1602(a)(2); COMAR 26.28.03.02A. At that point, the Maryland BEPS effectively become a ban on gas appliances. To be sure, a building owner can escape that ban by avoiding the gas appliances' emissions through costly means or by paying a fee for exceeding the permitted Kg CO2e/sq. ft. Md. Code Envir. § 2-1602(c)(2)(v); COMAR 26.28.04.01. But the key is that a building owner will not be able to use any gas appliances whatsoever without incurring additional costs through either avoiding their emissions or paying the non-compliance fee. That is no different than a gas ban that has a monetary penalty for non-compliance. The regulated public faces the same choice between giving up their gas appliances or paying a monetary cost. And, notably, those costs will rise in proportion to the gas appliances' "energy use" and "energy efficiency" since the fee is set per metric ton of CO2e emissions.

That same basic reasoning holds true during the period in which the Maryland BEPS will allow a positive net Kg CO2e/sq. ft. value as well. *See* Md. Code Envir. § 2-1602(a)(1); COMAR 26.28.03.02A. True, during that phase of the regulatory requirements, the Maryland BEPS will not amount to an outright gas ban. But they will be restricting and penalizing the use of gas appliances nonetheless. The limited Kg CO2e/sq. ft. foot allotment caps the amount of energy gas appliances can use. That impacts both the energy use and energy efficiency of gas appliances—the former by restricting the amount of energy they can use and the latter by penalizing less efficient and rewarding more efficient gas appliances. Gas appliances will also eat into the CO2e that buildings are allowed to emit, meaning that each use of any gas appliance—and particularly a less efficient gas appliance—will limit both their future use and the use of gas or electricity

14

generally.  Again, a building owner can avoid these restrictions by paying money—either for means to offset those emissions or for the fee for emitting in excess of the regulatory limit—but that does not somehow transform the nature of the regulations.  Either way, the Maryland BEPS are restricting and penalizing the use of covered gas appliances.

At the very least, all of that makes the Maryland BEPS a regulation "concerning" gas appliances' energy use and energy efficiency.  As discussed above, Congress's use of the term "concerning" significantly broadens the scope of EPCA's preemption provision.  *See supra* pp. 10-11.  A regulation that restricts the amount of energy gas appliances can use—and eventually bans them from using any energy at all—surely at least "concern[s]" the energy use and energy efficiency of gas appliances.  Indeed, even the *dissent* in *Berkeley* acknowledged that EPCA would preempt regulations that "cap[] overall energy consumption per apartment or per building." *Berkeley*, 89 F.4th at 1125 (Friedland, J., dissenting from denial of rehearing en banc).  That is precisely what the Maryland BEPS do.

\*        \*        \*

In sum, the textual analysis yields a single inexorable conclusion: the Maryland BEPS fall squarely within EPCA's preemption provision as a regulation "concerning" both the "energy use" and "energy efficiency" of EPCA-covered products.

### B.    EPCA's history and purpose further confirm its preemption of the Maryland BEPS.

EPCA's history and purpose confirm what the statute's plain text already makes evident— that EPCA preempts the Maryland BEPS.  *Cf. Medtronic, Inc. v. Lohr*, 518 U.S. 470, 490 (1996) (noting the relevance "of the basic purpose of the legislation as well as its history" to preemption).  As explained above, EPCA embodies a sweeping national policy concerning the energy use and energy efficiency of consumer and industrial appliances.  In response to the 1970s oil crises,

15

"President Ford called for 'the strongest and most far-reaching energy conservation program we have ever had.'"  *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1364 (D.C. Cir. 1985) (quoting 11 Weekly Comp. Pres. Doc. 40, 41 (Jan. 20, 1975)).  Hearing the call, Congress enacted what it regarded as a "comprehensive national energy policy."  *E.g.*, S. Rep. No. 94-516, at 116-17 (1975).

