# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| **MARYLAND BUILDING INDUSTRY ASSOCIATION, INC., ET AL.** * * * | |
| **Plaintiffs,** * * | |
| **V.** * * | **CIVIL NO. 8:25-cv-00113-DLB** |
| **SERENA COLEMAN McILWAIN, IN HER OFFICIAL CAPACITY AS SECRETARY OF THE MARYLAND DEPARTMENT OF THE ENVIRONMENT,** * * * * * | |
| **Defendant.** * * | |

······························································

## REPLY MEMORANDUM IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

Defendant, Serena Coleman McIlwain in her Official Capacity as Secretary of the Maryland Department of the Environment ("Department") submits this reply Memorandum in further support of its Motion to Dismiss Plaintiffs' First Amended Complaint for failure to state a claim.

Respectfully submitted:

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Doris N. Lange*
Doris N. Lange
Assistant Attorney General
Federal Bar No.: 19679

Maryland Department of the
Environment
1800 Washington Boulevard, Suite 6048
Baltimore, MD 21230
Phone: 410-537-3038
Fax: 410-538-3943
doris.lange@maryland.gov

Michael F. Strande
Assistant Attorney General
Federal Bar No.: 30039
Maryland Department of the
Environment
1800 Washington Boulevard, Suite 6048
Baltimore, MD 21230
Phone: 410-537-3421
Fax: 410-538-3943
michael.strande@maryland.gov

*Attorneys for Defendant*

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ........................................................................................................... 1

I. This Court Must Not Depart from Well-Established Tenets of Statutory Interpretation .................................................................................................. 1

    A. Energy Use Should be Defined Using the Statutory Definition and Technical, Specialized Meanings ............................................................ 2

    B. Technical Terms Do Not Take on Different Meanings in Different Contexts Within the Same Statute ......................................................... 4

II. The Regulation's Potential Effects on the Use of Gas Appliances are at Most Incidental and Outside the Scope of EPCA's Preemption Clause ...................... 7

    A. Preemption is not Determined by the Impact on Natural Gas Appliance Use ............................................................................................................ 7

    B. Preemption is Not Determined by Downstream Market Responses ....... 9

    C. The Regulation does not Impair Congress' Intent to Eliminate a Patchwork of Regulations ..................................................................... 12

III. EPCA's Waiver for Building Codes is Not Evidence that EPCA is Meant to Preempt State Regulations of Greenhouse Gas Emissions from Large Buildings ...................................................................................................... 12

IV. Conclusion ................................................................................................... 15

CERTIFICATE OF SERVICE AND NOTICE OF ELECTRONIC FILING ................... 16

**TABLE OF AUTHORITIES**

Page

**Cases**

*Air Conditioning, Heating & Refrigeration Inst. v. City of Albuquerque*, 835 F. Supp. 2d 1133 ................................................................................................ 14

*Air Conditioning and Refrigeration Inst. v. Energy Res. Conservation and Dev. Comm'n*, 410 F.3d 492 .......................................................................................... 12

*Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York*, No. 23-cv-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) *appeal docketed*, No. 25-977 (2d. Cir. Apr. 21, 2025) ............................................................... 8

*Building Industry Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1134 ................................................................................................ 14

*California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094 ................................. 3, 7, 8, 14, 15

*Dole v. United Steelworkers of Am.*, 494 U.S. 26 ................................................ 13

*Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*, 706 F.3d 499 ......................... 5, 6

*Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149 ................................................... 3

*Meese v. Keene*, 481 U.S. 465 ................................................................................. 2

*Mulhern Gas Co., Inc. v. Mosley,* No. 1:23-cv-01267-GTS-PJE, 2025 WL 2062194 (N.D.N.Y. July 23, 2025) ................................................................ 9, 10, 13

*Rinnai America Corp. v. South Coast Air Quality Management District*, No. 2:24-cv-10482-PA-PD, slip op. (C.D. Cal. July 22, 2025) ....................... 8, 9, 10, 11, 12, 13

