### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF MARYLAND

**MARYLAND BUILDING INDUSTRY**     \*
**ASSOCIATION, INC.,** *et al.*,

       \*

       **Plaintiffs,**

       \*

**v.**                               **Civ. No. DLB-25-113**

       \*

**SERENA COLEMAN MCILWAIN,** *in her*
*official capacity as Secretary of the Maryland* \*
*Department of the Environment*,

       \*

       **Defendant.**

### AMENDED MEMORANDUM OPINION[1]

In 2024, the Maryland Department of the Environment ("MDOE") adopted Building Energy Performance Standards ("BEPS"), which set greenhouse gas emissions targets for certain state-owned, commercial, and multifamily residential buildings in Maryland. The BEPS require the buildings to have net-zero greenhouse gas emissions by 2040.

The BEPS were not well-received by some in the Maryland building and energy industry. A group of condominium, construction, real estate, and cooperative housing associations, as well as utilities, brought this action against MDOE arguing that the BEPS are preempted by express preemption provisions in the Energy Policy and Conservation Act ("EPCA"), 42 U.S.C. §§ 6201–6422. EPCA imposes, among other things, federal energy efficiency standards for consumer and industrial appliances such as dishwashers, kitchen ranges, and air conditioners. To ensure national uniformity on those matters, EPCA expressly preempts state regulations "concerning" the "energy efficiency" and "energy use" of EPCA-covered appliances. 42 U.S.C. §§ 6297(c) & 6316(b)(2)(A).

---

[1] This amended memorandum opinion removes what was footnote nine in the memorandum opinion issued on March 31, 2026. This memorandum opinion is otherwise the same as the original.

The plaintiffs seek a declaration that the BEPS are preempted by EPCA and an injunction blocking their enforcement. MDOE has moved to dismiss the plaintiffs' complaint for failure to state a claim. Because the BEPS are not preempted by EPCA, the motion to dismiss is granted.

## I.      Background

### A.      The BEPS

On April 9, 2022, Maryland enacted the Climate Solutions Now Act of 2022, 2022 Md. Laws Ch. 38 ("Act"). The Act requires MDOE to "develop building energy performance standards for covered buildings that achieve . . . [a] 20% reduction in net direct greenhouse gas emissions on or before January 1, 2030 . . . and . . . [n]et-zero direct greenhouse gas emissions on or before January 1, 2040." Md. Code Ann., Env't § 2-1602(a).

In compliance with its statutory mandate, MDOE promulgated the BEPS, which were adopted on December 23, 2024. As relevant here, the BEPS require all "covered buildings" to meet certain "net direct emissions" standards for the periods 2030–2034 and 2035–2039 and ultimately to achieve net-zero emissions by 2040. *See* Md. Code Regs. ("COMAR") 26.28.03.02(A), (D).[2] Subject to certain exceptions, a "covered building" is:

> a building that is a commercial or multifamily residential building in the State of Maryland or is owned by the State of Maryland and has a gross floor area of 35,000 square feet or more, excluding the parking garage area, and is (i) A single building; (ii) One or more buildings held in the condominium form of ownership with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, and governed by a single board of managers; or (iii) Two or more buildings with a combined gross floor area of 35,000 square feet or more, excluding the parking garage area, that are served in whole or in part by the same electric or gas meter or are served by the same heating or cooling system or systems, which is not a district energy system.

---

[2] The BEPS also impose detailed reporting, disclosure, and recordkeeping requirements concerning a building's energy consumption and energy efficiency. *See generally* COMAR 26.28.02. Though the plaintiffs claim that the BEPS as a whole are preempted by EPCA, they make no substantive argument that these particular provisions are preempted. They focus instead on the BEPS' emissions standards. The Court will do the same.

COMAR 26.28.01.02(15). The BEPS define "net direct emissions" as "(i) The sum of all direct greenhouse gas emissions from a covered building; or (ii) For a covered building connected to a district energy system, direct greenhouse gas emissions plus the greenhouse gas emissions attributable to thermal energy inputs from the district energy system used by the covered building[.]" COMAR 26.28.01.02(31). The BEPS in turn define "direct greenhouse gas emissions" as "greenhouse gas emissions produced on-site by covered buildings, as calculated by the benchmarking tool"—i.e., the U.S. Environmental Protection Agency's ENERGY STAR Portfolio Manager or any federally-approved successor—"unless otherwise specified by" MDOE. COMAR 26.28.01.02(17), 26.28.01.02(10).

Different types of covered buildings have different interim emissions benchmarks. For example, a building classified as a "Bar/Nightclub" is limited to 1.7 Kg CO2e (kilograms of carbon dioxide equivalent) per square foot in net direct emissions for the 2030–2034 period, whereas a building classified as a "Worship Facility" is limited to 0.87 Kg CO2e per square foot in net direct emissions for the same period. COMAR 26.28.03.02. By 2040, however, all non-exempt covered buildings must reduce their net direct emissions to zero. *Id.*

In lieu of achieving these standards, the owner of a covered building "shall come into compliance" with the standards by paying a yearly "alternative compliance fee" "for every metric ton of net direct emissions in excess of the net direct emissions standard in a given calendar year." COMAR 26.28.04.01(A). The BEPS dub this fee an "Alternative Compliance Pathway." *Id.* The fee, which is measured in 2020 dollars adjusted for inflation, starts at $230 per metric ton for 2030 and increases by $4 per metric ton every year thereafter. *Id.* The BEPS also allow owners of covered buildings to apply for yearlong exemptions from the emissions standards on certain grounds, such as "financial distress" (defined by the BEPS to include situations where, for

instance, a property is subject to a tax lien or is controlled by a court-appointed receiver). COMAR 26.28.04.02(A), 26.28.01.02(22).

Before the BEPS were issued, MDOE sought public comment, as Maryland law required. During the public comment period, some commenters expressed concern that the BEPS' emissions standards did not "include a provision for carbon capture" and requested that renewable natural gas, hydrogen, and biofuels be included as an option for achieving compliance with the standards. *See* MDOE, Air & Radiation Admin., *Response to Comments On the Proposed Regulations under COMAR 26.28*, at 41, https://mde.maryland.gov/programs/regulations/air/Documents/Hearings/BEPS%20RTC%20December%202024%20Final%20Draft.pdf ("*Response to Comments*").[3] In response, MDOE "acknowledge[d] that carbon capture can play a role in reducing direct emissions from buildings" and pledged to convene a working group to "identify how to account for differing sources and sinks of onsite emissions like carbon capture in the performance standards" before 2030. *Id.*

## B.    EPCA

EPCA was enacted in 1975 "as part of a 'comprehensive national energy policy'" following a 1973–1974 oil embargo by certain petroleum-producing countries. *Nat. Res. Def. Council, Inc. v. Herrington*, 768 F.2d 1355, 1362, 1364 (D.C. Cir. 1985) (quoting S. Rep. No. 94–516, at 116 (1975)). The statute "was designed, in part, to reduce the United States' 'domestic energy consumption through the operation of specific voluntary and mandatory energy conservation programs.'" *Air Conditioning & Refrigeration Inst. v. Energy Res. Conservation & Dev. Comm'n*,

---

[3] MDOE asks the Court to take judicial notice of MDOE's response to public comments on the proposed BEPS. ECF 49-1, at 10 n.2. The plaintiffs do not object. The Court takes judicial notice of this public document and considers it when deciding the motion to dismiss. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

410 F.3d 492, 498–99 (9th Cir. 2005) (quoting S. Rep. No. 94–516, at 117). EPCA sought to achieve this end by authorizing energy efficiency standards and prescribing labeling requirements for "major home appliances and certain other consumer products," in hopes that "better informed consumers and voluntary efforts by manufacturers would make energy efficiency standards unnecessary." *Id.* at 499 (quoting S. Rep. No. 94–516, at 118). As originally enacted, EPCA "preempted state regulations insofar as they were 'other than' the applicable federal rules for testing and labeling" but "allowed state regulations that differed from the federal regulations" if they "were justified by a substantial state or local need, did not interfere with interstate commerce, and were more stringent than the federal standard." *Id.* (citing Pub. L. No. 94–163, §§ 327(a)(1), 327(b)(2), 89 Stat. 871, 927 (1975)).

In 1978, Congress amended EPCA with the National Energy Conservation and Policy Act ("NECPA"), which "required the [Department of Energy] to prescribe minimum energy efficiency standards for thirteen covered products" and allowed states "to prescribe regulations more stringent than federal regulations . . . *only* if the Secretary [of Energy] found there was a significant state or local interest to justify the state's regulation" and that regulation "would not unduly burden interstate commerce." *Id.* (citing Pub. L. No. 95–619, § 424(a), 92 Stat. 3206, 3264 (1978)). Despite this statutory directive, the Department of Energy declined to promulgate efficiency standards and "initiated a general policy of granting petitions from States requesting waivers from preemption"—creating a patchwork of state appliance standards throughout the country. *Id.* (quoting S. Rep. No. 100–6, at 4 (1987)).