The several amendments to EPCA over the years, which have progressively clamped down on state regulatory departures and ratcheted up on federal uniformity, further contextualize EPCA's broad preemptive scope.  *Cf. United States v. Montejo*, 442 F.3d 213, 215 (4th Cir. 2006) ("[W]e look to the statutory language and structure and the legislative history and purpose of the statute."), *abrogated on other grounds by Flores-Figueroa v. United States*, 556 U.S. 646 (2009); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000) (observing that, "over time . . . subsequent acts can shape or focus those meanings" of a statute).  As originally enacted in 1975, EPCA permitted differing state appliance regulations, so long as there was a demonstrated need, the regulations did not interfere with interstate commerce, and the regulations were more stringent than the federal standard.  *See* Pub. L. No. 94-163, § 327(b)(2), 89 Stat. at 927.  Three years later, NECPA amended portions of EPCA, specifying that states could prescribe regulations more stringent than federal regulations only if DOE granted a waiver.  *See* Pub. L. No. 95-619, § 424(a), 92 Stat. at 3263-64 (1978).  But in the ensuing years, as states frequently sought waivers from EPCA's preemption provision, Congress came to recognize "the problem of a growing patchwork of differing State regulations" across the country that had "increasingly complicate[d appliance manufacturers'] design, production and marketing plans."  S. Rep. No. 100-6, at 4.  The parochial state regulatory regimes had, according to federal lawmakers, created

16

"an era of confusion and uncertainty" for appliance manufacturers, who were forced to comply with "numerous conflicting State requirements." H.R. Rep. No. 100-11, at 23, 30.

Congress fixed this problem of balkanization by amending EPCA to centralize appliance regulation in DOE and strengthening EPCA's preemptive effect, both of which brought needed uniformity to the appliance industry. As a Senate report at the time put it, the overarching purpose of the amendments was "to reduce the regulatory and economic burdens on the appliance-manufacturing industry through the establishment of national energy conservation standards for major residential appliances." S. Rep. No. 100-6, at 2. Nationalizing these standards and tightening waiver requirements benefitted consumers as well. Rather than subjecting them to a "patchwork" of state regulations, under which some appliances would be outlawed, Congress expressly sought to avoid any state deviation that would "result in the unavailability in the State of a product type or of products of a particular performance class." *Id.*; *see* 42 U.S.C. §§ 6295(o)(4), 6297(d)(4).[3] Thus, with the amendments over the years, Congress continually strengthened EPCA's preemptive effect and substantially narrowed states' ability to depart from the federal regime.

The upshot of these several amendments is that EPCA became a muscular federal regulatory regime that protects consumer choice from local regulatory deviations. Or, in the Ninth Circuit's words, "by enacting EPCA, Congress ensured that States and localities could not prevent consumers from using covered products in their homes, kitchens, and businesses." *Berkeley*, 89 F.4th at 1103. Hence, EPCA's broadly phrased preemption clause preempting "any State regulation concerning [covered appliances'] energy efficiency or energy use," 42 U.S.C.

---

[3] The same Senate Report provided an example: "[The statute], upon a sufficient showing, would forbid a standard for small gas furnaces being set at a level that would increase the price to the point that the product would be noncompetitive and that would result in minimal demand for the product." S. Rep. 100-6, at 8-9.

§§ 6297(c), 6316(b)(2)(a), along with the stringent requirements for a waiver or exception, *id*. §§ 6297(d), (f), 6316(b)(2)(D).

The purpose and history of EPCA, in short, reinforce Congress's intent to preempt state regulations concerning appliances' energy use and energy efficiency. And it demonstrates, more specifically, that the Maryland BEPS are exactly the sort of state law that Congress sought to prevent. If allowed to stand and proliferate, appliance manufacturers would once again be subjected to a "patchwork" of regulatory regimes across the nation, with gas appliances penalized (and even prohibited) in some states and localities and permitted in others. S. Rep. No. 100-6, at 4. The penalties that the Maryland BEPS and similar regulations impose on gas appliances could also render them effectively "unavailab[le]" in those jurisdictions. *Id.* at 8; *see also supra* p. 14 (explaining that the Maryland BEPS ultimately will amount to a gas-appliance ban). It is clear from EPCA's history and purpose that Congress intended to avoid all of this. That manifest intention bolsters the plain-text analysis discussed above and confirms that EPCA preempts the Maryland BEPS.