*United States v. Butler*, 297 U.S. 1 ....................................................................... 3

*Utility Air Regulatory Group v. EPA,* 573 U.S. 302 ............................................. 4

**Statutes**

42 U.S.C. § 6291 ............................................................................................................... 7

42 U.S.C. § 6291(4)-(6).................................................................................................. 2, 4

42 U.S.C. § 6292(a)(20) ................................................................................................... 5

42 U.S.C. § 6292(b) .......................................................................................................... 6

42 U.S.C. § 6292(b)(1) .................................................................................................. 5, 7

42 U.S.C. § 6292(b)(1)(B)............................................................................................. 5, 6

42 U.S.C. § 6292(b)(2)(A)................................................................................................ 5

42 U.S.C. § 6293 ............................................................................................................ 2, 4

42 U.S.C. § 6294 .............................................................................................................. 6

42 U.S.C. § 6295(f)(3)..................................................................................................... 12

42 U.S.C. § 6295(f)(3)(A) ............................................................................................... 13

42 U.S.C. § 6295(f)(3)(C) ............................................................................................... 13

42 U.S.C. § 6295(f)(3)(E)................................................................................................ 13

42 U.S.C. § 6295(f)(3)(F)................................................................................................ 13

42 U.S.C. § 6295(f)(3)(G) .............................................................................................. 13

42 U.S.C. § 6295(*l*)(1) .................................................................................................... 6

42 U.S.C. § 6295(*l*)(1)(B)......................................................................................... 5, 6, 7

42 U.S.C. § 6297(c) ........................................................................................................ 10

42 U.S.C. § 6297(f) ......................................................................................................... 15

42 U.S.C. § 7602(g)........................................................................................................... 4

## Regulations

40 C.F.R. § 52.1070.................................................................................................. 11

81 Fed. Reg. 11,454-01 (March 4, 2016) ............................................................... 7

81 Fed. Reg. 11,456-57 (March 4, 2016) ............................................................... 7

COMAR 26.11.19.21 ............................................................................................ 11

COMAR 26.11.19.21(D)(2) .................................................................................. 11

COMAR 26.11.19.21(E)(1)................................................................................... 11

**PRELIMINARY STATEMENT**

Plaintiffs' Response to the Department's Motion to Dismiss Plaintiffs' First Amended Complaint argues that the text, history, purpose, and context of the Energy Policy and Conservation Act of 1975 ("EPCA") should inform the interpretation of its preemption clause. *See, e.g.*, ECF 55 at 9 and 28-30. The Department agrees. Yet, counter to those considerations, the Plaintiffs urge this Court to ignore the technical meaning and statutory definitions of the terms employed by EPCA's preemption clause, thereby affording "concerning" an impermissibly expansive scope. The Court should reject that invitation as discussed in the Department's memorandum supporting its motion to dismiss, ECF 49-1, and for the following additional reasons.

**ARGUMENT**

**I.      This Court Must Not Depart From Well-Established Tenets of Statutory Interpretation**

This case largely hinges on how the Court interprets the meaning of the term "energy use" as Congress intended its use in EPCA. Plaintiffs suggest that energy use should be interpreted by its plain, dictionary meaning, and that its meaning changes throughout the statute depending on its context. ECF 55 at 22. Conversely, the Department asks this Court to apply the well-settled interpretive maxim that technical and specialized terms be assigned their technical meaning and that this meaning be applied consistently throughout EPCA. *See* ECF 49-1 at 9 and 23.