Litigation ensued. In 1985, the U.S. Court of Appeals for the District of Columbia Circuit ordered the Department of Energy to adopt the federal standards NECPA had contemplated. *See Herrington*, 768 F.2d at 1433. The Department of Energy was unable to immediately comply with

the D.C. Circuit's mandate. *Air Conditioning*, 410 F.3d at 499. So, "major manufacturer trade associations and the Natural Resources Defense Council negotiated a compromise solution," which resulted in the National Appliance Energy Conservation Act of 1987 ("NAECA"). *Id.* Amending EPCA, NAECA added the current preemption provision regarding consumer appliances, codified at 42 U.S.C. § 6297(c). *See* Pub. L. No. 100–12, § 327(c), 101 Stat. 103, 118 (1987).

> EPCA's preemption provision for consumer products provides, in relevant part:
>
> [E]ffective on the effective date of an energy conservation standard established in or prescribed under section 6295 of this title for any covered [consumer] product, no State regulation concerning the energy efficiency, energy use, or water use of such covered product shall be effective with respect to such product[.]

42 U.S.C. § 6297(c). Covered consumer products include consumer appliances that use water or energy, such as air conditioners, water heaters, kitchen ranges, showerheads, and dishwashers.[4] *Id.* §§ 6291(1)–(2), 6292(a). "Energy" is defined as "electricity, or fossil fuels." *Id.* § 6291(3). "'[E]nergy use' means the quantity of energy directly consumed by a consumer product at point of use, determined in accordance with test procedures under section 6293 of this title." *Id.* § 6291(4). "'[E]nergy efficiency' means the ratio of the useful output of services from a consumer product to the energy use of such product, determined in accordance with test procedures under section 6293 of this title." *Id.* § 6291(5). "[E]nergy conservation standard" is defined as "a performance standard which prescribes a minimum level of energy efficiency or a maximum

---

[4] EPCA uses the term "covered product" to refer specifically to consumer products covered by the statute. *See* 42 U.S.C. §§ 6291(1)–(2), 6292. In this opinion, the Court uses the phrase (or, sometimes, "EPCA-covered product") to refer to both consumer *and* industrial products to which the statute applies. When the precise definition matters to the analysis, the Court will use the phrases "covered consumer product" and "covered industrial product" to refer to EPCA-covered consumer and industrial products, respectively.

quantity of energy [or water] use . . . determined in accordance with test procedures prescribed under section 6293 of this title; or . . . a design requirement for" certain covered consumer products. *Id.* § 6291(6). An energy conservation standard also "includes any other requirements which the Secretary [of Energy] may prescribe[.]" *Id.*

NAECA did more than add this preemption provision to EPCA. NAECA also "made it more difficult for states to obtain waivers of preemption [under EPCA] for more stringent state efficiency standards." *Air Conditioning*, 410 F.3d at 500. These changes were designed "to counteract the systems of separate state appliance standards that had emerged" from the Department of Energy's policy of liberally granting preemption waivers, "which [had] caused appliance manufacturers to be confronted with 'a growing patchwork of differing State regulations which would increasingly complicate their design, production and marketing plans.'" *Id.* (quoting S. Rep. No. 100–6, at 4).

In 1992, Congress amended EPCA again, this time through the Energy Policy Act of 1992, which added a preemption provision regarding industrial products, codified at 42 U.S.C. § 6316(b)(2)(A). *See* Pub. L. No. 102–486, § 122(e)(2), 106 Stat. 2776, 2816 (1992). Section 6316(b)(2)(A) is substantively identical to § 6297(c). It provides that "[a] standard prescribed or established under [42 U.S.C. § 6313(a)]"—which governs requirements for devices such as warm-air furnaces, packaged boilers, and commercial air conditioning equipment—"shall, beginning on the effective date of such standard, supersede any State or local regulation concerning the energy efficiency or energy use of a product for which a standard is prescribed or established pursuant to such section." 42 U.S.C. § 6316(b)(2)(A). "Energy," "energy use," and "energy efficiency" have the same or substantially the same meanings as they do in § 6297(c). *Id.* §§ 6311(3)–(4), (7).

Preemption waivers are available, though difficult to obtain. Pursuant to § 6297(d)(1)(A), "[a]ny State or river basin commission with a State regulation which provides for any energy conservation standard or other requirement with respect to energy use, energy efficiency, or water use for any . . . covered [consumer] product" may seek a preemption waiver from the Secretary of Energy. A state regulation of an industrial appliance that would otherwise be preempted also may be waived. *See id.* § 6316(b)(2)(D). The Secretary must grant such a waiver if they find that the "regulation is needed to meet unusual and compelling State or local energy or water interests," but they may not do so if they find, after considering the input of "interested persons," that the "regulation will significantly burden" the product's "manufacturing, marketing, distribution, sale, or servicing . . . on a national basis." *Id.* §§ 6297(d)(1)(B), 6297(d)(3). The Secretary also may not grant a preemption waiver if they find "that the State regulation is likely to result in the unavailability in the State of any covered product type (or class) of performance characteristics . . . , features, sizes, capacities, and volumes that are substantially the same as those generally available in the State at the time of the Secretary's finding[.]" *Id.* § 6297(d)(4).

Both § 6297 and § 6316 also authorize certain exceptions to preemption. As relevant here, § 6297(f)(3)—which, like § 6297(c), was added to EPCA by NAECA—provides that "regulation[s] or other requirement[s] contained in a State or local building code for new construction concerning the energy efficiency or energy use of [a] covered [consumer] product" are not preempted, provided certain requirements are met. And § 6316(b)(2)(B) similarly provides that a "standard [for industrial equipment] prescribed or established under section 6313(a) of this title shall not supersede a standard for such a product contained in a State or local building code for new construction" if, among other things, the building code does not require the product's energy efficiency to exceed a certain threshold. Finally, "a State or local government" need not

seek a preemption waiver "in order to enforce or apply its building code" unless the building code "requires the installation of covered [consumer] products with efficiencies exceeding" applicable federal and state standards. *Id.* § 6297(f)(4).

**C.     This Lawsuit**

The plaintiffs are condominium associations, builder and real estate trade organizations, and utility companies. They contend that they "and their members have interests in a broad range of residential and commercial buildings covered by the . . . BEPS and in the natural gas and the gas delivery infrastructure that is used to provide gas service to those buildings" and that the BEPS "will cause [them] financial harm, diminish their businesses, and substantially increase the cost for homes, lodging, and energy in Maryland[.]" ECF 36, ¶ 6. Many of them contend that the BEPS will require them or their members to pay more for gas and to comply with "expensive" reporting requirements. *See, e.g.*, *id.* ¶¶ 14, 18, 24.

Maryland Building Industry Association, Inc. is a "not-for-profit trade organization representing the interests of over 1,100 member firms and more than 100,000 . . . home builders, remodelers, developers, and affiliate professional and service providers" across Maryland and the District of Columbia. *Id.* ¶ 13. It contends that the "increased costs of compliance with the . . . BEPS likely will . . . decrease new construction" by "pric[ing] [customers] out of the market" and will force the association's members "to pay higher rates for gas service[.]" *Id.*

The Building Owners and Managers of Greater Baltimore, Inc. is a trade association for real estate professionals. *Id.* ¶ 14. Its "members will incur costs in replacing existing gas appliances in order to comply with the . . . BEPS or will be forced to incur the yearly penalty for noncompliance[.]" *Id.*

NAOIP MD, Inc. and NAIOP DC | MD, Inc. are commercial real estate associations whose members will face increased capital and utility costs, lose income "due to vacancy and disruptions to tenant occupancy during construction and renovations made necessary by the . . . BEPS," and suffer from reduced property values if the BEPS are not enjoined. *Id.* ¶¶ 15–17.

Maryland Multi-Housing Association, Inc. is an organization that "serves the multi-housing industry and Maryland communities by providing education, information, and legislative and advocacy services." *Id.* ¶ 18. Because of the BEPS, its members will incur costs to replace their gas appliances to comply with the BEPS "or will be forced to incur the yearly penalty for noncompliance" and will lose tenants during construction and renovation. *Id.*

Washington Gas Light Company, "a regulated public utility that provides natural gas service" throughout the District of Columbia, Maryland, and Virginia, asserts that the BEPS will cause it to lose customers and leave its remaining customers "to cover the costs of [its] new investments in maintaining its gas system." *Id.* ¶ 19.