## II.     The various arguments to the contrary cannot save the Maryland BEPS from preemption.

The State and its *amici* take issue with this straightforward application of EPCA, as understood in light of its purpose, context, and history. Yet none of their counterarguments can overcome the fact that the Maryland BEPS run headlong into federal law. Plaintiffs will address each of them in turn.

### A.     *Berkeley* was rightly decided and applies here.

While laws like the Maryland BEPS and gas-appliance bans are a relatively recent legislative innovation, this Court is not the first to address EPCA's preemptive effect on them. In *Berkeley*, the Ninth Circuit rejected the artificially narrow construction of EPCA's preemption

provision that the State now champions. That case concerned an ordinance "prohibiting the installation of natural gas piping within newly constructed buildings." *Berkeley*, 89 F.4th 1098. Much of the Ninth Circuit's reasoning has been discussed above and will not be repeated here. The key takeaway is that "a building code that prohibits consumers from using natural gas-powered appliances in newly constructed buildings necessarily regulates the 'quantity of energy directly consumed by [the appliances] at point of use.'" *Id.* at 1102 (alteration in original). "So, by its plain language, EPCA preempts Berkeley's regulation . . . because it prohibits the installation of necessary natural gas infrastructure on premises where covered appliances are used." *Id.* That understanding of EPCA's preemptive scope—and particularly the meaning of "concerning" and "energy use"—applies here to confirm that the Maryland BEPS also "concern" the "energy use" and "energy efficiency" of EPCA-covered gas appliances.

1.    The State protests against *Berkeley* in various ways. First, the State points out that *Berkeley* "prompted a robust dissent from eight of the Circuit's [judges]." Mot., ECF 49-1, at 22. True enough, but "comments in a dissenting opinion . . . 'are just that: comments in a dissenting opinion.'" *Georgia v. Pub. Res. Org.*, 590 U.S. 255, 273 (2020) (brackets and citation omitted). The dissent obviously did not garner enough votes from the full court to warrant reconsidering the panel's decision. *Berkeley* is now the law of the Ninth Circuit and a decision from which the Fourth Circuit would be reluctant to depart. *See Scott v. Baltimore County*, 101 F.4th 336, 348 (4th Cir. 2024) ("[W]e try to avoid creating circuit splits . . . ."), *cert. denied*, 145 S. Ct. 1898 (2025).

Relying on *Association of Contracting Plumbers of the City of New York, Inc. v. City of New York*, No. 23-CV-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025), *appeal docketed*, No. 25-977 (2d. Cir. Apr. 21, 2025), the State then argues that the Ninth Circuit "interpreted 'energy

19

use' using an incomplete definition, stressing that its "test procedures" component must mean that it "is a predetermined standard of how much energy is used by the product as developed, designed, and manufactured, regardless of how often or in what manner an end user might employ that product." Mot., ECF 49-1, at 10, 22. The State's argument here, however, cannot be squared with the fact that the parties in *Berkeley* extensively briefed the meaning of "energy use," including what import, if any, "test procedures" had on the issue. So it was not as if the Ninth Circuit analyzed the issue unaware of the definition or simply ignored part of it in order to reach a particular result, as the State seems to suggest. A fairer reading of *Berkeley* shows that the Ninth Circuit employed a more holistic approach to EPCA, interpreting "energy use" in light of its surrounding context,[4] including how EPCA's use of the word "concerning" expanded its preemptive reach and how the term "energy use" was employed in a way that aligned with the plain meaning of "point of use"—that is, where the consumer actually uses the appliance. *See Berkeley*, 89 F.4th 1103 (rejecting the "cabined" view of EPCA that the State now advances as "divorced from the statute's text"); *see also id.* at 1101 (analyzing the issue based on "EPCA's text, structure, and context").