1

### A. Energy Use Should be Defined Using the Statutory Definition and Technical, Specialized Meanings

The Court should reject Plaintiffs' suggestion that it ignore the statutory definition of "energy use" and instead employ a plain meaning analysis for obvious reason.  ECF 55 at 10.  The purpose of defining a word within a statute is so that its ordinary dictionary meaning is not implied or assumed, and to ensure only the identified elements of a definition are applied.  *Meese v. Keene*, 481 U.S. 465, 484-85 (1987) ("It is axiomatic that the statutory definition of the term excludes unstated meanings of that term."). Congress defined "energy use" and "energy efficiency" with precision; it requires both terms to be "determined in accordance with the test procedures under 42 U.S.C. § 6293."[1]  *See* 42 U.S.C. § 6291(4)-(6) (statutory definitions for energy efficiency, energy use, and energy conservation standards).  Merriam-Webster defines "determined" to mean "having reached a decision"[2] and "in accordance with," as an idiom meaning "in a way that agrees with or follows."[3]  The ordinary meaning of the undefined words in the definition demonstrates that "energy use" and "energy efficiency" are constrained by the test procedures in § 6293.

---

[1]    Entitled "Test procedures," 42 U.S.C. § 6293, among other things, sets general parameters and rules surrounding test procedures applicable to EPCA-covered products, directs the Secretary of the DOE to adopt regulations prescribing test procedures for covered products, and sets forth rules on advertising products subject to test procedures applying to manufacturer, distributor, retailers, and private labelers.

[2]    "Determined," Merriam-Webster.com, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/determined (accessed August 8, 2025).

[3]    "In accordance with," Merriam-Webster.com, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/in%20accordance%20with (accessed August 8, 2025).

These definitions are integral to the statute's operation and must be used when interpreting the scope of EPCA preemption.  *See* ECF 49-1 at 9-10; 16-17; and 22-23.

Plaintiffs incorrectly conclude that the Ninth Circuit has conclusively determined "the meaning of 'energy use,' including what import, if any, 'test procedures' had on the issue."  ECF 55 at 20; *California Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1125 (9th Cir. 2024).  To the contrary, Congress, not the Ninth Circuit has already decided the "import" of test procedures and how they relate to energy use, by including those procedures in the term's definition.  It is Plaintiffs, not the Department, that cannot square their interpretation of "energy use" in a way that comports with the statutory definition, regardless of the Ninth Circuit's decision.  An interpretation of "energy use" without acknowledgement that the term is "determined in accordance with" test procedures is inaccurate because every word within a statute has a purpose and should be given its due significance.  *United States v. Butler*, 297 U.S. 1, 65 (1936).

The full definition of "energy use" gives the necessary context to understand the technical term of art, "point of use."  When interpreting the detailed technical scheme enacted by Congress, and the U.S. Department of Energy's (hereinafter, "DOE") technical implementing regulations on the subject, it would be improper for this Court to default to the ordinary meaning of technical or statutorily defined terms without first consulting EPCA's text and context.  *See* ECF 49-1 at 9 and 23; *Digital Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018) ("When a statute includes an explicit definition, we must follow that definition, 'even if it varies from a term's ordinary meaning.'") (internal citation omitted). Considered in the context of DOE's implementing regulations, it is clear that

3

"point of use" is a technical term that limits a calculation of "energy use" to energy consumed by a covered product, without accounting for the energy lost prior to reaching the location where the product is plugged in. ECF 49-1 at 23. Through its technical definitions and terms of art, Congress cabined the relevant provisions of EPCA's reach to pre-market activities—not downstream emissions controls imposed on building owners.

### B. Technical Terms Do Not Take on Different Meanings in Different Contexts Within the Same Statute

To support their argument that the definition of "energy use" varies by context, even within EPCA's statutory framework, Plaintiffs cite *Utility Air Regulatory Group v. EPA,* 573 U.S. 302 (2014), a case interpreting the Clean Air Act's broad definition of "air pollutant." ECF 55 at 22. Plaintiffs' reliance on this case is inapposite.[4] In contrast to the broad, non-technical meaning of "air pollutant" at issue in *Utility Air Regulatory Group*, EPCA provides a technical and narrow definition of "energy use" linking it directly to federally prescribed "test procedures." 42 U.S.C. § 6291(4)-(6); 42 U.S.C. § 6293. A consistent, technical interpretation of these terms is integral to the statute's function of