Leisure World Community Corporation governs trust properties and owns the property manager for a gated community in Silver Spring. *Id.* ¶ 20. Leisure World is owned by the owners of condominiums, a cooperative, and a homeowner association. *Id.* Residents of Leisure World "will have to fund expensive retrofits . . . to comply with the . . . BEPS or will be forced to incur the yearly penalty for noncompliance[.]" *Id.* Many Leisure World residents are "on limited or fixed incomes, such that some owners likely will be unable to afford the increased assessments necessary to pay for the compliance work and/or fees for noncompliance." *Id.*

The Elizabeth Condominium Association, Inc. manages a high-rise condominium in Chevy Chase. *Id.* ¶ 21. It will have to "spend millions of dollars to try to bring its building into compliance with the . . . BEPS" because the building "relies on gas for its boilers[.]" *Id.*

10

Promenade Towers Mutual Housing Corporation is a cooperative housing corporation that owns residential apartments and commercial spaces in Bethesda. *Id.* ¶ 22. It "relies upon natural gas for residential and commercial uses" and "would have to undertake major and costly projects," such as replacing its boilers, to comply with the BEPS. *Id.* The cost of these improvements would fall on its residents, "many of whom are of modest means[.]" *Id.*

The Willoughby of Chevy Chase Condominium Council of Unit Owners, Inc., which runs a Maryland condominium, claims that in order to comply with the BEPS, it will have "to spend millions of dollars on electrification measures" or else "pay substantial fees for noncompliance" and that some of its members "will be unable to afford the increased assessments necessary to pay for the compliance work and/or fees for noncompliance." *Id.* ¶ 23.

Apartment and Office Building Association of Metropolitan Washington, a membership organization for "commercial office building and multifamily residential real estate," states that its members "will be forced to choose between either incurring substantial costs to replace existing gas appliances . . . or incurring the yearly penalty for noncompliance" with the BEPS' emissions requirements. *Id.* ¶ 24. "For those buildings that cannot comply with the . . . BEPS in an economically viable manner, the best of a bad series of options may be" to install "new structures, at great cost." *Id.*

Finally, Columbia Gas of Maryland, Inc., a regulated public utility that provides gas service throughout western Maryland, states that the BEPS will cause it to lose customers and force it to charge higher rates to its remaining customers. *Id.* ¶ 25. It adds that the BEPS will "impede customers' ability to adopt new, more environmentally-friendly gas technologies which would reduce their costs, improve the reliability of their utility service, and lower emissions at the same time." *Id.*

In their amended complaint, the plaintiffs claim that the BEPS' emissions standards are facially invalid because they "restrict[] and penaliz[e] EPCA-covered gas appliances in new and existing buildings[.]" *Id.* ¶¶ 5, 28. "Since all EPCA-covered gas appliances emit some level of carbon dioxide," the plaintiffs maintain, the "BEPS are regulating their energy use and energy efficiency by imposing declining [emissions] requirements—which eventually will go all the way down to zero—and associated penalties if those requirements are not met." *Id.* ¶ 67. The plaintiffs state that the emissions standards "restrict[] and penaliz[e] the consumption of certain quantities— and eventually any quantity—of gas energy by covered appliances" and that they "penalize less efficient gas appliances and effectively require more efficient appliances." *Id.* They seek a declaratory judgment that the BEPS are preempted by EPCA and an injunction against their enforcement. *Id.* ¶ 83.

On May 5, 2025, MDOE filed a motion to dismiss the amended complaint for failure to state a claim. ECF 49. That motion is fully briefed. ECF 49-1, 55 & 62. The Court also has received amicus briefs from the Chesapeake Climate Action Network and Sierra Club, ECF 47, the Public Health Law Center, ECF 52, and the American Gas Association, ECF 61. No hearing is necessary to resolve the motion. *See* Loc. R. 105.6 (D. Md. 2025).

## II.    Standard of Review

Under Rule 12(b)(6), a party may seek dismissal for failure "to state a claim upon which relief can be granted." *Robertson v. Anderson Mill Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting Fed. R. Civ. P. 12(b)(6)). To survive the challenge, the opposing party must have pleaded facts demonstrating it has a plausible right to relief from the court. *Lokhova v. Halper*, 995 F.3d 134, 141 (4th Cir. 2021) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). A plausible claim is more than merely conceivable or speculative. *See Holloway v. Maryland*, 32 F.4th 293,

299 (4th Cir. 2022). The allegations must show there is "more than a sheer possibility that the defendant has acted unlawfully." *Int'l Refugee Assistance Project v. Trump*, 961 F.3d 635, 648 (4th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). But the claim does not need to be probable and the pleader need not show "that alternative explanations are less likely" than their theory. *Jesus Christ Is the Answer Ministries, Inc. v. Baltimore Cnty.*, 915 F.3d 256, 263 (4th Cir. 2019) (quoting *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015)).

When ruling on a Rule 12(b)(6) motion, the court must accept the allegations as true and "draw all reasonable inferences in favor of" the pleader. *Williams v. Kincaid*, 45 F.4th 759, 765 (4th Cir. 2022) (quoting *King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016)). But the court does not accept "legal conclusions couched as facts or unwarranted inferences, unreasonable conclusions, or arguments." *United States ex rel. Taylor v. Boyko*, 39 F.4th 177, 189 (4th Cir. 2022) (quoting *United States ex rel. Nathan v. Takeda Pharms. N. Am., Inc.*, 707 F.3d 451, 455 (4th Cir. 2013)). Merely reciting a claim's elements "and supporting them by conclusory statements does not meet the required standard." *Sheppard v. Visitors of Va. State Univ.*, 993 F.3d 230, 234 (4th Cir. 2021) (quoting *ACA Fin. Guar. Corp. v. City of Buena Vista*, 917 F.3d 206, 212 (4th Cir. 2019)). The court "does not resolve contests surrounding facts, the merits of a claim, or the applicability of defenses." *Ray v. Roane*, 948 F.3d 222, 226 (4th Cir. 2020) (quoting *Tobey v. Jones*, 706 F.3d 379, 387 (4th Cir. 2013)).

The court's review of a Rule 12(b)(6) motion typically is limited to the pleadings, documents attached to the complaint, and the parties' briefs. *See* Fed. R. Civ. P. 12(b)(6), 12(d); *see also* Fed. R. Civ. P. 10(c). The court also may consider judicially noticed facts and documents integral to and explicitly relied on in the complaint when their authenticity is not disputed. *See Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606–07 (4th Cir. 2015); Fed. R. Evid. 201(b).

13

Courts frequently resolve preemption challenges such as this one on Rule 12(b)(6) motions. *See, e.g.*, *Va. Uranium, Inc. v. Warren*, 848 F.3d 590, 593–94 (4th Cir. 2017) (affirming 12(b)(6) dismissal of complaint challenging Virginia's moratorium on uranium mining as preempted by Atomic Energy Act), *aff'd*, 587 U.S. 761 (2019); *Self-Ins. Inst. of Am., Inc. v. Snyder*, 827 F.3d 549, 553–54 (6th Cir. 2016) (affirming 12(b)(6) dismissal of complaint challenging Michigan health care tax as preempted by Employee Retirement and Income Security Act of 1974 ("ERISA")); *Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1057–58 (9th Cir. 2018) (affirming 12(b)(6) dismissal of complaint challenging California prevailing wage law as preempted by Federal Aviation Administration Authorization Act of 1994 ("FAAAA")).

## III.   Discussion

Under the Constitution's Supremacy Clause, federal law is "the supreme law of the Land." U.S. Const. art. VI, cl. 2. Thus, "in our system federal statutes take precedence over conflicting state laws provided that Congress acted within its authority"—a phenomenon known as preemption. *GenBioPro, Inc. v. Raynes*, 144 F.4th 258, 270 (4th Cir. 2025). "Preemption can take three basic forms:" express, field, and conflict. *Real Time Med. Sys., Inc. v. PointClickCare Techs., Inc.*, 131 F.4th 205, 229 (4th Cir. 2025). The plaintiffs here rely on express preemption, which occurs when "Congress clearly expresses an intention for a federal law to preempt state law[.]" *Id.* (quoting *N. Va. Hemp & Agric., LLC v. Virginia*, 125 F.4th 472, 492 (4th Cir. 2025)).

"Preemption fundamentally is a question of congressional intent[.]" *English v. Gen. Elec. Co.*, 496 U.S. 72, 78–79 (1990). Where, as here, a "statute 'contains an express pre-emption clause,' [courts] do not invoke any presumption against [preemption] but instead 'focus on the plain wording of the clause, which necessarily contains the best evidence of Congress'[s] pre-emptive intent.'" *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016) (quoting

*Chamber of Commerce v. Whiting*, 563 U.S. 582, 594 (2011)). In interpreting an express preemption clause, the court must "identify the domain expressly pre-empted by" the statute. *Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 517 (1992). "As in any case of statutory construction, [the court's] analysis begins with the language of the statute." *Air Evac EMS, Inc. v. Cheatham*, 910 F.3d 751, 764 (4th Cir. 2018) (quoting *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999)).