As Plaintiffs have explained, *see supra* pp. 10-11, 15, "concerning" expands EPCA's preemption provision, and because "point of use" is not defined by the statute, courts construe it according to its ordinary meaning. *See Asgrow Seed Co. v. Winterboer*, 513 U.S. 179, 187 (1995)

---

[4] The State also makes much of the fact that the title of EPCA's preemption provision mentions only "energy conservation standards." *See* Mot., ECF 49-1, at 11-12. But the Supreme Court has repeatedly held that "the title of a statute cannot limit the plain meaning of the text." *Pa. Dep't of Corrections v. Yeskey*, 524 U.S. 206, 212 (1998) (alterations omitted) (quoting *Brotherhood of R.R. Trainmen v. Balt. & O. R. Co.*, 331 U.S. 519, 528-29 (1947)). Examining that text, EPCA's preemption provision distinguishes between "energy conservation standards" and "regulation[s] concerning energy efficiency [or] energy use," 42 U.S.C. § 6297(c), and defines those terms differently, *compare id.* §§ 6291(4)-(5), 6311(3)-(4), *with id.* § 6291(6). So it is clear that the title cannot limit the application of EPCA solely to energy conservation standards, as the State suggests.

("When terms used in a statute are undefined, we give them their ordinary meaning."); *Scrimgeour v. Internal Rev.*, 149 F.3d 318, 327 (4th Cir. 1998) (similar); *see also* Mot., ECF 49-1, at 7 (urging that the Court interpret the statute according to its "plain meaning"); *id.* at 24 (similar). Also instructive is that Congress employed the term "energy use" elsewhere in EPCA in ways that comport with Plaintiffs' understanding. *See, e.g.*, 42 U.S.C. § 6292(b)(1)(B) (permitting classification of a covered product if the "average annual per-household *energy use* by products of such type is likely to exceed 100 kilowatt-hours (or its Btu equivalent) per year" (emphasis added)); *id.* § 6295(*l*)(1)(B) (permitting the promulgation of energy conservation standards for products if, *inter alia*, "the aggregate household *energy use* within the United States by products of such type (or class) exceeded 4,200,000,000 kilowatt-hours (or its Btu equivalent) for any such 12-month period." (emphasis added)). Those provisions plainly refer not to some immutable characteristic of a product as its rolls off the factory floor, as the State insists, but rather to its actual energy use in practice.

This statutory context also shows why the State misses the mark when it redirects the Court's attention to various EPCA appliance-labeling requirements. *See* Mot., ECF 49-1, at 24. Plaintiffs have never disputed that "energy use" can be used differently in different contexts. As the Supreme Court has recognized, "the presumption of consistent usage 'readily yields' to context, and a statutory term—even one defined in the statute—'may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.'" *Util. Air. Grp. v. EPA*, 573 U.S. 302, 320 (2014) (quoting *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007)). So it is beside the point whether Plaintiffs' interpretation can be grafted onto labeling regulations. *See* Mot., ECF 49-1, at 24 (citing, *e.g.*, 16 C.F.R. § 305.1). As with any interpretive endeavor, understanding the meaning of "energy use" is a context- and provision-

21

specific inquiry. *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 133 (noting the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme"). And that is especially true where, as here, the statutory term is used in multiple different provisions in multiple different senses. *Cf. Util. Air Grp.*, 573 U.S. at 318-20 (noting the many instances the term "air pollution" is used throughout the Environmental Protection Act and how it is used in both broad and narrow senses). The State, in short, must do more than merely point to labeling requirements if it wants to sidestep EPCA's broad preemption provision.