---

[4] 42 U.S.C. § 7602(g) defines "air pollutant" as "any air pollution agent or combination of such agents, including any physical, chemical, biological, radioactive (including source material, special nuclear material, and byproduct material) substance or matter which is emitted into or otherwise enters the ambient air," including "any precursors to the formation of any air pollutant, to the extent the [EPA] Administrator has identified such precursor or precursors for the particular purpose for which the term 'air pollutant' is used." This definition displays the breadth meant to encompass the various contexts in which the U.S. Environmental Protection Agency is authorized to regulate all types of air pollutants, without specific, determinative requirements applicable to each due to the various different pollutant-specific programs of that sprawling statute.

regulating product performance under its design constraints and therefore demands adherence to its specific technical definitions.

EPCA's labeling requirements—providing that covered products must be labeled with their energy use—merely illustrates that the term as defined is a calculated, static assessment of the typical quantity of energy consumed by such a product, determined in advance of its installation at a particular location.  ECF 49-1 at 24.  Plaintiffs acknowledge the Department's interpretation comports with the term's use in EPCA's labeling provisions but summarily dismiss any implication that might spring therefrom.  ECF 55 at 21.

Instead, Plaintiffs identify 42 U.S.C. § 6292(b)(1)(B) and § 6295(*l*)(1)(B) as two instances where they believe Congress "employed the term 'energy use' [] in ways that comport with Plaintiffs' understanding." *Id*.  Without support for their assertion, Plaintiffs contend that energy use in those provisions "plainly refer[s]…to its actual energy use in practice." *Id*.  In reality, neither provision requires an evaluation of "actual energy use." Rather, those sections are merely prerequisites to establishing EPCA regulations.

Section 6292(b)(1)(B) sets forth one of two criterion which must be met for the Secretary of the DOE to classify a consumer product not already listed pursuant to EPCA's catch-all classification at § 6292(a)(20).  *Hearth, Patio & Barbecue Ass'n v. U.S. Dep't of Energy*, 706 F.3d 499, 501 (D.C. Cir. 2013).  Specifically, the DOE must show that (1) the classification was "necessary or appropriate" to carry out the chapter's purpose, and (2) the "average annual per-household energy use by products of such type is likely to exceed 100 kilowatt-hours [] per year." *Id*.; 42 U.S.C. § 6292(b)(1).  Importantly, § 6292(b)(2)(A) defines "average annual per-household energy use with respect to a type of product" to

5

mean the "estimated aggregate annual energy use (in kilowatt-hours or the Btu equivalent) of consumer products of such type which are used by households in the United States, divided by the number of such households which use products of such type." It is clear from this definition that Congress did not intend for "energy use" to be measured by the amount of energy a particular product consumes in an individual household. Rather, the average estimation required by § 6292(b)(1)(B) involves the energy use of the product class currently on the market measured in accordance with test procedures as designed, manufactured, and sold, without any evaluation of actual use thereafter.

Next, where the DOE satisfies this threshold jurisdictional test of § 6292(b) for catch-all regulation, it may not regulate unless it makes all four showings under 42 U.S.C. § 6295(*l*)(1).[5] *Hearth, Patio & Barbecue Ass'n*, 706 F.3d at 501. Plaintiffs cite to one of those factors which requires a determination that the aggregate household energy use within the United States by products of such type exceeds 4.2 billion kilowatt-hours in a 12-month period. 42 U.S.C. § 6295(*l*)(1)(B). To be consistent with Plaintiffs' theory on what "point of use" means within the term energy use, the DOE would need to measure a

---

[5]       42 U.S.C. § 6295(*l*)(1) provides that the Secretary may prescribe an energy conservation standard for certain types of covered products if the requirements of subsections (o) and (p) are met and the Secretary determines that: (A) the average per household energy use within the United States by products of such type exceeded 150 kilowatt-hours for a 12-month period; (B) the aggregate household energy use within the United States by products of such type exceeded 4,200,000,000 kilowatt-hours for any such 12-month period; (C) substantial improvement in the energy efficiency of products of such type (or class) is technologically feasible; and (D) the application of a labeling rule under section 6294 is not likely to be sufficient to induce manufacturers to produce, and consumers and other persons to purchase, covered products of such type which achieve the maximum energy efficiency which is technologically feasible and economically justified.