Nevertheless, "because an express preemption clause may not always 'immediately end the inquiry,' [a court] also [may] look to the statute's structure and purpose" to ascertain its preemptive scope. *PCS Phosphate Co. v. Norfolk S. Corp.*, 559 F.3d 212, 217–18 (4th Cir. 2009) (quoting *Altria Grp., Inc. v. Good*, 555 U.S. 70, 76 (2008)).[5] The court must read the words of a preemption clause "in their context and with a view to their place in the overall statutory scheme," also taking into account their "history [and] purpose[.]" *Gundy v. United States*, 588 U.S. 128, 141 (2019) (plurality opinion) (first alteration in *Gundy*) (quoting *Maracich v. Spears*, 570 U.S. 48, 76 (2013)). And the court should strive "to 'interpret [the] statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into an harmonious whole.'" *In re Rowe*, 750 F.3d 392, 396 (4th Cir. 2014) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)).

---

[5] The Court heeds the Supreme Court's instruction in *Puerto Rico* and does not employ a presumption against preemption in resolving this case. As the Fourth Circuit has observed, however, "[t]he Supreme Court has made somewhat varying pronouncements on presumptions in express preemption cases," creating some confusion in this area of law. *Cheatham*, 910 F.3d at 762 n.1; *see also Cal. Rest. Ass'n v. City of Berkeley*, 89 F.4th 1094, 1107–08 (9th Cir. 2024) (O'Scannlain, J., concurring) (explaining that, prior to *Puerto Rico*, "[t]he Supreme Court consistently instructed [the courts] to apply the presumption [against preemption] in express-preemption cases, at least in areas of traditional state concern" and that *Puerto Rico* "did not mention—much less expressly overrule—the decades of cases where the presumption had been applied in like circumstances").

The two preemption clauses at issue here, § 6297(c) and § 6316(b)(2)(A), preempt state regulations "concerning the energy efficiency [and] energy use" of covered products. 42 U.S.C. §§ 6297(c), 6316(b)(2)(A). The plaintiffs argue that the BEPS "concern" the "energy efficiency" and "energy use" of EPCA-covered products and thus are preempted and invalid.[6] MDOE argues that the BEPS are not preempted because the BEPS' connection to the energy use and energy efficiency of covered products "is too indirect, remote, and tenuous to support preemption." ECF 49-1, at 23–24. To determine who is correct, the Court examines the statutory text, "the necessary starting point." *Gobeille v. Liberty Mut. Ins. Co.*, 577 U.S. 312, 319 (2016).

### A.     The Meaning of "Concerning"

Sections 6297(c) and 6316(b)(2)(A) preempt regulations "concerning" the energy use or energy efficiency of covered products. The statute does not define "concerning." Merriam-Webster's Dictionary defines "concern" as "to relate to : be about." *See Concern*, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/concern (last visited Mar. 31, 2026); *see also Concern*, Oxford English Dictionary Online, https://doi.org/10.1093/OED/1097976362 (last visited Mar. 31, 2026) (listing first definition of "concern" as "[t]o refer or relate to; to be about"). The Supreme Court likewise has explained that "'[c]oncerning' means 'relating to,' and is the equivalent of 'regarding, respecting, about.'" *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018).[7] It follows that a regulation "concerning" energy use or energy efficiency is one that "relates to" those subjects.

---

[6] The plaintiffs assert a facial challenge to the BEPS. This means that they are asking the Court to conclude that "no set of circumstances exists under which the [BEPS] would be valid." *AES Sparrows Point LNG, LLC v. Smith*, 470 F. Supp. 2d 586, 600 (D. Md. 2007) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

[7] *Appling* was not a preemption case. It concerned the interpretation of a provision in the Bankruptcy Code. Even so, the Supreme Court's explanation of the meaning of "concerning" in

What, then, does it mean for a regulation to "relate to" the energy use or energy efficiency of an EPCA-covered product? In answering this question, the Court does not write on a blank slate. Several federal statutes contain express preemption clauses that preempt state laws "related to" the clauses' subject matter. *See, e.g.*, 29 U.S.C. § 1144(a) (ERISA); 49 U.S.C. § 14501(c)(1) (FAAAA); 49 U.S.C. § 41713(b)(1) (Airline Deregulation Act of 1978). The Supreme Court has "repeatedly recognized" that such language "express[es] a broad pre-emptive purpose." *Coventry Health Care of Mo., Inc. v. Nevils*, 581 U.S. 87, 95–96 (2017) (alteration in *Nevils*) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992)). That said, "the breadth of the words 'related to' does not mean the sky is the limit"; the phrase should not be read "with an 'uncritical literalism,' else 'for all practical purposes pre-emption would never run its course.'" *Dan's City Used Cars, Inc. v. Pelkey*, 569 U.S. 251, 260 (2013) (quoting *N.Y. State Conf. of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 655–56 (1995)). After all, "universally, relations stop nowhere." *Dubin v. United States*, 599 U.S. 110, 119 (2023) (quoting *Travelers*, 514 U.S. at 655). Thus, "[p]re-emption does not occur . . . if the state law has only a 'tenuous, remote, or peripheral' connection with" the specified subject matter. *District of Columbia v. Greater Wash. Bd. of Trade*, 506 U.S. 125, 130 n.1 (1992) (quoting *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 100 n.21 (1983)).

For purposes of a preemption provision with "relating-to" language, a state law "relates to" a particular subject matter if the law has "a connection with, or reference to" the subject matter. *Rowe v. N.H. Motor Transp. Ass'n*, 552 U.S. 364, 370 (2008) (emphasis omitted) (quoting

---

that context informs this Court's interpretation of "concerning" here. At least one other court has relied on *Appling* to determine the scope of "concerning" in § 6297(c). *See Berkeley*, 89 F.4th at 1103 (citing *Appling* for the proposition that "concerning" "has a broadening effect") (internal quotation marks omitted).

*Morales*, 504 U.S. at 384); *Gobeille*, 577 U.S. at 319–20. A law "refers to" a subject if the law "acts immediately and exclusively upon" it or if the subject's "existence . . . is essential to the law's operation[.]" *Gobeille*, 577 U.S. at 319–20 (quoting *Cal. Div. of Lab. Standards Enf't v. Dillingham Constr., N.A.*, 519 U.S. 316, 325 (1997)). And "to determine whether a state law has the forbidden connection, [a court must] look both to the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on" the preempted subject matter. *Egelhoff v. Egelhoff ex rel. Breiner*, 532 U.S. 141, 147 (2001) (quoting *Dillingham*, 519 U.S. at 325).

Guided by this precedent, the Court finds that the BEPS concern the energy use or energy efficiency of covered products, and are thus preempted, if either (1) they "refer to" those subjects, that is, "act[] immediately and exclusively upon" covered products' energy use or energy efficiency or rely upon covered products' energy use or energy efficiency as "essential to [their] operation"; or (2) they have a sufficient "connection with" those subjects, considering Congress's preemptive intent and the nature and effect of the BEPS on covered products' energy use and energy efficiency. *See Dillingham*, 519 U.S. at 325.

**B.    Whether the BEPS "Refer To" or Have an Impermissible "Connection With" Covered Products' Energy Use or Energy Efficiency**

For the reasons explained below, the BEPS do not "refer to" or have an impermissible "connection with" the "energy use" or "energy efficiency" of covered products. Thus, the BEPS are not preempted by EPCA.

**1.    "Refer To"**

The BEPS "refer to" covered products' energy use or energy efficiency if they "act[] immediately and exclusively upon" the products' energy use or energy efficiency or if the energy

18

use or energy efficiency of covered products is "essential to [the BEPS'] operation."[8] *Gobeille*, 577 U.S. at 319–20 (quoting *Dillingham*, 519 U.S. at 325).

The Supreme Court recently applied this "refer to" test in an ERISA preemption case. In *Rutledge v. Pharmaceutical Care Management Association*, the Supreme Court considered whether an Arkansas law that required pharmacy benefit managers ("PBMs") to reimburse pharmacies for prescription drugs "at a price equal to or higher than that which the pharmacy paid to buy the drug from a wholesaler" was preempted by ERISA.[9] 592 U.S. 80, 84 (2020). "ERISA pre-empts 'any and all State laws insofar as they may now or hereafter relate to any employee benefit plan' covered by ERISA." *Id.* at 86 (quoting 29 U.S.C. § 1144(a)). The Supreme Court had to determine whether the Arkansas law "related to"—that is, "referred to" or "had a connection with"—ERISA plans. *See id.* at 83.