In any event, this debate over the meaning of "energy use" ultimately does not matter. Even if "energy use" were narrowly defined to refer only to a product's characteristics determined at the time of manufacture, regulations like Berkeley's gas ban or the Maryland BEPS would still "concern" an EPCA-covered product's energy use because they limit and penalize their use of gas energy. And that is true whether their "energy use" is determined on the factory floor using DOE test procedures, as the State believes, or where consumers actually use the appliances in the real world. Either way, gas appliances are penalized for using gas energy. Framed in terms of the parties' differing views of the preemption provision, that means both penalizing all gas appliances that have a figure greater than zero specified on their kBTUs/year energy use labels—by making it harder and more costly to operate those appliances in covered buildings—and penalizing the actual use of any gas appliance in a covered building. So however "energy use" may be defined and measured for the particular EPCA-covered gas appliance at issue, the Maryland BEPS "concern" its "energy use" (and "energy efficiency") by limiting and penalizing its use of gas energy.

2. In addition to attacking *Berkeley* head-on, the State also attempts to distinguish it in two ways. It claims that the Maryland BEPS avoid preemption because, unlike the ban at issue in *Berkeley*, (1) the Maryland BEPS are not a building code for new construction, and (2) they do not prohibit the use of gas-powered appliances. Neither is persuasive.

The State asserts that the Maryland BEPS are not a building code and acts as if that is a get-out-of-preemption-free card that immunizes the Maryland BEPS from EPCA preemption. Mot., ECF 49-1, at 26-29. But that is not how it works. EPCA does not preempt *only* "building codes," but rather all "State regulation[s] concerning the energy efficiency [or] energy use . . . of [a] covered product." 42 U.S.C. §§ 6297(c), 6316(b)(2)(a). Building codes are just one example of such regulations that can be preempted if they concern the energy efficiency or energy use of EPCA-covered appliances, but there is no basis for claiming that building codes are the sole member of that category. Rather, EPCA preempts any and all state regulations that concern the energy efficiency or energy use of EPCA-covered appliances, regardless of what label they may bear.

Another false premise in the State's argument is that the Maryland BEPS are not a "building code." After all, they are a regulatory "code" that imposes mandatory requirements on "buildings." The fact that the State slapped a "BEPS" rather than "building code" label on those regulations should not matter because, in substance, the Maryland BEPS function as a building code. Instructively, the Ninth Circuit took this same functional view in *Berkeley*, where—even though the City of Berkeley codified the gas ban ordinance in its Health and Safety rather than Building and Construction title[5]—the court nevertheless characterized the ordinance as a "building

---

[5] City of Berkeley, Municipal Code Title 12, Health and Safety, Chapter 12.80 (repealed), https://berkeley.municipal.codes/BMC/12.80; *see also Cal. Rest. Ass'n v. City of Berkeley*, 547 F. Supp. 3d 878, 883 (N.D. Cal. July 6, 2021) ("Significantly, the Ordinance is part of Title 12 of

23

code." 89 F.4th at 1098.

In any event, assuming *arguendo* that the Maryland BEPS are not a "building code," the notion that building codes can fall inside EPCA's preemptive scope while BEPS cannot makes no sense as a practical matter. The only meaningful sense in which BEPS differ from traditional building codes is that their application is not limited to new buildings (or renovations of existing buildings). Rather, BEPS broadly apply to both new and existing buildings. They take provisions that could be placed in a traditional building code and then spring them on buildings that have stood for decades, thereby creating a kind of retroactive building code. Needless to say, that makes compliance substantially more difficult since it will involve expensive retrofits for structures that were not built with those requirements in mind. But EPCA-covered appliances use energy in both existing and new buildings. So it would be irrational for EPCA to preempt traditional building codes but not BEPS, since they are essentially building codes on steroids. Indeed, if it were otherwise, the State could simply sidestep EPCA altogether by placing its restrictions and bans on gas appliances in its BEPS rather than in its traditional building codes. No serious interpretation of federal law could allow for such hyper-formalistic gamesmanship.