product's actual energy consumption in people's homes to make the requisite determination. The more reasonable interpretation would consistently apply the term "energy use" in § 6295(*l*)(1)(B) in accordance with its definition in § 6291. *See* 81 Fed. Reg. 11,454-01, 11,456-57 (March 4, 2016) (explaining that DOE estimates energy use to satisfy the requirements of § 6292(b)(1) and § 6295(*l*)(1), including estimates of annual shipments, market saturation rates, product lifetimes, and energy consumption per unit through feedback from manufacturers and retailers). The remaining instances of "energy use" throughout EPCA all fit within the same context and should be afforded consistent application of the specialized, technical definition no matter where it is used.

II.    **The Regulation's Potential Effects on the Use of Gas Appliances are at Most Incidental and Outside the Scope of EPCA's Preemption Clause**

The Parties agree that although Congress' use of the term "concerning" expands the scope of EPCA's preemption beyond regulations establishing energy conservation standards for the covered products themselves, it does not create limitless preemption. ECF 55 at 28. The question remains: where is the limit?

A.    **Preemption is not Determined by the Impact on Natural Gas Appliance Use**

Plaintiffs argue that the Regulation constitutes an "effective ban" on gas powered appliances because the anticipated compliance costs would make continued use of gas appliances impractical. ECF 55 at 6, 14, and 22. Plaintiffs argue this triggers EPCA's preemption based on an extension of the *Berkeley* court's logic, where a ban on gas piping in new buildings "concerned energy use" because it effectively prevented consumers from

using natural gas-powered appliances.  This argument was recently rejected by three[6] federal courts.

The U.S. District Court of the Central District of California—a court that is bound by the *Berkeley* precedent—considered a near-identical question as the one posed here. *Rinnai America Corp. v. South Coast Air Quality Management District*, No. 2:24-cvCV 24-10482- PA-PD, slip. op. (C.D. Cal. July 22, 2025), included as Attachment A.  In *Rinnai*, the South Coast Air Quality Management District promulgated a rule imposing a zero-nitrogen oxide emission standard on certain categories of natural gas appliances ("Nitrogen Oxide Rule").  Acknowledging *Berkeley's* narrow precedential value, the court found that although the Nitrogen Oxide Rule constituted a ban on certain EPCA-covered products, it was not preempted because it "concerns the pollution appliances emit, and not how much energy an appliance uses, and is therefore outside of [*Berkeley's*] holding." *Id.* at 6.  In so finding, the court noted that the Nitrogen Oxide Rule "says nothing about the quantity of gas an appliance may use.  Nor does its application depend on an appliance's efficiency or energy use." *Id.* at 9.

The U.S. District Court for the Northern District of New York reached a similar conclusion when considering whether EPCA preempted state statutes prohibiting the installation of certain fossil-fuel equipment and building systems in certain new buildings.

---

[6]    Defendant's Memorandum of Law in Support of Motion to Dismiss addresses the first of these three recent opinions, *Ass'n of Contracting Plumbers of the City of New York, Inc. v. City of New York,* No. 23-cv-11292, 2025 WL 843619 (S.D.N.Y. Mar. 18, 2025) *appeal docketed*, No. 25-977 (2d. Cir. Apr. 21, 2025). ECF 49-1 at 22.