The Court concluded that the Arkansas law was not preempted by ERISA. *Id.* at 91–92. In relevant part, the Court reasoned that the Arkansas law did not "refer to" ERISA plans. The Arkansas law did "not act immediately and exclusively upon ERISA plans," the Court explained, "because it applie[d] to PBMs" irrespective of whether the PBMs managed a plan covered by ERISA. *Id.* at 88. In a similar vein, the Court concluded that ERISA plans were "likewise not essential to [the Arkansas law's] operation" because the law defined regulated PBMs to broadly encompass PBMs that serviced both ERISA plans and other healthcare plans that ERISA did not

---

[8] The analysis in this section applies equally to covered consumer products and covered industrial products.

[9] As the Supreme Court explained, "PBMs serve as intermediaries between prescription-drug plans and the pharmacies that beneficiaries use" by informing pharmacies about beneficiaries' coverage and copayment information and by reimbursing pharmacies for beneficiaries' prescriptions. *Rutledge*, 592 U.S. at 83–84. In turn, the PBMs are reimbursed by the beneficiaries' prescription-drug plans. *Id.* at 84.

cover, such as "Medicaid, Medicare, military, and market place plans." *Id.* at 89 & n.1. In other words, the law "regulat[ed] PBMs whether or not the plans they service[d] f[e]ll within ERISA's coverage." *Id.* at 89. Therefore, the Arkansas law did not "refer to" ERISA plans. In reaching its holding, the Court relied on two other cases that had employed similar reasoning to conclude that a state law did not "refer to" ERISA plans. *See Travelers*, 514 U.S. at 656 (New York law that imposed surcharges on "patients and HMO's, regardless of whether the commercial coverage or membership, respectively, [was] ultimately secured by an ERISA plan" did not "refer to" ERISA plans); *Dillingham*, 519 U.S. at 328 (California wage statute regulating apprenticeship programs that was "indifferent to the funding, and attendant ERISA coverage, of apprenticeship programs" did not "refer to" ERISA plans).

Consider another case, this one from the Second Circuit, that addressed whether a state regulation "relates to" the subject matter of another federal preemption clause. In *Metropolitan Taxicab Board of Trade v. City of New York*, the court considered whether New York City rules that imposed lower taxicab lease caps (i.e., "the maximum dollar amount per shift for which taxis can be leased") on "non-hybrid, non-clean diesel" taxis were preempted by an EPCA provision (not the preemption provisions at issue here) that forbids states from adopting laws or regulations "related to fuel economy standards[.]" 615 F.3d 152, 155–56 (2d Cir. 2010) (quoting 49 U.S.C. § 32919(a)). The court concluded that the rules were "related to" fuel economy standards because they "referred to" fuel economy standards. *Id.* at 157. This was so, the court reasoned, because the "rules expressly rel[ied] on a distinction between hybrid and non-hybrid vehicles": They required "that a taxi be a hybrid in order to qualify for [an] upwardly adjusted lease cap," which did "nothing more than draw a distinction between vehicles with greater or lesser fuel-efficiency." *Id.* Fuel

20

economy standards, the court found, were "essential to [the taxicab rules'] operation[.]" *Id.* Because the taxicab rules referred to fuel economy standards, they were preempted.

As these cases demonstrate, in determining whether the BEPS "refer to" the energy use or energy efficiency of covered products, the Court must ask whether the BEPS regulate buildings differently depending on the energy use or energy efficiency of the covered products in the buildings.[10] If the BEPS drew such a distinction—by, for example, imposing different greenhouse gas emissions benchmarks based on the energy efficiency of a building's appliances or by rendering the owners of buildings with less energy-efficient appliances ineligible for a waiver of the emissions requirements—the BEPS would be akin to the preempted New York City taxicab rules in *Metropolitan Taxicab*. They would regulate their objects differently depending on the subject matter of the preemption clause: In *Metropolitan Taxicab*, it was fuel economy standards; here, it is the energy use and energy efficiency of covered products.

But the BEPS do not work that way. The BEPS impose declining greenhouse gas emissions benchmarks on buildings across Maryland, ultimately requiring that all buildings subject to the BEPS achieve net-zero emissions by 2040. These emissions requirements do not change depending on the energy use or energy efficiency of covered products in those buildings. The BEPS do not draw a distinction between buildings with high-efficiency covered products and those with less-efficient covered products. To be sure, the BEPS do draw distinctions on other bases—such as the type of building or the financial health of its owner. A nightclub, for example, has different interim emissions benchmarks than a house of worship. A building subject to a tax lien may be eligible for a waiver of the emissions requirements that an unencumbered building could not obtain. But the

---

[10] Recall that "energy use" is defined as "the quantity of energy directly consumed . . . at point of use," and "energy efficiency" is defined as "the ratio of the useful output of services . . . to the [product's] energy use," *see* 42 U.S.C. §§ 6291(4)–(5).

BEPS do not distinguish between buildings that use high-efficiency covered products and those that do not. Like the Arkansas law at issue in *Rutledge*, which applied to PBMs "whether or not they manage[d] an ERISA plan," the BEPS' greenhouse gas emissions requirements apply to buildings regardless of how much energy their covered products use or how efficient those products are. *See Rutledge*, 592 U.S. at 88. Similarly, the energy use and energy efficiency of covered products are "not essential to [the BEPS'] operation." *See id.* The regulation's emissions requirements apply across the board to all buildings subject to the BEPS—without regard to the buildings' covered products. Thus, the BEPS do not "act[] immediately and exclusively upon" EPCA-covered products' energy use or energy efficiency, and the energy use or efficiency of EPCA-covered products is not "essential to [the BEPS'] operation." *See Gobeille*, 577 U.S. at 319–20 (quoting *Dillingham.*, 519 U.S. at 325).

Thus, the BEPS do not "refer to" the energy efficiency or energy use of covered products.

### 2.    "Connection With"

The Court now turns to the more difficult question: Do the BEPS have a forbidden "connection with" the energy use or energy efficiency of EPCA-covered products? In considering this question, the Court must "look both to the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive, as well as to the nature of the effect of the state law on" the energy use and energy efficiency of covered products. *See Egelhoff*, 532 U.S. at 147 (quoting *Dillingham*, 519 U.S. at 325). To discern the objectives of EPCA's preemption provisions, the Court considers their texts, their titles, their broader statutory schemes, and their legislative histories. *See, e.g.*, *Gobeille*, 577 U.S. at 321–23 (considering ERISA's "extensive" "reporting, disclosure, and recordkeeping requirements" as guide to Congress's preemptive intent); *Rowe*, 552 U.S. at 370, 373 (considering legislative history of FAAAA in

discussing Congress's preemptive purpose); *Ass'n of Contracting Plumbers of City of New York, Inc. v. City of New York*, No. 23-CV-11292 (RA), 2025 WL 843619, at *6 (S.D.N.Y. Mar. 18, 2025) (considering statutory scheme and title of § 6297(c) in determining Congressional objectives), *appeal docketed*, No. 25-977 (2d Cir. Apr. 21, 2025); *see also Yates v. United States*, 574 U.S. 528, 540 (2015) (plurality opinion) (explaining that statutory headings, while "not commanding," "supply cues" as to Congress's intent). Because EPCA's preemption provisions for covered consumer products and covered industrial products vary slightly in these respects, the Court analyzes them separately.

### a.    Covered Consumer Products

The Court first determines whether the BEPS have an impermissible "connection with" the energy use or energy efficiency of covered consumer products.

MDOE argues this analysis should begin and end with § 6297(c)'s title. "'[T]he title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute." *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R.*, 331 U.S. 519, 528–29 (1947)). Section 6297(c) is titled "General rule of preemption for energy conservation standards when Federal standard becomes effective for product." EPCA defines "energy conservation standard" as "a performance standard which prescribes a minimum level of energy efficiency or a maximum quantity of energy [or water] use . . . determined in accordance with test procedures prescribed under section 6293 of this title; or . . . a design requirement for" certain covered consumer products. 42 U.S.C. § 6291(6). Thus, according to § 6297(c)'s title, Congress sought to preempt state regulations that set an energy efficiency floor or an energy use ceiling for covered consumer products or otherwise seek to modify their design.

There is some support in § 6297(c)'s broader statutory scheme for the notion that Congress intended to preempt state energy conservation standards. Section 6297(c) is found in a part of EPCA titled "Energy Conservation Program for Consumer Products Other than Automobiles" (42 U.S.C. §§ 6291–6309). That part establishes comprehensive federal energy conservation standards for covered consumer products, *see id.* § 6295, imposes reporting and labeling requirements on manufacturers of covered consumer products regarding the products' energy consumption, *see id.* §§ 6294, 6296, and with limited exceptions, bars the distribution in commerce of covered consumer products that do not conform to federal energy conservation standards, *see id.* § 6302(a)(5). From these parts of EPCA, it is clear that Congress sought to impose nationwide energy conservation standards for covered consumer products and to maintain a tight grip over those products' manufacture and distribution. Allowing states to set their own standards for covered consumer products' energy use or efficiency would upset this carefully crafted scheme.