The State also contends that neither *Berkeley* nor EPCA have any application here because the Maryland BEPS do "not prohibit consumers from using natural gas-powered appliances or prohibit the installation of natural gas infrastructure." Mot., ECF 49-1, at 27. On this point, the State explains that the Maryland BEPS offer alternative compliance paths, such as by installing carbon-capture technology. *Id.* at 28. The State's *amici* echo this point, emphasizing that the Maryland BEPS "allow for a variety of compliance pathways," Br. *Amicus Curiae* PHLC, ECF 52, at 4, and that "the BEPS act[] as a flexible and phased program," Br. *Amici Curiae* Sierra Club

the Berkeley Municipal Code, which concerns 'Health and Safety.' This is separate from title 19, regarding 'Buildings and Construction,' which contains Berkeley's building and energy code.").

& CCAN, ECF 47, at 3.  The point they are making here, it seems, is that the Maryland BEPS are not an outright ban on the use of gas appliances.

There are few problems to unpack there.  First, whether the Maryland BEPS completely ban gas appliances is not the dispositive question in the preemption inquiry.  EPCA would preempt the State from setting a 500 kBtu/year "energy use" limit on gas stoves as much it would a 0 kBtu/year limit (*i.e.*, a ban), because both "concern" the "energy use" of EPCA-covered gas appliances.  So too here.  Regardless of whether the Maryland BEPS amount to a ban or merely heavily penalize gas usage, they at least "concern" the "energy use" and "energy efficiency" of EPCA-covered gas appliances, and this is all that is needed to trigger preemption under EPCA. *See supra* pp. 10-11, 15.  Second, alternative compliance pathways, such as the installation of carbon-capture technology, illustrate well why EPCA preempts the Maryland BEPS.  The installation of such technology presumably would have to be considered when designing and manufacturing EPCA-covered products—precisely the kind of factory-floor complications that the State admits EPCA preemption was designed to prevent.  *See* Mot., ECF 49-1, at 24.  And third, to the extent it matters, the Maryland BEPS become a ban by 2040, as explained above.  *See supra* p. 14.  The presence of "a variety of compliance pathways" does not change the fact that unless the regulated public pays money one way or another, they will not be allowed to use their gas appliances past that date.  *See supra* p. 14.

The State and its *amici* also engage in needless semantics to assure the Court that the "alternative compliance fee" solves all these problems because it is not a penalty but instead a compliance fee.  *E.g.*, Mot., ECF 49-1, at 28.  *Amicus* PHLC even dives into the niceties of criminal-punishment theory to make the point, speaking about "levels of guilt" and the discretion courts typically have when assessing fines.  *See* Br. *Amicus Curiae* PHLC, ECF 52, at 4-5.  To the

extent legislative labels matter, *but see, e.g.*, *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 350-54 (1974) (rejecting a state legislative label as belied by its substance), this semantic argument makes no difference to the people and businesses like Plaintiffs who must now shoulder the financial burden the Maryland BEPS impose.  Whether one calls it a "fine," a "penalty," or an "alternative compliance fee," the effect is all the same:  Consumers will have to pay that monetary exaction if they fail to meet the Maryland BEPS' mandatory net Kg CO2e/sq. ft. limits by, say, using their EPCA-covered gas appliances too much.  That confirms the Maryland BEPS at least "concern" the "energy use" or "energy efficiency" of EPCA-covered gas appliances.

The State and its *amici* try another similar maneuver.  The State emphasizes that the Maryland BEPS require "*buildings* to achieve 'net direct emissions standards,'" while EPCA preemption applies only "with respect to" covered products.  Mot., ECF 49-1, at 13-14.  EPCA "is chiefly concerned with setting energy efficiency standards for appliances," Sierra Club and CCAN add, and the Maryland BEPS, by contrast, "are aimed at reducing emissions from buildings."  Br. *Amici Curiae* Sierra Club & CCAN, ECF 47, at 11.  *Amicus* PHLC then piles on, arguing that "[b]ecause the BEPS do not regulate any appliances, they are not preempted by EPCA."  Br. *Amicus Curiae* PHLC, ECF 52, at 5.