*Mulhern Gas Co., Inc. v. Mosley,* 1:23-CV-01267-GTS-PJE, 2025 WL 2062194 (N.D.N.Y. July 23, 2025).  The court concluded that under EPCA's definition of "energy use," the challenged statutes "neither directly regulate energy use of any covered equipment, nor do they in any way concern the energy use of a covered product." *Id*. at *14.  As that court explained, the definition of energy use "specifies the quantity of energy directly consumed must be determined in accordance with the relevant test procedures." *Id*. at *15.  Because the challenged statutes prohibit equipment based on its fuel source rather than its energy consumption, they do not "concern energy use" and are outside the scope of EPCA's preemption.  *Id*. at *14-15.  Although the Department maintains that the Regulation is neither a complete ban, nor a de facto ban, on natural gas appliances because it permits for alternative compliance pathways, *Rinnai* and *Mulhern Gas Co.* demonstrate that this is a distinction without a difference.  Even a complete ban on a product would not implicate EPCA's preemption clause because the Regulation concerns pollution abatement, not energy consumption.

### B.      Preemption is Not Determined by Downstream Market Responses

Plaintiffs also argue that the Regulation cannot be recast as one concerning pollution because its emissions limits indirectly compel building owners to abandon EPCA-covered gas appliances, demonstrating that the Regulation concerns energy use.  ECF 55 at 26-27.  This argument has no merit.  As *Mulhern Gas Co.* explains, where a statute does not concern the energy use of a covered product (as that term is defined), it is "outside the scope of the EPCA's preemption, and therefore the EPCA has nothing to say about what

they can regulate, even if those regulations happen to impact the availability to New York

consumers of certain covered products." *Mulhern Gas Co., Inc.*, at 32-33.

The Regulation's greenhouse gas emission standards do not command building

owners to implement energy conservation standards[7] governing appliances at the point of

manufacture and sale that conflict with EPCA.  42 U.S.C. § 6297(c).  It imposes no

labeling, testing, or performance criteria on any EPCA-covered product and does not

counteract federal regulations adopted pursuant to EPCA.  ECF 49-1 at 24-25.  Instead, the

Regulation applies air pollution limits uniformly to buildings regardless of appliance type

or fuel source, and it permits a range of compliance strategies that do not involve appliance

changes at all.[8]  ECF 49-1, at 28-29.

The *Rinnai* court rejected Plaintiffs' argument that setting a pollution emissions

limit to zero concerns energy use such that it is preempted by EPCA.  *Rinnai*, at 9.  As it

explained, that interpretation taken to its logical conclusion "would upset the historic and

---

[7]    As explained in Defendant's Memorandum in Support of Motion to Dismiss,
both "energy use" and "energy efficiency" are energy conservation standards.  ECF 49-1
at 11-12.  One element of the Department's position is that the Regulation is not an energy
conservation standard, and it is therefore not subject to EPCA's preemption clause.
Plaintiffs confuse this position. ECF 55 at n.4. While "energy conservation standards"
appears in the title of EPCA's preemption clause, it is also included within the preemption
clause itself, and three types of energy conservation standards—energy use, energy
efficiency, and water use—are, as well.  42 U.S.C. 6297(c).  Therefore, it is the plain text
of §6297(c) that limits EPCA's preemptive scope.

[8]    Plaintiffs claim that the ability to comply with the Regulation by using carbon
capture technology does not really provide flexibility (ECF 55 at 25), but both alternative
fuels and post-combustion carbon capture technologies present an opportunity to maintain
existing appliances and reduce or eliminate the level of greenhouse gas emissions that enter
the atmosphere.

recognized powers of states and local governments to set emissions standards and implement other regulations designed to protect the health and safety of their citizens." *Id*. One such example is the Department's historic regulation of large commercial bakery ovens as major sources of air pollution in accordance with its obligations under the federal Clean Air Act.  As part of its EPA-approved State Implementation Plan to attain and maintain the National Ambient Air Quality Standards for ozone, the Department promulgated COMAR 26.11.19.21 (hereinafter, "Commercial Oven Rule").  40 C.F.R. § 52.1070.  The Commercial Oven Rule required pollutant reductions from EPCA-covered industrial products through explicit volatile organic compounds control requirements or the implementation of "innovative control methods."  COMAR 26.11.19.21(D)(2), (E)(1). Regardless of whether such pollution control requirements impose costs on those using the product or may cause consumers to shift away from such products, such measures concern pollution, not energy use or energy efficiency.  *Rinnai*, at 9 (stating "there is no reason to believe that Congress ever intended or even contemplated that the EPCA would preempt emission regulations designed to combat air pollution").