If the Court were to stop its analysis at the preemption provision's title, as MDOE urges, and find that § 6297(c) preempts energy conservation standards and nothing else, the conclusion that the BEPS lack the forbidden "connection with" energy use and energy efficiency of covered consumer products would be inescapable. This is because the BEPS do not set a floor for the energy efficiency of covered consumer products or impose a ceiling on how much electricity or fossil fuels a covered consumer product may use. And they do not require that covered consumer products be designed in any particular way. Thus, the BEPS are not an "energy conservation standard," as EPCA defines that term. If the analysis were that simple, the BEPS clearly would be the sort of state regulation "that Congress understood would survive[.]" *See Egelhoff*, 532 U.S. at 147 (quoting *Dillingham*, 519 U.S. at 325).

24

The analysis, however, is not so simple. MDOE overlooks other parts of the statutory scheme that indicate Congress intended § 6297(c) to sweep more broadly than just energy conservation standards. Consider afresh the language of § 6297(c) itself. If Congress truly intended to limit § 6297(c)'s preemption to energy conservation standards, it easily could have said so in the text of the statute—not just the title. After all, "energy conservation standard" is defined in EPCA as a standalone term. *See* 42 U.S.C. § 6291(6). Section 6297(c) could have read: "No State energy conservation standard of such covered product shall be effective with respect to such product." But instead, it reads: "[N]o State regulation *concerning the energy efficiency, energy use or water use* of such covered product shall be effective with respect to such product[.]" *Id.* § 6297(c) (emphasis added). The Court may not disregard the statutory text. *See Pa. Dep't of Corr. v. Yeskey*, 524 U.S. 206, 212 (1998) ("[T]he title of a statute . . . cannot limit the plain meaning of the text.") (alterations in *Yeskey*) (quoting *Trainmen*, 331 U.S. at 519). Also consider the language of § 6297's waiver provision: "Any State . . . which provides for any energy conservation standard *or other requirement* with respect to energy use [or] energy efficiency" of a covered consumer product may seek a preemption waiver from the Secretary of Energy. 42 U.S.C. § 6297(d)(1)(A) (emphasis added). If states need a preemption waiver to enforce "other requirement[s]" aside from energy conservation standards, that suggests that § 6297(c) preempts more than just energy conservation standards. Thus, the title of § 6297(c) notwithstanding, the Court cannot conclude that § 6297(c) preempts only state energy conservation standards.

Turning its focus from the title of § 6297(c) to the text, MDOE argues that § 6297(c)'s preemptive scope is narrowed by the words "with respect to." Recall that § 6297(c) states that a regulation "concerning the energy efficiency [or] energy use" of a covered consumer product "shall [not] be effective with respect to" that product. For support, MDOE relies on the Supreme

Court's decision in *Dan's City*. There, the Court held that the words "with respect to," as used in the FAAAA's preemption clause, "'massively limit[ed] the scope of preemption' ordered by the FAAAA." 569 U.S. at 261 (quoting *City of Columbus v. Ours Garage & Wrecker Serv., Inc.*, 536 U.S. 424, 449 (2002) (Scalia, J., dissenting)). MDOE overlooks a key difference in how § 6297(c) and the FAAAA's preemption clause are written. The latter provides that "[a] State . . . may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of any motor carrier . . . with respect to the transportation of property." 49 U.S.C. § 14501(c)(1). There, "with respect to" limits the scope of preemption, as the Supreme Court recognized, because it modifies "law, regulation, or other provision"—adding an additional condition that a law must satisfy before it may be preempted. In § 6297(c), on the other hand, "with respect to" modifies "effective"—signaling simply that a preempted regulation is not "effective with respect to" a covered consumer product. In this context, "with respect to" neither limits nor illuminates the universe of regulations that are preempted in the first place.

Other parts of § 6297's statutory scheme shed more light. Most illuminating, for purposes of this case, are the provisions that apply to building codes, which signal Congress's intent about the preemption of building regulations such as the BEPS.

Section 6297 contains an exception to preemption for certain building codes. *See* 42 U.S.C. § 6297(f)(3). This exception, of course, does not "delineate the scope" of the preemption clause. *Dan's City*, 569 U.S. at 264. But the Court may look to this exception as an "interpretive guide," *see id.*—a way of illuminating the "domain" of building regulations that Congress sought to preempt, *see Cipollone*, 505 U.S. at 517.[11]

---

[11] The parties dispute whether the BEPS qualify as a "building code" under § 6297(f). The Court need not resolve that question. The building code exception to § 6297(c) is relevant because of what it tells us about the scope of state laws—including building regulations—that Congress

Section 6297(f)(3) provides that, once a federal energy conservation standard for a covered consumer product goes into effect, "a regulation or other requirement contained in a State or local building code for new construction concerning the energy efficiency or energy use of [that] covered [consumer] product" is not preempted if the following requirements are met:

(A) The code permits a builder to meet an energy consumption or conservation objective for a building by selecting items whose combined energy efficiencies meet the objective.

(B) The code does not require that the covered [consumer] product have an energy efficiency exceeding the applicable energy conservation standard established in or prescribed under section 6295 of this title, except that the required efficiency may exceed such standard up to the level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(C) The credit to the energy consumption or conservation objective allowed by the code for installing covered [consumer] products having energy efficiencies exceeding such energy conservation standard established in or prescribed under section 6295 of this title or the efficiency level required in a State regulation referred to in subparagraph (B) is on a one-for-one equivalent energy use or equivalent cost basis.

(D) If the code uses one or more baseline building designs against which all submitted building designs are to be evaluated and such baseline building designs contain a covered [consumer] product subject to an energy conservation standard established in or prescribed under section 6295 of this title, the baseline building designs are based on the efficiency level for such covered [consumer] product which meets but does not exceed such standard or the efficiency level required by a regulation of that State for which the Secretary has issued a rule granting a waiver under subsection (d).

(E) If the code sets forth one or more optional combinations of items which meet the energy consumption or conservation objective, for every combination which includes a covered [consumer] product the efficiency of which exceeds either standard or level referred to in subparagraph (D), there also shall be at least one combination which includes such covered [consumer] product the efficiency of which does not exceed such standard or level by more than 5 percent, except that at least one combination shall include such covered [consumer] product the efficiency of which meets but does not exceed such standard.

---

understood would be preempted. The *Building* Energy Performance Standards are indisputably a building regulation—regardless of whether they are a "building code."

(F) The energy consumption or conservation objective is specified in terms of an estimated total consumption of energy (which may be calculated from energy loss- or gain-based codes) utilizing an equivalent amount of energy (which may be specified in units of energy or its equivalent cost).

(G) The estimated energy use of any covered [consumer] product permitted or required in the code, or used in calculating the objective, is determined using the applicable test procedures prescribed under section 6293 of this title, except that the State may permit the estimated energy use calculation to be adjusted to reflect the conditions of the areas where the code is being applied if such adjustment is based on the use of the applicable test procedures prescribed under section 6293 of this title or other technically accurate documented procedure.

*Id.*

To state the obvious: This building code exception tells us that Congress did not intend to preempt building codes that meet the exception's criteria. But what does the exception tell us about the scope of state regulations that Congress *did* intend to preempt? It tells us that Congress wanted to preempt (at a minimum) state or local building codes that set an "objective" for "energy consumption" or "conservation" and do so in a way that mandates the installation of high-efficiency appliances. *See id.*; *see also Berkeley*, 89 F.4th at 1125 (Friedland, J., dissenting from denial of rehearing en banc) (citing § 6297(f) for the proposition that "EPCA contemplates preempting building codes that set building-wide energy efficiency standards that can only be met through the use of hyper-efficient appliances").

The legislative history of the building code exception to § 6297(c) confirms this conclusion. *See Travelers*, 514 U.S. at 657 (consulting legislative history of ERISA to gauge congressional intent for preemption provision); *Rowe*, 552 U.S. at 373 (same for FAAAA). The Senate report on NAECA states that "the limited requirements" of § 6297(f)(3) "are designed to ensure the performance-based building codes cannot circumvent the federal standard for a given covered product by effectively requiring the installation of such product with an efficiency exceeding the applicable Federal standards or State standards for which a waiver from preemption

has been obtained." *See* S. Rep. No. 100–6, at 11. This legislative history of the building code exception to preemption confirms that Congress wanted to ensure that state building codes could not frustrate national uniformity in appliance standards by requiring the installation of products whose efficiencies exceeded federal standards.[12] Those types of building codes are not excepted from preemption.