These arguments are nothing more than red herrings—and quite similar to ones the Supreme Court has rejected before.  *See, e.g.*, *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012) (holding that a state could not avoid preemption "just by framing it as a ban on" something else up the supply chain, effectively forcing the producers to change their operations).  As the Supreme Court put it in *American Trucking Associations, Inc. v. City of Los Angeles*, "[w]e have often rejected efforts by States to avoid preemption by shifting their regulatory focus from one company to another in the same supply chain."  569 U.S. 641, 652 (2013).  There have been many such

efforts,[6] and this appears to be yet another.  It makes no difference whether the Maryland BEPS target the manufacturers who make the EPCA-covered appliances or the buildings where EPCA-covered appliances are used.  EPCA applies all the same.  *See, e.g.*, 42 U.S.C. § 6297(f) (providing, under certain circumstances not present here, an exception to preemption for building codes). Thus, under the reasoning of *Harris*, *American Trucking Association*, and others, the State and its *amici* cannot so easily avoid EPCA by moving the goalposts.

### B.       EPCA does not create a right to use gas appliances.

The State also suggests that Plaintiffs are advocating for an "affirmative right to use appliances in any location they choose."  Mot., ECF 49-1, at 25; *see also id.* at 19 ("Contrary to Plaintiffs' contention, EPCA's preemption clause does not create an affirmative right for consumers to use covered appliances at a particular location or in any manner they choose.").  After creating this strawman, the State decries it as an "absurd result," *id.* at 25, again relying on the reasoning of *Association of Contract Plumbers*, which also bought into the idea that Plaintiffs' reading of EPCA would somehow "grant consumers an absolute right to use such products."  2025 WL 843619, at *5.

That misunderstands the basic question at issue.  This case is not about any "right" to use a particular appliance, let alone an "absolute right" to use one in "any manner" and in "any location" of choice.  *Id.*; Mot., ECF 49-1, 19, 25.  Plaintiffs have never asked for anything of the sort.  This case instead poses a rather simple but classic question that arises when state and federal law clash: Which controls?  With respect to regulations "concerning" the "energy use" and "energy

---

[6] *E.g.*, *Rowe v. New Hampshire Motor Transp. Ass'n*, 552 U.S. 364, 371-73 (2008) (finding preemption under the Federal Aviation Administration Authorization Act although the State's requirements directly targeted retailers rather than motor carriers); *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 255 (2004) (finding preemption under the Clean Air Act although the requirements directly targeted car buyers rather than sellers).

efficiency" of covered gas appliances, EPCA, along with the Supremacy Clause of the Constitution, *see* U.S. Const. VI, cl. 2, establishes that area as the exclusive domain of federal law, with no room for state laws like the Maryland BEPS to intrude on that sphere.

The question here, then, is not whether consumers have an unqualified right to purchase gas appliances, or whether manufacturers have a corresponding right to sell them, but rather whether states and localities can obstruct that otherwise lawful commerce consistent with EPCA. The text, purpose, and history of EPCA all demonstrate that they cannot. That is a different matter entirely from the creation of some right to use gas appliances, as the Ninth Circuit recognized in *Berkeley*. *See* 89 F.4th at 1106 (noting that it "does not follow" from its decision that "the City must affirmatively make natural gas available everywhere" because its "very narrow" holding "doesn't touch on whether the City has any obligation to maintain or expand availability of a utility's delivery of gas to meters").

### C. The parade of horribles presented by the State and its *amici* is both overblown and not implicated here.

The State and its *amici* repeatedly emphasize throughout their briefing that Plaintiffs' reading of EPCA poses an existential threat to the State's police powers and that all sorts of long-existing regulations will now fall into EPCA's gravitational pull. *E.g.*, Mot., ECF 49-1, at 21 ("Those powers should be preserved lest all public safety-based regulations limiting pollution from electricity or fossil-fuel-powered equipment be preempted as regulating energy use."). These claims are exaggerated and incorrect.