The Regulation's incidental impact on downstream market consequences caused by building owners that may choose to burn less fuel or switch appliances to reduce emissions does not pull it into EPCA's preemptive scope.[9]  A finding to the contrary would

---

[9]     The American Gas Association's amicus brief, which does not directly address EPCA, focuses on the rights of natural gas companies to perform their obligations under their tariffs and to earn a return.  The Regulation does not prevent the performance of any gas company obligation, nor does it regulate gas rates or company profits.  Any downstream market reactions to the Regulation are otherwise irrelevant.

impermissibly intrude on state and federal pollution control authorities. *Air Conditioning and Refrigeration Inst. v. Energy Res. Conservation and Dev. Comm'n*, 410 F.3d 492, 500 (D.C. Cir. 2005) ("In sum, the legislative history of [EPCA and its amendments] supports a narrow interpretation of the preemption provision…[and]…demonstrates that Congress intended to preempt state energy efficiency standards, testing procedures, and consumer labeling requirements.").

> **C.** **The Regulation does not Impair Congress' Intent to Eliminate a Patchwork of Regulations**

Despite Plaintiffs' broad claim that "appliance manufacturers would once again be subjected to a "patchwork" of regulatory regimes across the nation," there is no factual allegation that supports such a position. ECF 55 at 18. Manufacturers will be able to sell the same gas-powered appliances to Marylanders that they would be able to sell to consumers in any other state, with market reactions to the Regulation being the only shift. The *Rinnai* court acknowledged this when it found that the Nitrogen Oxide Rule did not implicate any of the issues EPCA was intended to address. *Rinnai* at 9 (finding the Nitrogen Oxide Rule "does not create an inconsistent state efficiency standard, require that consumers use appliances with a higher efficiency standard, or force manufacturers to meet standards different than those set by the DOE.").

> **III.** **EPCA's Waiver for Building Codes is Not Evidence that EPCA is Meant to Preempt State Regulation of Greenhouse Gas Emissions from Large Buildings**

EPCA creates an automatic exemption for building codes that would otherwise be preempted because they concern the energy efficiency or energy use of covered products,

if the codes comply with seven enumerated requirements. 42 U.S.C. § 6295(f)(3). Plaintiffs claim that the Regulation does not satisfy the seven requirements and therefore cannot qualify for the building code exemption. ECF 55 at 12-13. But the Regulation does not need to qualify for the exemption because it is not a building code, and even if it was, it does not "concern[] the energy efficiency or energy use of such covered product." *Mulhern Gas Co., Inc.*, at 32-33 (explaining New York does not need to show that it qualifies for a waiver from EPCA preemption, because the challenged statutes do not concern energy use and therefore are outside the act's preemptive scope).

Nevertheless, the building code exemption itself is instructive in identifying the kinds of regulations that could be within the scope of preemption. *Dole v. United Steelworkers of Am.*, 494 U.S. 26, 36 (1990) (reiterating the traditional canon of statutory construction requiring that words grouped in a list be given a related meaning). Most of the criteria focus on regulations that establish an "energy consumption or conservation objective." *See* 42 U.S.C. §§ 6295(f)(3)(A), (C), (E), (F), and (G). This list provides contextual clues as to what types of building code regulations Congress viewed as "concerning" energy use or energy efficiency, which involves criteria that are wholly inapplicable to regulations establishing pollution emission standards. *Rinnai,* at 10 ("Indeed, while the EPCA specifically preempts building codes concerning energy use unless certain exemptions are met, it fails to mention air pollution regulations, despite the fact that the [Clean Air Act] had been in place for many years at the time the EPCA was enacted and amended.")