Another provision in § 6297(f) also signals that Congress intended to preempt state regulations that require the installation of covered products whose energy efficiency exceeds federal standards. Section 6297(f)(4) provides that, while states generally do not need to petition the Secretary of Energy to enforce their building codes, states may not enforce a building code without first obtaining a preemption waiver from the Secretary of Energy if the code "requires the installation of covered [consumer] products with efficiencies exceeding" the federal standard. 42 U.S.C. § 6297(f)(4)(B). This prohibition against a state's enforcement of certain building codes, without first obtaining a waiver, evinces Congress's concern that states would misuse their building codes to require the installation of high-efficiency products. Section 6297(f)(4) is further evidence of Congress's intent to preempt such building codes.

These building code provisions within § 6297(c)'s statutory scheme illuminate the kinds of building regulations that Congress intended to preempt: regulations that mandate the installation of high-efficiency appliances. The BEPS are not such a regulation. They do not require the installation of more energy-efficient appliances in buildings. To comply with the BEPS' greenhouse gas emissions standards, building owners need not replace their appliances at all.

---

[12] This concern is reflected in Congress's overarching purpose in enacting NAECA. With NAECA, Congress sought "to counteract . . . systems of separate state appliance standards . . . which [had] caused appliance manufacturers to be confronted with 'a growing patchwork of differing State regulations which would increasingly complicate their design, production and marketing plans.'" *Air Conditioning*, 410 F.3d at 500 (quoting S. Rep. No. 100–6, at 4).

Owners can comply in other ways, including by paying a yearly compliance fee—an option that would not require replacement of a single appliance. Moreover, there are still other ways of complying with the standards, such as the installation of carbon-capture technology.[13] Because the BEPS do not require building owners to install appliances whose energy efficiencies exceed federal standards, they are not like the building codes that Congress intended to preempt.

The plaintiffs agree that the Court may consider the building code provisions in § 6297 as a useful interpretive tool to discern the type of building regulations that Congress intended to preempt under § 6297(c). But that is where the plaintiffs' agreement with the Court's analysis ends. In the plaintiffs' view, these building code provisions *help*, rather than hurt, their case. As they see it, the building code exception in § 6297(f)(3) *proves*, rather than disproves, that Congress intended to preempt a regulation like the BEPS. Their argument goes like this. They argue (correctly) that the BEPS do not satisfy the exception's requirements. Because the BEPS do not satisfy these requirements, the BEPS are not excepted from preemption. And because the BEPS are not excepted from preemption, they must be preempted. *See* ECF 36, ¶ 71 ("The . . . BEPS do not meet all seven requirements listed in Section 6297(f)(3) and are therefore preempted."). This argument is a fallacy. "Exceptions to a general rule, while sometimes a helpful interpretive guide, do not in themselves delineate the scope of the rule." *Dan's City*, 569 U.S. at 264. The mere fact that a regulation does not satisfy the criteria for a preemption exception does not mean the regulation is preempted.

---

[13] According to Amicus Public Health Law Center, "weatherization measures like insulation and ventilation improvements" also may reduce a building's emissions. ECF 52, at 6. MDOE plans to convene a working group "to identify how to account for differing sources of onsite emissions like biofuels in the performance standards" before 2030. *See Response to Comments*, at 41.

Indeed, if anything, assessing the BEPS against the criteria for the building code exception—as the plaintiffs encourage the Court to do—demonstrates how far afield the BEPS are from the type of building regulation Congress intended to preempt. Comparing the BEPS to § 6297(f)(3)'s criteria is like trying to fit a square peg into a round hole. Consider the first criterion: "The code permits a builder to meet an *energy consumption or conservation objective* for a building by selecting items whose combined energy efficiencies meet the objective." 42 U.S.C. § 6297(f)(3)(A) (emphasis added). Or the third: "The credit to the *energy consumption or conservation objective* allowed by the code for installing covered [consumer] products having energy efficiencies exceeding [the federal] energy conservation standard . . . is on a one-for-one equivalent energy use or equivalent cost basis." *Id.* § 6297(f)(3)(C) (emphasis added). These criteria cannot sensibly be applied to the BEPS. They presume that a building code being assessed against the criteria sets an "objective" for a building's "energy consumption" or "conservation." They also presume that the building code prescribes means of achieving the objective that may or may not require installation of high-efficiency products. But the BEPS do not set an objective for energy consumption or conservation at all, much less one that can be accomplished only through the installation of high-efficiency products. The square peg (the BEPS) cannot fit into the round hole (the exception to preemption). This is evidence that the BEPS are not the type of building regulation that Congress understood would need an exception to preemption in the first place. Put slightly differently, the BEPS are not the type of regulation that Congress intended to preempt.[14]

---

[14] The Court notes, however, an important caveat. It appears from MDOE's response to public comments on the BEPS that—in compliance with its statutory mandate—MDOE intends to update the BEPS to include "energy use intensity" targets that may push building owners to install more efficient products. *See, e.g.*, *Response to Comments*, at 42–43 (explaining that the General Assembly required the BEPS to include energy use intensity standards and that MDOE intends to adopt such standards in 2027 and recommending that building owners "not install[] any inefficient electric equipment in anticipation of this energy efficiency standard being adopted"). The current

In sum, a close examination of § 6297's statutory scheme, including its building code provisions, reveals that—at least with respect to building regulations such as the BEPS—the "domain" Congress sought to preempt, *Cipollone*, 505 U.S. at 517, consists of building regulations that require building owners to swap out less-efficient appliances for appliances whose efficiencies exceed federal standards. The BEPS are not such a regulation. Thus, considering "the objectives of the [federal] statute as a guide to the scope of the state law that Congress understood would survive," *Egelhoff*, 532 U.S. at 147 (quoting *Dillingham*, 519 U.S. at 325), the Court finds that the BEPS are a regulation that Congress understood would survive a preemption challenge. They do not have a forbidden "connection with" the energy use or energy efficiency of EPCA-covered consumer products.

### b.    Covered Industrial Products

The Court next considers whether the BEPS have an impermissible "connection with" the energy use or energy efficiency of covered industrial products.

Section 6316(b)(2)(A) was enacted just five years after § 6297(c). It provides that federal standards for covered industrial products "shall, beginning on the effective date of such standard, supersede any State or local regulation *concerning the energy efficiency or energy use* of [those] product[s.]"[15] 42 U.S.C. § 6316(b)(2)(A) (emphasis added). This provision contains substantially identical language to § 6297(c). *See Air Conditioning*, 410 F.3d at 500 (explaining that in passing the Energy Policy Act of 1992, Congress, "with a few subtle distinctions," largely "incorporated

---

version of the BEPS does not include "energy use intensity" targets, and the Court expresses no view on whether any future version of the BEPS that includes such a requirement would be preempted by EPCA in whole or in part.

[15] Unlike § 6297(c), § 6316(b)(2)(A) has no subsection-specific title that might illuminate its meaning, and the legislative history of the Energy Policy Act of 1992, which added § 6316(b)(2)(A) to EPCA, "is silent on preemption." *Air Conditioning*, 410 F.3d at 500.

the preemption provisions of . . . § 6297"). "When Congress uses the same language in two statutes having similar purposes, particularly when one is enacted shortly after the other, it is appropriate to presume that Congress intended that text to have the same meaning in both statutes." *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005). Because the two preemption provisions use substantially the same language and have a similar purpose, the Court presumes Congress intended them to have the same meaning. Thus, the Court's preemption analysis of § 6297(c) applies equally to § 6316(b)(2)(A). For the same reasons the BEPS are not preempted under § 6297(c), they are not preempted under § 6316(b)(2)(A).

The BEPS are not preempted by EPCA.[16]

### 3.    The Plaintiffs' Counterarguments

The plaintiffs' arguments to the contrary are unpersuasive.

The plaintiffs argue that the BEPS are preempted by EPCA because the BEPS "restrict[]" the use of gas appliances. ECF 55, at 20. In the plaintiffs' view, the BEPS "regulate [gas] appliances' energy use and energy efficiency by restricting—and ultimately prohibiting entirely—[the] necessary byproducts of their use of gas energy," i.e., carbon dioxide and other gases. *Id.* at

---

[16] The parties spill much ink disputing whether "energy use," as EPCA defines the term, refers to a fixed characteristic of a covered product when it is manufactured or whether it refers to a covered product's actual use of energy by a consumer. This question of statutory interpretation divided the Ninth Circuit when it decided an EPCA preemption case two years ago. *See Berkeley*, 89 F.4th at 1101–02 (panel opinion); *id.* at 1121–22 (Friedland, J., dissenting from denial of rehearing en banc). This Court need not weigh in on the question here because the analysis in this case does not turn on this nuance in the meaning of "energy use." Regardless of whether "energy use" refers to a fixed or mutable characteristic of a covered product, the BEPS are not preempted by EPCA because (i) the BEPS do not distinguish between buildings with high-efficiency covered products and those with less-efficient covered products and the emissions requirements do not depend on the energy efficiency or energy use of a building's covered products; and (ii) the BEPS do not require building owners to use more energy-efficient products at all. Thus, regardless of whether "energy use" means what the plaintiffs urge or what MDOE urges, the BEPS do not "refer to" or have a forbidden "connection with" the energy use or energy efficiency of EPCA-covered products.