As a preliminary matter, none of these broader questions are at issue here. To be sure, as the Ninth Circuit explained in *Berkeley*, "the breadth of EPCA's preemption provision 'does not mean sky is limit.'" *Berkeley*, 89 F.4th at 1103 (quoting *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013)). But that court had no occasion to explore the outer reaches of those limits

in *Berkeley*, and its holding thus had "nothing to say about a State or local government regulation of a utility's distribution of natural gas to premises where covered products might be used." *Id.* This Court finds itself in the same position. While delineating the outer bounds of EPCA's broad preemption provision will not be an easy task, this Court has no occasion to undertake it here. This is not an edge case. It does not concern some tailored regulation, but rather the penalization and eventual ban of covered gas appliances in many buildings throughout the State. This case, therefore, does not require the Court to delimit the boundaries of EPCA preemption. *Cf. Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 585 (2012) ("It is enough for today that wherever that line may be, the statute is surely beyond it.").

Moving to the substance of these arguments, *amici* Sierra Club and CCAN claim that the Maryland BEPS are a valid exercise of the State's police power since the State has the power to protect its residents from air pollution and the Maryland BEPS further that end. *See* Br. *Amici Curiae* Sierra Club & CCAN, ECF 47, at 11-12. But simply because the State retains the power to protect its residents from air pollution as a general matter does not mean that any and all regulations implementing that power are immune from preemption. Both the Supreme Court and Fourth Circuit have rejected that argument before. *See Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 374 (2008) ("Despite the importance of the public health objective, we cannot agree with Maine that federal law creates an exception on that basis, exempting state laws that it would otherwise pre-empt."); *Holland v. Burlington Indus., Inc.*, 772 F.2d 1140, 1148 n.6 (4th Cir. 1985) (rejecting a state official's "argument for a Tenth Amendment exception from ERISA's preemption . . . or an exception based on the state's police power"), *abrogated on other grounds by Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989).

29

*Amicus* PHLC, for its part, argues that other health and safety regulations (*e.g.*, prohibitions of using portable generator indoors, water-use permitting, noise ordinances) are also at risk of being preempted by EPCA. *See generally* Br. *Amicus Curiae* PHLC, ECF 52, at 9-14. But PHLC's parade of horribles can be traced to a single faulty premise: that "the chain of causality Plaintiffs assert could extend indefinitely." *Id.* at 11. PHLC then follows that faulty premise down to its logical conclusion, imagining on the way all sorts of regulations that could be implicated in a never-ending causal chain. *Id.* at 9-14.

But Plaintiffs are not advocating that position. Rather, Plaintiffs maintain that the "objectives" of EPCA, along with its text, history, and purpose, serve as the surest guide in determining "the scope of the state law that Congress understood would survive." *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 325 (1997) (internal quotation marks omitted). The State agrees. *See* Mot., ECF 49-1, at 14 (submitting that the Court must analyze "the structure, context, and history of the statute to identify the scope of where 'concerning' ends"). So the relevant limiting principle here can be derived from Plaintiffs' extensive briefing regarding the text, history, and purpose of EPCA, not an indefinite causal chain that *amicus* PHLC invented. However far the outer boundaries of the area preempted by EPCA extends, the statute's text, history, and purpose confirm that the Maryland BEPS fall squarely within it.

**CONCLUSION**

For these reasons, the Court should deny Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint.

Plaintiffs request a hearing on this matter.

Respectfully submitted,

BAKER BOTTS L.L.P.

/s/ Scott Novak_____
Scott Novak (Bar ID: 1736274)
700 K St NW
Washington, DC
202.639.1316
scott.novak@bakerbotts.com

J. Mark Little (*pro hac vice*)
910 Louisiana Street
Houston, TX 77098
713.229.1489
mark.little@bakerbotts.com

*Counsel for Counsel for Maryland Building Industry Association, Inc., The Builders Owners and Managers Association of Greater Baltimore, Inc., NAIOP Maryland, Inc., NAIOP DC | MD, Inc., Washington Gas Light Company, Leisure World Community Corporation, The Elizabeth Condominium Association, Inc., Promenade Towers Mutual Housing Corporation, The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., Apartment and Office Building Association of Metropolitan Washington, and Columbia Gas of Maryland, Inc.*

31