Conversely, the criteria suggest that Congress anticipated that regulations establishing energy consumption or conservation objectives could be within the scope of EPCA's preemption. This is consistent with cases interpreting the building code exemption. *See e.g. Air Conditioning, Heating & Refrigeration Inst. v. City of Albuquerque*, 835 F. Supp. 2d 1133, 1135 (D.N.M. 2010) (finding code provisions requiring HVAC systems and equipment in certain buildings to comply with minimum efficiency standards were both preempted by EPCA); *Building Industry Ass'n of Washington v. Washington State Bldg. Code Council*, 683 F.3d 1134 (9th Cir. 2012) (finding a state building code that implemented a 15% reduction in new buildings' energy consumption compared to a prior-years' baseline, with the ultimate goal of reaching a 70% reduction in annual net energy consumption by 2031, concerned energy conservation but was not preempted because it otherwise met the requirements of the building code exemption).

Plaintiffs try to shoehorn the Regulation into the mold of an energy conservation standard, arguing that EPCA preempts regulations that "cap[] overall energy consumption per apartment or per building" which is "precisely what the [Regulation does]". ECF 55 at 15. First, the claim that the Regulation caps overall energy consumption is plainly incorrect. As previously explained, the requirements of the Regulation can be met using alternative fuels or carbon capture technology, adding building envelope insulation or other physical alterations, or by payment of an alternative compliance fee. A fully electric building would have no cap on energy consumption to comply with the Regulation and a fully-gas powered building would have no cap on energy consumption if it were able to

14

capture or otherwise prevent greenhouse gas emissions.  Second, the *Berkeley dissent* did not state that EPCA would preempt regulations that "cap[] overall energy consumption per apartment or per building."  The full quote explains:

> For instance, EPCA contemplates preempting *building codes* that set building-wide *energy efficiency standards* that can *only* be met through the use of *hyperefficient* appliances. *See* § 6297(f).  Because the terms "energy use" and "energy efficiency" are product-specific, a preemption provision without the word "concerning" might not preempt building codes that set standards by, for example, capping overall energy consumption per apartment or per building.

*Berkeley*, 89 F.4th 1094, 1125 (emphasis added).  Third, as illustrated by *Washington State*, noted above, EPCA does not preempt regulations just because they cap overall energy consumption per building.

In short, the building code exemption and the cases interpreting it consistently involve regulations with direct energy conservation goals.  This context confirms that the building code exemption is irrelevant to the Regulation, which establishes a pollution standard, not an energy use objective.

## IV.    Conclusion

Based on the foregoing, Defendant, Serena Coleman McIlwain in her Official Capacity as Secretary of the Maryland Department of the Environment requests that this Court grant its Motion to Dismiss Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief, dismiss Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief with prejudice, and grant such other relief as this Court deems proper.

Respectfully submitted:

15

ANTHONY G. BROWN
Attorney General of Maryland

*/s/ Doris N. Lange*
Doris N. Lange
Assistant Attorney General
Federal Bar No.: 19679
Maryland Department of the
Environment
1800 Washington Boulevard, Suite 6048
Baltimore, MD 21230
Phone: 410-537-3038
Fax: 410-538-3943
doris.lange@maryland.gov

Michael F. Strande
Assistant Attorney General
Federal Bar No.: 30039
Maryland Department of the
Environment
1800 Washington Boulevard, Suite 6048
Baltimore, MD 21230
Phone: 410-537-3421
Fax: 410-538-3943
michael.strande@maryland.gov

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE AND NOTICE OF ELECTRONIC FILING

I hereby certify that on August 6, 2025, a copy of the foregoing Reply Memorandum in Support of Defendant's Motion to Dismiss Plaintiffs' First Amended Complaint for Declaratory and Injunctive Relief was electronically filed and served on all counsel of record via the Court's CM/ECF system.

*/s/ Doris N. Lange*
Doris N. Lange

16

17