19–20. This regulation of the byproducts of gas appliances is, according to the plaintiffs, a regulation of the energy use and energy efficiency of gas appliances. Thus, the plaintiffs believe the BEPS "concern" the "energy use" of an EPCA-covered product—gas appliances—and are preempted by EPCA.

In support of this argument, the plaintiffs rely on the U.S. Court of Appeals for the Ninth Circuit's recent decision in *California Restaurant Association v. City of Berkeley*. There, the Ninth Circuit held that a City of Berkeley ordinance prohibiting natural gas piping in newly-constructed buildings was preempted by EPCA because it "concerned" the "energy use" of EPCA-covered gas appliances. *Berkeley*, 89 F.4th at 1101. This was so, the court reasoned, because the ordinance prevented consumers from using natural-gas-powered appliances where the consumers would otherwise be able to; thus, the ordinance necessarily restricted the "quantity of energy" those appliances could use at their "point of use," i.e., the place they were used. *Id.* at 1101–03. The court emphasized, however, that its holding was a narrow one: "We only decide that EPCA's preemptive scope applies to building codes that regulate the gas usage of covered appliances on premises where gas is otherwise available." *Id.* at 1103.

To hear the plaintiffs tell it, the BEPS are analogous to the ordinance at issue in *Berkeley* because they "limit" and "penalize" the use of gas appliances. ECF 55, at 28. But even assuming *Berkeley* bound this Court—which it does not—the plaintiffs' reliance on *Berkeley* rests on a faulty premise. The BEPS do not restrict or prohibit the use of gas appliances in the way the *Berkeley* Court deemed problematic. A regulated party subject to the BEPS need not abandon their gas appliances or even use them less. They can reduce a building's emissions in other ways, such as

by installing carbon-capture technology.[17] Or, if they wish, they can pay a predetermined fee for every ton of emissions they emit in excess of the BEPS' benchmarks. In these respects, the BEPS are meaningfully distinct from the ordinance at issue in *Berkeley*. Far from imposing any requirements that would constrain a building owner's ability to use otherwise-available gas (like the gas-piping restrictions at issue in *Berkeley*), the BEPS instead set greenhouse gas emissions benchmarks that can be met in a variety of ways—or not met at all, if one opts instead to pay a fee. This means that a building may continue using gas at its current rate while remaining in full compliance with the regulation.

Perhaps recognizing the problem that the alternative compliance fee poses for their argument, the plaintiffs characterize the fee as a penalty on building owners who do not replace their gas appliances. Many building owners, the plaintiffs argue, cannot afford to replace their gas appliances, and if they do not, they cannot meet the emissions benchmarks and must pay a compliance fee. The compliance fee, the plaintiffs insist, effectively penalizes building owners for not replacing their gas appliances. As the plaintiffs see it, this "penalty" is tantamount to a gas ban.

---

[17] The plaintiffs state that "presumably," "the installation of [carbon-capture] technology . . . would have to be considered when designing and manufacturing EPCA-covered products—precisely the kind of factory-floor complications that . . . EPCA preemption was designed to prevent." ECF 55, at 31. This is not "presumable." Even a quick internet search discloses examples of carbon-capture technology that can be installed in buildings without any apparent need to modify the design of existing appliances. *See, e.g.*, *Fit Guide*, CarbinX, https://www.carbinx.com/buy-carbinx [https://perma.cc/GC4B-T43P] (last visited Mar. 31, 2026) (marketing a carbon-capture unit "roughly the size of two refrigerators" that can be installed in mechanical rooms and "is compatible with UL category 1, 2 and 3 vented natural-gas heating appliances"); Paul Daling, *Innovation turns building vents into carbon-capture devices*, Univ. of Chicago Pritzker Sch. of Molecular Eng'g (Nov. 11, 2025), available at https://pme.uchicago.edu/news/innovation-turns-building-vents-carbon-capture-devices (describing recently-developed "carbon nanofiber direct air capture" filter that could be integrated into buildings' ventilation systems and "potentially turn every home, office, school or other building into a small carbon-capture system"). The plaintiffs offer no support for their assertion that carbon-capture technology requires making alterations to the design of appliances themselves, and the Court cannot take judicial notice of this presumed "fact."

The plaintiffs are incorrect. A monetary assessment is a penalty "only if it is sought for the purpose of punishment, and to deter others from offending in like manner." *Gonzalez v. Sessions*, 894 F.3d 131, 138 (4th Cir. 2018) (quoting *Kokesh v. S.E.C.*, 581 U.S. 455, 462 (2017)). Nothing about the BEPS' alternative compliance fee suggests that it qualifies, literally or functionally, as a penalty. The alternative compliance fee is assessed at the same rate for all who pay it. It is not imposed as a sanction for a violation of the BEPS. *See id.* ("To properly advance the[] punitive goals of retribution and deterrence, a particular punishment or penalty must account for the culpability flowing from the actor's underlying conduct."). It is, rather, an elective option—a *means of complying* with the law rather than a punishment for violating it. Moreover, as amicus Public Health Law Center observes, there is a preexisting penalty scheme under Maryland law for violating regulations such as the BEPS. *See* ECF 52, at 6. The state may pursue fines running into the tens of thousands of dollars against violators. *See* Md. Code Ann., Env't §§ 2-610, 2-610.1. There is no indication that the BEPS' alternative compliance fee was intended to supplant this penalty scheme.

True, as the plaintiffs argue, for some building owners, it may ultimately be more cost-effective to replace their gas appliances. But not even the *Berkeley* Court went so far as to conclude that EPCA preempts regulations that merely discourage gas usage. As one member of the panel explained in concurrence, "EPCA preemption is unlikely to reach a host of state and local regulations that incidentally impact" covered products' gas usage. *See Berkeley*, 89 F.4th at 1117 (Baker, J., concurring). Indeed, Judge Baker observed in his concurrence that "states and local governments are likely free to impose carbon taxes designed to discourage such consumption." *Id.* If that is so, it strains credulity to suggest that Maryland could not structure its building regulations in such a way as to render alternatives to gas appliances a more financially attractive option.

For plaintiffs with financial constraints, phasing out gas appliances may be the only feasible option. For them, the BEPS may effectively require, not merely encourage, the abandonment of gas appliances. Even if that meant the BEPS were preempted for those plaintiffs, the plaintiffs have brought a facial challenge: They ask this Court to find there is no set of circumstances under which the BEPS would be lawful under EPCA. To succeed on their facial challenge, the plaintiffs cannot point to *some* circumstances under which the BEPS would be preempted. Instead, they must plausibly allege that the BEPS would be preempted under *every* circumstance. *See, e.g.*, *Cal. Coastal Comm'n v. Granite Rock Co.*, 480 U.S. 572, 593 (1987) ("To defeat Granite Rock's facial [preemption] challenge [to the California Coastal Commission's permit requirement], the Coastal Commission needed merely to identify a possible set of permit conditions not in conflict with federal law."); *Iowa Migrant Movement for Just. v. Bird*, 157 F.4th 904, 919 (8th Cir. 2025) (noting that to defeat plaintiffs' preemption challenge to Iowa law, defendant needed to "show only that the Act '[was] constitutional in some of its applications'") (quoting *United States v. Rahimi*, 602 U.S. 680, 693 (2024)). They have not done so here. By the plaintiffs' own allegations, at least some of them *do* have a choice (albeit one they would rather not make) between replacing their gas appliances and pursuing another compliance option. *See, e.g.*, ECF 36 ¶ 14 (stating that members of Building Owners and Managers of Greater Baltimore "will incur costs in replacing existing gas appliances in order to comply with the . . . BEPS *or* will be forced to" pay the compliance fee) (emphasis added); *id.* ¶ 24 (stating that "[f]or those buildings that cannot comply with the . . . BEPS in an economically viable manner, *the best of a bad series of options* may be" to install "new structures, at great cost") (emphasis added). That dooms their facial preemption challenge.

The plaintiffs' challenge to the BEPS on federal preemption grounds fails.

**IV.      Conclusion**

For the foregoing reasons, the BEPS are not a regulation "concerning the energy efficiency [and] energy use" of consumer and industrial appliances covered by EPCA's preemption provisions, 42 U.S.C. §§ 6297(c) and 6316(b)(2)(A). The BEPS are not preempted by EPCA. MDOE's motion to dismiss is granted. This case is dismissed with prejudice because there are no facts the plaintiffs can allege to establish that EPCA preempts the BEPS. A separate Order follows.

Date: April 2, 2026 _____

_____
Deborah L. Boardman
United States District Judge